# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| CIERRA DUNN, VERCHON DEBROSSARD, MICHAEL KLINGENBERG, TRENTAE FUGATE, CAMERON LARD, SOPHIA JACOBSEN, JIVONTE JOHNSON, JAYVIONE LEWIS, MAKENZIE MOLER, JAQUAN PATTON, JOSHUA PETEFISH, EMMA TIMBERLAKE, HARRISON WOODS, and TONY YOUNG, | 4:21-cv-00053-SHL-HCA |
| **Plaintiffs,** | |
| vs. | **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| JOHN DOE 1 – 22, IAN LAWLER, MICHAEL MCCTAGGART, BRANDON HOLTAN, CHRIS HARDY, BRENDAN EGAN, JEREMY BETTS, TYLER PALMER, DAVE CHIODO, TIMOTHY COUGHENNOWER, BENJAMIN MCCARTHY, NICK SMITH, ADAM HERMAN, TODD WILSHUSEN, KEN CALLAHAN, RYAN ARMSTRONG, TYLER MOFFATT, JACOB HEDLUND, KYLE GRUVER, NICHOLAS VALENTINE, CLARK ALLEN, ERNESTO ESCOBAR HERNANDEZ, CHAD NICOLINO, JEFFREY GEORGE, BRADLEY YOUNGBLUT, JAKE FORRESTER, KIRK BAGBY, DANA WINGERT, CITY OF DES MOINES, IOWA, POLK COUNTY, IOWA, CITY OF WEST DES MOINES, IOWA and CITY OF ALTOONA, IOWA, | |
| **Defendants.** | |

**TABLE OF CONTENTS**

I.     Introduction…………………………………………………………....1

II.    Summary of Rulings…………………………………………………..1

III.   Background Facts Applicable to All Plaintiffs……………………....5

    A.  *Interactions between Protesters and Law Enforcement Officers*
       *On May 30 and 31, 2020, in Des Moines, Iowa*…………………………….......5

    B.  *Facts Regarding Supervisory and Government Entity Defendants*………………….13

       1.  Des Moines Police Chief Dana Wingert…………………………………13

       2.  Des Moines Police Lieutenant Kirk Bagby…………………………....14

       3.  Des Moines Police Captain Michael McTaggart…………………………15

       4.  Government Entity Defendants…………………………………………16

IV.   Legal Background – Summary Judgment and Qualified Immunity Standards……19

    A.  *Summary Judgment Standards*……………………………………………19

    B.  *Federal Law Qualified Immunity Standards*……………………………………19

       1.  Qualified Immunity for Individual Officers under Federal Law………………...19

       2.  Qualified Immunity for Supervisors and Government Entities under
          Federal Law……………………………………………………………...20

    C.  *State Law Qualified Immunity Standards*………………………………………21

       1.  Qualified Immunity for Individual Officers under Iowa Law…………………...22

       2.  Qualified Immunity for Supervisors and Government Entities under
          *Baldwin*………………………………………………………………24

    D.  *State Law Statutory Immunity Standards*………………………………………25

V.    Legal Background – Unlawful Seizure and False Arrest Claims (Counts I, II,
    and VIII)………………………………………………………………...25

    A.  *Federal Law Unlawful Seizure Claims (Count I)*………………………………25

    B.  *State Law Unlawful Seizure Claims (Count II)*…………………………………26

    C.  *State Law False Arrest Claims (Count VIII)*……………………………………28

VI.   Overarching Legal Analysis – Unlawful Seizure and False Arrest Claims…………..28

    A.  *Officers Did Not Have Arguable Probable Cause to Arrest Plaintiffs for*
       *Failure to Disperse or Unlawful Assembly Based Solely on Plaintiffs'*
       *Presence Near 3rd Street and Court Avenue after 2:40 a.m*…………………………28

    B.  *For Purposes of the State Law* Godfrey *Claims for Unlawful Seizure, Officers*
       *Did Not Have a Lawful Basis to Arrest Plaintiffs for Failure to Disperse or*
       *Unlawful Assembly Based Solely on Plaintiffs' Presence Near 3rd Street*
       *and Court Avenue after 2:40 a.m*…………………………………………..…38

    *C.*  *The Emergency Response Immunity Defense Is Available on Plaintiffs' False Arrest Claims*……………………………………………………………………….………40

**VII.**   **Specific Legal Analysis – Unlawful Seizure and False Arrest Claims**………………41

    *A.*  *Plaintiff Harrison Woods*……………………………………………………………41

        1.  Facts Specific to Woods……………………………………………………………41

        2.  The Court Grants Summary Judgment in Favor of Defendants McTaggart and Bagby on Woods's Count I…………………………………………………………45

        3.  The Court Denies Both Sides' Motions for Summary Judgment on Woods's Count II………………………………………………………………………………48

        4.  The Court Grants Summary Judgment in Favor of Defendants McTaggart and Bagby on Woods's Count VIII……………………………………………………...51

    *B.*  *Plaintiff Michael Klingenberg*………………………………………………………52

        1.  Facts Specific to Klingenberg………………………………………………………52

        2.  The Court Denies Both Sides' Motions for Summary Judgment on Klingenberg's Count I except as to Defendants Bagby and McTaggart, Both of Whom Are Entitled to Summary Judgment ……………………………………...54

        3.  The Court Denies Both Sides' Motions for Summary Judgment on Klingenberg's Count II………………………………………………………………...58

        4.  The Court Grants Summary Judgment in Favor of All Relevant Defendants on Klingenberg's Count VIII except Defendants Holtan and Herman on the Issue of Punitive Damages………………......................................................59

    *C.*  *Plaintiff Mackenzie Moler*…………………………………………………………60

        1.  Facts Specific to Moler……………………………………………………………..60

        2.  The Court Denies Both Sides' Motions for Summary Judgment on Moler's Count I as to Defendant Forrester but Grants Summary Judgment in Favor of of Defendants McTaggart and Bagby…………………………………………64

        3.  The Court Denies Both Sides' Motions for Summary Judgment on Moler's Count II………………………………………………………………………………...67

        4.  The Court Grants Summary Judgment in Favor of All Relevant Defendants on Moler's Count VIII except Defendant Forrester on the Issue of Punitive Damages…………………………………………………………………67

    *D.*  *Plaintiff Joshua Petefish*……………………………………………………...68

        1.  Facts Specific to Petefish…………………………………………………………68

        2.  The Court Denies Both Sides' Motions for Summary Judgment on Petefish's Count I as to Defendant Lawler but Grants Summary Judgment in Favor of Defendants McTaggart and Bagby…………………………………………72

        3.  The Court Denies Both Sides' Motions for Summary Judgment on Petefish's Count II………………………………………………………………………………...75

4. The Court Grants Summary Judgment in Favor of Relevant Defendants on Petefish's Count VIII except Defendant Lawler on the Issue of Punitive Damages..................................................................... 76

E. *Plaintiffs Cameron Lard and Verchon DeBrossard*......................................76

1. Facts Specific to Lard and DeBrossard..........................................76

2. The Court Denies Both Sides' Motions for Summary Judgment on Lard's and DeBrossard's Count I except as to Defendants Bagby and McTaggart, Both of Whom Are Entitled to Summary Judgment.................................80

3. The Court Denies Both Sides' Motions for Summary Judgment on Lard's and DeBrossard's Count II.................................................84

4. The Court Grants Summary Judgment in Favor of Defendants Bagby and McTaggart on Lard's and DeBrossard's Count VIII but Denies Summary Judgment as to Other Relevant Defendants on the Issue of Punitive Damages........................................................84

F. *Plaintiffs Jaquan Patton, Emma Timberlake, Tony Young, Sophia Jacobsen, Jivonte Johnson, and Jayvione Lewis*......................................................85

1. Facts Specific to Patton, Timberlake, Young, Jacobsen, Johnson, and Lewis......85

2. The Court Grants Summary Judgment in Favor of Patton, Timberlake, Young, Jacobsen, Johnson, and Lewis on Count I as to Each Defendant Shown by Undisputed Evidence to Have Been Directly Involved in the Arrests and in Favor of Defendants Nicolino, George, McTaggart and Bagby.....................95

3. The Court Grants Summary Judgment in Favor of Patton, Timberlake, Young, Jacobsen, Johnson, and Lewis on Count II as to Each Defendant Shown by Undisputed Evidence to Have Been Directly Involved in the Arrests and in Favor of Defendants Nicolino and George...................................102

4. The Court Grants Summary Judgment for All Defendants on the False Arrest Claims except as to Claims for Punitive Damages Against Officers Directly Involved in the Arrests.......................................103

G. *Plaintiffs Cierra Dunn and Trentae Fugate*.............................................104

1. Facts Specific to Dunn and Fugate..................................................104

2. The Court Grants Summary Judgment in Favor of All Relevant Defendants on Dunn's and Fugate's Count I.............................................107

3. The Court Grants Summary Judgment in Favor of All Relevant Defendants on Dunn's and Fugate's Count II............................................108

4. The Court Grants Summary Judgment in Favor of All Relevant Defendants on Dunn's and Fugate's Count VIII...........................................108

VIII. **Legal Background – Excessive Force and Assault and Battery Claims (Counts III, IV, and IX)**.......................................................................108

A. *Federal Law Excessive Force Claims (Count III)*......................................108

  *B. State Law Excessive Force Claims (Count IV)*……………………………………..109

  *C. State Law Assault and Battery Claims (Count IX)*…………………………………110

**IX.** **Legal Analysis – Excessive Force and Assault and Battery Claims**…………………110

  *A. The Court Denies Summary Judgment as to Defendant John Doe on Woods's Excessive Force Claims but Grants Summary Judgment in John Doe's Favor on Woods's Assault and Battery Claim*……………………………………………..111

  *B. The Court Grants Summary Judgment in Favor of All Relevant Defendants on Moler's Excessive Force and Assault and Battery Claims*…………………………..112

  *C. The Court Denies Summary Judgment as to Defendant John Doe on Petefish's Excessive Force Claims but Grants Summary Judgment in John Doe's Favor on Petefish's Assault and Battery Claim*……………………………………114

  *D. The Court Grants Summary Judgment for Some Defendants (but not Others) on Lard's Excessive Force and Assault and Battery Claims*……………………………115

**X.** **Background and Analysis – Malicious Prosecution Claims (Counts VII and XII)**…118

  *A. Federal Law Malicious Prosecution Claims (Count VII)*…………………………..118

   1. The Court Will Assume without Deciding that Plaintiffs Have Shown a Sufficient Impairment of Their Fourth Amendment Rights to Proceed on a Section 1983 Claim Based on Malicious Prosecution…………………………..119

   2. The Court Will Assume without Deciding that the Federal Malicious Prosecution Claims Are Viable in Other Relevant Respects……………………120

   3. The Relevant Defendants Have Not Shown They Are Entitled to Summary Judgment on the Federal Malicious Prosecution Claims……………122

  *B. The Court Grants Summary Judgment in Favor of All Relevant Defendants on Plaintiffs' State Law Malicious Prosecution Claims (Count XII)*…………………..124

**XI.** **Background and Analysis – State Law Recklessness Claims (Count X)**……………125

**XII.** **Legal Background – Failure to Train/Supervise (Counts V and VI) and Respondeat Superior (Count XI) Claims**……………………………………………..125

  *A. Federal Law Failure to Train/Supervise Claims (Count V)*………………………..125

  *B. State Law Failure to Train/Supervise (Count VI) and Respondeat Superior (Count XI) Claims*…………………………………………………………………………127

**XIII.** **Legal Analysis – Failure to Train/Supervise (Counts V and VI) and Respondeat Superior (Count XI) Claims**……………………………………………… 127

  *A. All Supervisor and Entity Defendants Are Entitled to Summary Judgment on the Failure to Train/Supervise Claims*………………………………………………127

  *B. The Entity and Supervisory Defendants Are Entitled to Summary Judgment on the State Law Failure to Train/Supervise Claims*...…………………………………129

  *C. The Court Grants in Part and Denies in Part Summary Judgment on the State Law Respondeat Superior Claims against the Entity Defendants, Consistent with*

*the Court's Rulings on the Predicate Claims against Individual Officers*............130

    1.  <u>For All Defendants except John Does, the Outcome of the *Respondeat Superior* Claims Tracks the Outcome of the Claims against Individual Defendants</u>.............................................................................131

    2.  <u>The Court Denies the City of Des Moines' Motion for Summary Judgment with Respect to John Doe Defendants</u>..................................................131

**XIV.  Conclusion**.................................................................................**135**

# I. Introduction.

Police work is difficult, particularly in times of civil unrest. Nonetheless, the United States and Iowa Constitutions place limits on what law enforcement officers can do, and officers can be held liable in some instances when those Constitutional boundaries are crossed. This case requires the Court to decide whether the fourteen Plaintiffs have met their burden of proving that some or all of the fifty-three Defendants crossed the line in making arrests and using force in the aftermath of protests in downtown Des Moines, Iowa, following George Floyd's death in May 2020.

The Court concludes that some Plaintiffs have met their burden, including, for example, six Plaintiffs who were arrested in the early morning hours of May 31 after doing nothing more than parking a car and walking toward an apartment building after not having been present for any protests at any point during the night. Law enforcement officers did not have probable cause—or even *arguable* probable cause—to arrest them. Similarly, two Plaintiffs were told by officers they could leave the scene of unlawful activity only to be arrested while attempting to do so, and a third was arrested for the crime of failure to disperse from an unlawful group despite standing by himself. These Plaintiffs, too, have established sufficient facts to conclude the officers violated their Fourth Amendment rights. Some Plaintiffs also have established sufficient facts to allow a reasonable juror to conclude that excessive force was used, including two Plaintiffs who were pepper-sprayed despite allegedly not resisting arrest or otherwise engaging in threatening activity.

In other instances, the Court concludes summary judgment should be granted in favor of Defendants. For example, some Defendants reasonably believed a crime had been committed and therefore are not liable for unlawful seizure even if prosecutors later decided there was not enough evidence to prove the crime beyond a reasonable doubt. The Court also grants summary judgment in favor of supervisors and government entities on many claims, as Plaintiffs have not shown that these supervisors or entities had a "custom or practice" of making unlawful arrests or using excessive force or were "deliberately indifferent" to the possibility of such things. Instead, at most, Plaintiffs have shown that individual officers exceeded constitutional lines in specific instances. The Court also grants summary judgment on some claims based on other principles of federal and/or state law that limit liability for alleged constitutional and common law torts.

# II. Summary of Rulings.

The Court is obligated to independently analyze the merits of each claim by each Plaintiff against each Defendant to determine whether summary judgment should be granted. In a case

where fourteen Plaintiffs are bringing up to twelve claims each against some combination of fifty-three Defendants (counting John Does), this is a massive task. By the Court's calculation—and keeping in mind that there are cross-motions for summary judgment on many claims—there are approximately 800 unique summary judgment rulings that must be made in this Order. There is no concise way to summarize so many rulings, and thus the Court will simply list which of each Plaintiff's claims survive summary judgment for reasons explained in detail later in the Order:

**Plaintiff Harrison Woods—claims that survive summary judgment**:

- Count II against Defendants Michael McTaggart and Kirk Bagby;
- Count IV against Defendant John Doe;
- Count VII against Defendants McTaggart and Bagby; and
- Count XI against Defendant City of Des Moines.

**Plaintiff Michael Klingenberg—claims that survive summary judgment:**

- Count I against Defendants Benjamin McCarthy, Brandon Holtan, and Adam Herman;
- Count II against Defendants McCarthy, Holtan, Herman, McTaggart, and Bagby;
- Count VII against Defendants McCarthy, McTaggart, Bagby, Clark Allen, and Ernesto Escobar-Hernandez;
- Count VIII against Defendants Holtan and Herman (as to punitive damages only); and
- Count XI against Defendant City of Des Moines.

**Plaintiff Makenzie Moler—claims that survive summary judgment:**

- Count I against Defendant Jake Forrester;
- Count II against Defendants Forrester, McTaggart, and Bagby;
- Count VII against Defendants Forrester, McTaggart, Bagby, Allen, and Escobar-Hernandez;
- Count VIII against Defendant Forrester (as to punitive damages only); and
- Count XI against Defendants City of Des Moines and City of West Des Moines.

**Plaintiff Joshua Petefish—claims that survive summary judgment:**

- Count I against Defendant Ian Lawler;
- Count II against Defendants Lawler, McTaggart, and Bagby;
- Count IV against Defendant John Doe;
- Count VII against Defendants Lawler, McTaggart, and Bagby;
- Count VIII against Defendant Lawler (as to punitive damages only); and

- Count XI against Defendant City of Des Moines.

**Plaintiffs Cameron Lard and Vernon DeBrossard—claims that survive summary judgment:**

- Count I against Defendants Chris Hardy, Brendan Egan, Jeremy Betts, Kyle Gruver, Nicholas Valentine, Timothy Coughennower, and Bradley Youngblut;

- Count II against Defendants Hardy, Egan, Betts, Gruver, Valentine, Coughennower, McTaggart, Bagby, and Youngblut;

- Count III (Plaintiff Lard only) against Defendants Betts and Coughennower;

- Count IV (Plaintiff Lard only) against Defendants Betts and Coughennower;

- Count VII against Defendants Hardy, Egan, Betts, Gruver, Valentine, Coughennower, McTaggart, and Bagby;

- Count VIII against Defendants Hardy, Egan, Betts, Gruver, Valentine, and Coughennower (as to punitive damages only);

- Count IX (Plaintiff Lard only) against Defendants Betts and Coughennower (as to punitive damages only); and

- Count XI against Defendant City of Des Moines.

**Plaintiff Jaquan Patton—claims that survive summary judgment:**

- Count I against Defendants Ryan Armstrong, Forrester, and Youngblut (with partial summary judgment granted in favor of Patton as to all three);

- Count II against Defendants Armstrong, Forrester, and Youngblut (with partial summary judgment granted in favor of Patton as to all three), as well as Defendants McTaggart and Bagby;

- Count VII against Defendants Armstrong, Forrester, McTaggart, and Bagby;

- Count VIII against Defendants Armstrong and Forrester (as to punitive damages only); and

- Count XI against Defendants City of Des Moines (with partial summary judgment granted in favor of Patton) and City of West Des Moines.

**Plaintiff Sophia Jacobsen—claims that survive summary judgment:**

- Count I against Defendants Armstrong and Tyler Palmer (with partial summary judgment granted in favor of Jacobsen as to both);

- Count II against Defendants Armstrong and Palmer (with partial summary judgment granted in favor of Jacobsen as to both), as well as Defendants McTaggart and Bagby;

- Count VII against Defendants Armstrong, Palmer, McTaggart, and Bagby;

- Count VIII against Defendants Armstrong and Palmer (as to punitive damages only); and

- Count XI against Defendants City of Des Moines (with partial summary judgment granted in favor of Jacobsen) and City of Altoona.

**Plaintiff Jivonte Johnson—claims that survive summary judgment:**

- Count I against Defendants Armstrong, Moffatt, and Youngblut (with partial summary judgment granted in favor of Johnson as to all three);

- Count II against Defendants Armstrong, Moffatt, and Youngblut (with partial summary judgment granted in favor of Johnson as to all three), as well as Defendants McTaggart and Bagby;

- Count VII against Defendants Armstrong, Moffatt, McTaggart, and Bagby;

- Count VIII against Defendants Armstrong and Moffatt (as to punitive damages only);

- Count XI against Defendants City of Des Moines (with partial summary judgment granted in favor of Johnson) and City of Altoona.

**Plaintiff Jayvione Lewis—claims that survive summary judgment:**

- Count I against Defendants Armstrong, Holtan, Youngblut, Jacob Hedlund, Dave Chiodo, and Todd Wilshusen (with partial summary judgment granted in favor of Lewis as to all but Wilshusen);

- Count II against Defendants Armstrong, Holtan, Youngblut, Hedlund, Chiodo, and Wilshusen (with partial summary judgment granted in favor of Lewis as to all but Wilshusen), as well as Defendants McTaggart and Bagby;

- Count VII against Defendants Armstrong, Holtan, Hedlund, Chiodo, Wilshusen, McTaggart, and Bagby;

- Count VIII against Defendants Armstrong, Holtan, Hedlund, Chiodo, and Wilshusen (as to punitive damages only); and

- Count XI against Defendant City of Des Moines (with partial summary judgment granted in favor of Lewis).

**Plaintiff Emma Timberlake—claims that survive summary judgment:**

- Count I against Defendants Armstrong and Nick Smith (with partial summary judgment granted in favor of Timberlake as to Armstrong but not Smith);

- Count II against Defendants Armstrong and Smith (with partial summary judgment granted in favor of Timberlake as to Armstrong but not Smith), as well as Defendants McTaggart and Bagby;

- Count VII against Defendants Armstrong, Smith, McTaggart, and Bagby;

- Count VIII against Defendants Armstrong and Smith (as to punitive damages only); and

- Count XI against Defendants City of Des Moines (with partial summary judgment granted in favor of Timberlake) and Polk County.

**Plaintiff Tony Young—claims that survive summary judgment:**

- Count I against Defendants Armstrong and Youngblut (with partial summary judgment granted in favor of Young);

- Count II against Defendants Armstrong and Youngblut (with partial summary judgment granted in favor of Young), as well as Defendants McTaggart and Bagby;

- Count VII against Defendants Armstrong, McTaggart, and Bagby;

- Count VIII against Defendant Armstrong (as to punitive damages only);

- Count XI against Defendant City of Des Moines (with partial summary judgment granted in favor of Young).

**Plaintiffs Cierra Dunn and Trentae Fugate—claims that survive summary judgment:**

- Count VII against Defendants Holtan, Moffatt, McTaggart, Palmer, and Bagby.

## III. Background Facts Applicable to All Plaintiffs.[1]

### A. *Interactions between Protesters and Law Enforcement Officers on May 30 and 31, 2020, in Des Moines, Iowa.*

Following George Floyd's death on May 25, 2020, protests arose across the United States, including in Des Moines. (ECF 198-2, ¶¶ 39, 43–44.) The first large scale protests in Des Moines took place on May 29, 2020, and were focused on the Des Moines Police Department's alleged disparate treatment of racial minorities. (Id., ¶¶ 48–49.) The initial protest on May 29 remained peaceful throughout the window of time organizers had planned for the event. (Id., ¶ 50.) But after the organized demonstration ended, several people stayed behind and damaged police vehicles, launched rocks and containers at officers, and pushed against police skirmish lines. (Id., ¶ 51.)

---

[1] There are four entity Defendants: Polk County and the Cities of Des Moines, Altoona, and West Des Moines. There are fifty-three individual Defendants, the vast majority of whom are employees of the City of Des Moines (and twenty-two of whom are identified only as "John Doe"). Collectively, the City of Des Moines and its employee-Defendants will be referred to in this Order as the "City of Des Moines Defendants." The other entities (and their respective employee-Defendants) will be referred to as the "Polk County Defendants," "City of West Des Moines Defendants," and "City of Altoona Defendants," respectively.

One or more of the City of Des Moines Defendants is involved in virtually every claim in the case, and thus the facts set forth in this Background section are derived primarily from Plaintiffs' and the City of Des Moines Defendants summary judgment filings. The role of the Polk County, City of Altoona, and City of West Des Moines Defendants in this litigation is more limited. Nonetheless, where they have raised genuine issues of disputed fact, the Court also will cite to their papers, especially in connection with Plaintiffs who have raised claims against non-City of Des Moines Defendants. Notably, there are situations where the City of Des Moines Defendants admitted certain facts that were contested by one or more of the other groups of Defendants, or vice versa. This adds complexity to an already complex summary judgment record. Still, where the dichotomy is material, the Court will identify and discuss it.

The record includes extensive video footage of relevant events, which the Court has relied upon heavily to help provide clarity or context for disputed facts. The resolution of the many legal and factual issues also depends in part on an understanding of Des Moines geography (including the location of area businesses) as of May 30 and 31, 2020. In appropriate circumstances, the Court has taken judicial notice of Des Moines geography and business addresses.

Eventually, officers used pepper spray and tear gas to disperse protesters, but not before several buildings were damaged near the Des Moines Police Station on East Court Avenue between East 1st and 2nd Streets. (Id., ¶¶ 52–53.)

The protests at issue in this case occurred the following night, May 30, 2020, and carried over into the early morning hours of May 31. (Id., ¶ 54.) Relevant events occurred in various places in and near downtown Des Moines, including: (i) the Iowa State Capitol Building, which is located on the far eastern edge of what might be considered downtown Des Moines; (ii) the Police Station (i.e., the same site as events the prior night); and (iii) the Court Avenue District, which is a hub of businesses, bars, and restaurants located on Court Avenue between approximately 2nd and 5th Avenues. The Court Avenue District is west of the Des Moines River and approximately three-tenths to four-tenths of a mile from the Police Station. It is more than one mile from the Iowa Capitol Building.

Like the night before, the protests on May 30 began peacefully, but, between 9:30 and 10:00 p.m., a small handful of people broke windows and one person attempted to burn down the Polk County Courthouse, located west of the Court Avenue District between 5th and 6th Avenues. (Id., ¶¶ 54–56.) Officers were sent to protect the Polk County Courthouse and the adjacent Criminal Courts Building because approximately 200 people had congregated in the area. (Id., ¶¶ 57, 60.) The group began to approach the officers guarding the buildings before dispersing west on Cherry Street. (Id., ¶ 63.) A few people threw objects at the officers, but Plaintiffs allege this occurred only after an officer needlessly pepper-sprayed a protester who was on the sidewalk livestreaming events on Facebook. (Id., ¶¶ 60–63.) In any event, officers eventually used chemical agents to disperse the crowd. (Id., ¶ 62.)

Shortly after 10:00 p.m., several hundred people began walking east on Court Avenue toward the Iowa Capitol Building, which is more than one mile east of the Polk County Courthouse. (Id., ¶¶ 65, 69.) Most protesters were peaceful, but on several occasions projectiles were thrown toward officers. (Id., ¶ 72.) At 10:29 p.m., as the group neared the Capitol, officers deployed tear gas. (Id., ¶¶ 71–73.) At approximately 11:07 p.m., officers at the Capitol issued an order declaring an illegal assembly. (Id., ¶ 76.) In the next five minutes, officers gave three more dispersal orders. (Id., ¶¶ 78–82.) Some people dispersed, but most did not. (Id., ¶¶ 79, 81.) At 11:16 p.m., officers deployed pepper spray and teargas. (Id., ¶¶ 78–84.) The crowd slowly backed away to the west of the Capitol grounds over the next forty minutes. (Id., ¶ 85.) By 11:59 p.m., a

group of protesters was moving west down Locust Street, a main thoroughfare two blocks north of Court Avenue, away from the Capitol. (Id., ¶ 86.)

Over the next twenty minutes, protestors crossed the Des Moines River while heading west on Grand Avenue (which is one block north of Locust Street) before turning south to the intersection of 3rd Street and Court Avenue—in the heart of the Court Avenue District. (Id., ¶¶ 87–90.) Once there, at 12:19 a.m., the protesters started marching back east toward the Police Station. (Id., ¶ 91.) The crowd numbered approximately 200 to 250 people. (Id., ¶ 92.) In response, officers formed a scrimmage line between the Police Station and Federal Annex on East Court Avenue, just east of the Des Moines River. (Id., ¶ 93.) This included officers assigned to "Metro STAR," a special tactical team comprised of officers from the Des Moines Police Department, the Polk County Sheriff's Office, and a small number of surrounding suburbs. (Id., ¶ 94.)[2]

As protestors headed east across the Court Avenue bridge and approached the scrimmage line at approximately 12:24 a.m., officers were given authority to use tear gas as a dispersant. (Id., ¶¶ 92, 95–98.) Several law enforcement officers could be heard on body cameras telling protesters to "get off the street," "go home," and "leave or get gassed." (Id., ¶ 99.) Officers deployed teargas at 12:26 a.m. and broadcast an order to the crowd to "clear the [Court Avenue] bridge." (Id., ¶¶ 103–04.) The crowd retreated to the west, with some people (but not necessarily the <u>same</u> people) concentrating in the area around 3rd Street and Court Avenue. (Id., ¶¶ 105–07.)

At 12:45 a.m., in the 200 block of Court Avenue, someone threw an object from a parking garage that struck Des Moines Police Officer Brady Pratt on the head and knocked him to the ground. (Id., ¶ 108.) Pratt escaped serious injury only because of his helmet. (Id.) At approximately 1:00 a.m., police and protesters formed competing skirmish lines on Court Avenue, with police pulling back into the East Village to the Police Station and protesters slowly walking east toward them. (Polk County Drone Footage[3] DJI_0477, :01–:15.) The parties dispute the number of protesters involved at this point, with Plaintiffs alleging the group had dwindled to no more than fifty, in contrast to approximately sixty officers. (ECF 198-2, ¶¶ 101, 109.) Defendants do not

---

[2] "STAR" is an acronym for "Special Tactics and Response Unit." (ECF 198-2, ¶ 46.) Metro STAR's primary mission is to provide a professional response to emergency situations and critical incidents and its officers are specially trained and outfitted for this purpose. (Id., ¶ 47.)

[3] The parties provided video footage from many sources, including security cameras, drone footage, video footage taken by Plaintiffs, and video footage taken by other citizens who were present at relevant events. References to "DJI_0477" are to drone video footage found in the record at ECF 170-4, p. 907. The time stamp on the drone footage appears to have no relationship to the time of day.

admit this, but also do not allege a specific number of protesters. (Id., ¶ 109.) Drone video footage shows that police officers outnumbered protesters in the skirmish line. (DJI_0477, :01–:15.)

The next hour was relatively uneventful and passed without large-scale clashing. At 2:00 a.m., there were still people in the Court Avenue District, primarily between 2nd Avenue and 3rd Street. (ECF 198-2, ¶ 110.) The parties characterize those people differently. The City of Des Moines Defendants describe them as protesters who "did not disperse" and "reformed into a sizeable group." (Id.) Plaintiffs describe the crowd as a mix of protesters and "individuals from the Court Avenue bar scene" who, regardless of origin, "were largely just hanging out." (Id.) Polk County and the Cities of West Des Moines and Altoona Defendants agree more with Plaintiffs, admitting the crowd was not acting violently, but "merely standing around, mingling and dancing." (ECF 194-1, ¶ 24; ECF 190-1, ¶ 24.)

Video footage largely supports Plaintiffs' position. One bystander's video shows a group of approximately fifty to one hundred people in the street listening to music and displaying, at most, occasional passive acts of protest such as lifting signs, raising their fists, or chanting. (Jon_Carmichael_Facebook[4], :00–7:37.) There were occasional moments of discord, such as when a police vehicle came within approximately one hundred feet of a group (ECF 198-2, ¶ 111), but officers made no effort to break up the crowd or prevent ingress or egress from the area (id., ¶ 159). By shortly after 2:00 a.m., the scene had become calm enough that Des Moines Police Chief Dana Wingert gave a speech to officers thanking them for their work and dismissing them for the night. (Id., ¶ 112; ECF 193, ¶¶ 19–21; ECF 190-1, ¶¶ 19–21; ECF 194-1, ¶¶ 19–21.)

At around 2:25 a.m., however, the crowd unexpectedly became agitated and violent, with a group blocking traffic along Court and 2nd Avenues. (ECF 198-2, ¶ 113The crowd had grown to approximately one hundred people by this point, although it is difficult to tell which of these were protesters and which were people who had left Court Avenue bars at 2 a.m. closing time and were simply watching. (Carmichael, 12:21–24:33.) Regardless, some people threw objects at vehicles, set off fireworks, set up a barricade of garbage cans to block police on the other side of Court Avenue, chased civilian vehicles, and broke windows in the parking garage at 3rd Street and Court Avenue (hereinafter, the "3rd and Court Parking Garage"). (ECF 198-2, ¶¶ 113–17.)

---

[4] References to "Carmichael" are to video footage taken by Jon Carmichael and found in the record at ECF 170-4, p. 908. The time stamp on the Carmichael footage appears to have no relationship to the time of day.

Around 2:30 a.m., part of the crowd broke off and started walking west along Court Avenue. (Id., ¶ 116; ECF 190-1, ¶ 29; ECF 193, ¶ 29; ECF 194-1, ¶ 29; Carmichael, 24:27–25:07.) Others remained behind near the intersection of 2nd and Court. (Carmichael, 25:00–25:05, 25:38–26:06.) The group that broke off, comprised at the front of approximately fifteen to thirty people, shattered windows at private businesses on the north and south sides of Grand Avenue, including Tonic Bar and Johnny's Hall of Fame, as well as additional windows at the 3rd and Court Parking Garage. (ECF 198-2, ¶¶ 117, 120–21, 130; Carmichael, 25:20–31:28.) Someone also threw fireworks inside Tonic Bar, and people went inside and took items out of the business. (ECF 198-2, ¶¶ 121–22.) In the words of a bystander livestreaming the events, people were "just going down the street breaking windows now." (Id., ¶ 130.) Alarms could be heard, and reports were made to the police regarding property destruction and theft on Court Avenue. (Id., ¶¶ 124–25.) Some people who were not part of the break-off group nonetheless began to follow to the west, apparently out of curiosity, often filming on their phones. (Carmichael, 30:12–30:58, 31:18–31:28.)

By 2:35 a.m., the epicenter of activity was the Hy-Vee grocery store on Court Avenue, which essentially fills the block between 4th Street and 5th Avenue. (ECF 198-2, ¶¶ 128, 131.) The group migrating west had grown by this point from the initial fifteen to at least fifty, consisting of some people engaged in overt criminal acts and others merely watching. (Carmichael, 32:29–33:03; 4th Court HyVee Cam West[5], 2:36:24.) The people who reached Hy-Vee first broke the store's windows and went inside. (ECF 198-2, ¶¶ 133, 137; Hy-Vee Cam West, 2:34:07–2:36:24.)

This migration of the violent members of the crowd to the west is pivotal to the case and perhaps best captured by video footage from a Polk County drone hovering over the Court Avenue District. (Polk County Drone Footage DJI_0291[6].) The drone footage shows that, as of approximately 2:30 a.m., there was a sizeable crowd at the intersection of 2nd and Court, but a significant portion of the crowd was beginning to move to the west. (DJI_0291, :00–1:00.) Within three minutes, almost the entire crowd was on the move and the once-crowded intersection was nearly empty. (*Compare* DJI_0291 :00–1:00 *with* 3:36–4:00.) The drone shows the crowd moving

---

[5] The record includes video footage from many security cameras in or near the Court Avenue District. References to "Hy-Vee Cam West" are to footage from a Hy-Vee security camera near the intersection of 4th Street and Court Avenue, facing west. It can be found in the record at ECF 170-4, p. 887. The footage has a time stamp that the parties appear to agree accurately captures the time of day.

[6] "DJI_0291" refers to Polk County drone footage found in the record at ECF 170-4, p. 905. The video does not include a timestamp, but the parties appear to agree that it starts at approximately 2:30 a.m. (*See* ECF 198-2, ¶ 116.)

steadily to the west and engaging in sporadic acts of violence before concentrating just outside the entrance to Hy-Vee at 2:36 a.m. (DJI_0291, 4:01–5:34.)

In response to the renewed unrest, officers swept into the Court Avenue District from the east (i.e., from the direction of the Police Station), with the first large wave of officers heading straight to Hy-Vee in armored vehicles in pursuit of the unruly crowd at that location. (ECF 198-2, ¶¶ 134, 138–39, 147; Downtown Camera 3rd-Court NE-SW Cam[7], 2:36:29–2:38:08.) There were so many officers heading to Hy-Vee that their vehicles more or less back-filled the eastern half of the 300 block of Court Avenue. (NE-SW Cam, 2:36:29–2:38:08.) When officers reached Hy-Vee at approximately 2:37 a.m., the unruly crowd dispersed from there in multiple directions, but, according to Plaintiffs, not to the east. (ECF 198-2, ¶¶ 138–41.) In other words, according to Plaintiffs (and consistent with common sense), none of the people responsible for the unlawful activity at Hy-Vee attempted to flee in the direction of the officers moving toward them on Court Avenue. (Id.; Hy-Vee Cam West, 2:37:00–2:37:20; Carmichael, 34:06–34:36; DJI_0291, 5:35–5:47.) Video footage confirms this. (Id.) It shows that the people who fled from Hy-Vee ended up further west at the Criminal Justice building at 6th and Cherry Streets (id.; ECF 198-2, ¶ 142) or south of the Polk County Courthouse, which is located near the intersection of 5th and Court Avenues (id., ¶ 144). None of the fourteen Plaintiffs were seen or arrested at those locations.

Although the initial waves of officers went straight to Hy-Vee upon arriving in the Court Avenue District around 2:37 a.m., there were secondary waves of officers following close behind who began interacting with people further to the east, including near the intersection of 3rd Street and Court Avenue. (NE-SW Cam, 2:43:13–2:44:32.) Officers had been directed to "clear Court Avenue and surrounding areas" and "prevent further reconstitution of riotous groups and further destruction of property." (ECF 198-2, ¶¶ 134, 138–39, 147.)

The area near 3rd and Court was already essentially peaceful by the time the secondary waves of officers arrived there. (NE-SW Cam, 2:40:00–2:43:12.) The record—including, especially, the extensive video footage—provides at least two apparent reasons for this. First, the primary agitators in the crowd were in the group that had gone west down Court Avenue toward Hy-Vee approximately ten minutes earlier (DJI_0291), and thus anyone who remained behind near

---

[7] "NE-SW Cam" refers to surveillance footage taken by a camera located on the northeast corner of the intersection of 3rd Street and Court Avenue facing southwest into the intersection. It is found in the record at ECF 170-4, p. 892. There is a timestamp superimposed on the footage, which the parties appear to agree accurately represents the time of day.

3rd and Court had essentially "opted out" of being part of that violent group. Second, many of the bystanders near the 3rd and Court intersection responded to the increased police presence by walking or running away to the north or south. (NE-SW Cam, 2:38:17-2:38:45.) Thus, by approximately 2:40 a.m., there was no significant crowd near that intersection, but rather small groups of isolated people whom Plaintiffs characterize as "stragglers." (Id., 2:40:00.)

Video footage captures instances of inexplicable police conduct near the 3rd and Court intersection shortly after 2:40 a.m. For example, at one point, video shows an officer pepper-spraying a man from close range without provocation while the man crossed the street. (Id., 2:43:16–2:43:24.) The man then ran away without being pursued. (Id.) A few feet away, a different officer kicked a man twice who was already kneeling on the ground. (Id., 2:43:25–2:43:34.) The man similarly rose and ran away without being pursued. (Id.) The video also shows officers surround a middle-aged man near an intersection. (Id., 2:43:24–2:43:30.) Officers outnumbered him roughly ten-to-one, and he did not appear to be doing anything threatening. (Id.) Nonetheless, an officer abruptly pepper-sprayed him directly in the face from close range, causing him to fall to the ground in agony. (Id., 2:43:31–2:43:34.) Officers then ignored the man while he laid in the intersection as cars passed until, eventually, he stood up on his own and walked away without being arrested. (Id., 2:43:34–2:44:28.)

In any event, the parties appear to agree that some officers conveyed dispersal orders following their arrival in the Court Avenue District after 2:35 a.m. but disagree as to how those orders were conveyed. The City of Des Moines Defendants allege that officers gave dispersal orders in the Court Avenue District via a "public address system," "thro[ugh] individual officer orders or through a bullhorn." (Id., ¶¶ 156, 410; ECF 193, ¶ 63.) Plaintiffs admit certain officers gave "verbal dispersal orders as they walked around Court Avenue," but "[d]ispute such orders were delivered through a bullhorn." (ECF 198-2, ¶ 156.) The Polk County, City of Altoona and City of West Des Moines Defendants side with Plaintiffs, admitting that officers issued dispersal orders verbally on an *ad hoc* basis after 2:35 a.m. but not through a bullhorn or other form of amplification. (ECF 190-1, ¶ 63; ECF 194-1, ¶ 63.) The Court's careful review of video footage reveals no meaningful support for the City of Des Moines' position that a "public address system" or "bullhorn" were used at that time.

The record does, to be clear, contain a few references to a "bullhorn." For example, Plaintiff Vernon DeBrossard recalled hearing officers tell people over a bullhorn to "go home" when he

was "downtown" without specifying where or when this occurred. (ECF 198-2, ¶ 410; ECF 170-4, p. 860.) Officer Jason Tart also recalled officers using a bullhorn (ECF 170-4, pp. 275–76), while Officer Jake Forrester recalled dispersal orders being issued through "PA systems on squad cars" (id, pp. 177–78). By contrast, other officers could not recall how dispersal orders were issued or only remembered issuing them verbally after 2:35 a.m. (ECF 173-1, pp. 100, 261, 281, 283.) The following testimony from Officer Jacob Lovell is logical and consistent with the extensive video footage:

> Q: Besides that, any other specific memories of dispersal orders given down there?
>
> A: Not on Court Avenue. I know like prior through the night, they had it constantly going through the loud speaker, but down here, I don't think we had time to kind of set that up.
>
> Q. When you're talking about the loud speaker, would that be when you were on the skirmish line on the bridge?
>
> A. Yes. Pretty much anywhere we were able to set up the shield line and have an actual planned response, they always had someone on the loud speaker giving a dispersal order once it came to that time.

(Id., p. 273.)

Although officers were directed to "clear the area" in the aftermath of events at Hy-Vee, the record is somewhat unclear on how, exactly, they were directed to accomplish this. (ECF 198-2, ¶ 147.) The parties agree that Metro STAR Lieutenant Russ Schafnitz authorized Metro STAR officers to make arrests in the area, but the City of Des Moines Defendants clarify that this was limited to "individuals who were engaging in criminal activity or who did not clear the area from the crowd which had been declared an unlawful assembly." (ECF 193, ¶ 37.) This clarification is consistent with video footage, which does not show officers arresting every person they saw in the Court Avenue District. (*See, e.g.*, NE-SW Cam, 2:43:13–2:44:32; Downtown Camera 3rd_4th Crosswalk Cam[8], 2:38:14–2:40:41; Carmichael, 36:15–38:23). Instead, many people were allowed to leave on foot or in vehicles. (Id.) The parties agree, in any event, that unified command was "difficult" because of the size of the area police were trying to clear. (Id., ¶ 151.)

The record is also somewhat vague regarding the area officers were directed to clear, although evidence indicates that it ranged from Locust Street (north), Court Avenue (south), Water

---

[8] The "3rd_4th Cam" refers to surveillance footage taken by a camera located in the middle of the 300 block of Court Avenue facing southwest over a crosswalk. The footage is found in the record at ECF 170-4, p. 889. There is a timestamp superimposed on the footage, which the parties appear to agree accurately represents the time of day.

Street (east), and 5th Avenue (west). (Id., ¶ 152.) All fourteen Plaintiffs were arrested in this area during the eighty or so minutes between 2:44 and 4:00 a.m. Plaintiff Woods was arrested first, while walking north by himself along 3rd Street (more than one block east of the Hy-Vee) near Court Avenue at approximately 2:44 a.m. (ECF 193, ¶¶ 78, 83–84, 89.) Around the time of Woods's arrest, a bystander told officers, "[y]ou're getting the wrong ones. You guys are picking off the stragglers, that's crazy." (Id., ¶ 1.)

Plaintiff Klingenberg was arrested at 2:49 a.m., while walking alone just outside the 3rd and Court Parking Garage. (Id., ¶ 104; ECF 198-2, ¶ 374.) Plaintiff Moler was arrested as she entered her vehicle in the same Parking Garage at approximately 2:49 a.m., shortly after she and others near her were told by officers they could leave. (ECF 193, ¶¶ 132, 134; ECF 198-2, ¶¶ 296, 310.) Plaintiff Petefish was arrested at 2:54 a.m. while standing or walking by himself in a parking lot of a restaurant at the intersection of 2nd and Court Avenues. (ECF 193, ¶ 145, 147–48, 155; ECF 198-2, ¶¶ 389, 391, 393.) Plaintiffs Debrossard and Lard were arrested at 2:55 a.m. at the door of Lard's apartment at the intersection of 3rd Street and Grand Avenue, which is two blocks north of Court Avenue. (ECF 193, ¶ 181; ECF 198-2, ¶¶ 397, 418.) Plaintiffs Patton, Lewis, Johnson, Timberlake, Jacobsen, and Young were arrested at approximately 3:20 a.m. near Lard's apartment at the intersection of 3rd Street and Locust Street, which is two blocks north of Court Avenue. (ECF 193, ¶ 203; ECF 198-2, ¶¶ 225–26.) Plaintiffs Dunn and Fugate were arrested at approximately 4:00 a.m. near the same intersection as they were entering Dunn's vehicle. (ECF 193, ¶¶ 270–71; ECF 198-2, ¶ 186.) Additional facts specific to each Plaintiff and Defendant will be discussed in the Legal Analysis sections, below.

*B. Facts Regarding Supervisory and Government Entity Defendants.*

Plaintiffs bring claims not just against the individual officers who arrested them, but also their supervisors and the government entities who employed them. Plaintiffs also bring claims against officers involved in preparing and filing charging paperwork.

1. Des Moines Police Chief Dana Wingert.

The supervisory-level Defendants include Des Moines Police Chief Dana Wingert and Police Lieutenants Kirk Bagby and Michael McTaggart. As alleged by Plaintiffs, Defendant Wingert's direct involvement in the events of May 30 and 31, 2020, was limited to giving a speech at approximately 2:15 a.m. expressing his appreciation to responding officers and dismissing them for the night (before they unexpectedly had to be recalled due to subsequent disturbances). (ECF

198-2, ¶ 112; ECF 193, ¶ 20.) Plaintiffs' claims against Wingert revolve around the theory that he failed to provide appropriate training and otherwise was deliberately indifferent to the likelihood that officers would make unlawful arrests or use excessive force.

### 2. Des Moines Police Lieutenant Kirk Bagby.

As of May 30, 2020, Des Moines Police Lieutenant Kirk Bagby[9] had responsibilities at the police academy and supervised patrol officers and instructors. (ECF 170-4, p. 262.) Bagby typically worked days, but he offered to work overtime on May 30 to assist with challenges arising out of the widespread protests. (Id., p. 263.) He reported for duty at approximately 6:00 p.m. and spent the bulk of his shift providing security around the east side of the Des Moines Police Station. (Id.) Like other officers, Bagby was preparing to go off-duty shortly after 2:00 a.m. on May 31 because the crowds had diminished in size and calmed. (Id.; ECF 198-2, ¶ 112.) His plans changed when police started receiving reports of destructive activity in the Court Avenue District. (ECF 170-4, p. 263; ECF 198-2, ¶ 124.)

At approximately 2:30 a.m., Bagby, along with Captain Chris Hardy and Lieutenant Daniel Blom, drove across the river to 3rd and Walnut Streets, one block north of Court Avenue. (ECF 170-4, p. 263.) Bagby was instructed to "disperse the crowd," which he achieved by walking south down 3rd Street toward Court Avenue, breaking up commingled groups of people. (Id., p. 264; ECF 193, ¶ 59.) He reached Court Avenue at approximately 2:43 a.m., then turned and walked one or two blocks east, ending up near 2nd or Water Streets. (ECF 170-4, p. 265.) Then he made "a circle" and headed north again, back to his vehicle. (Id., p. 266.) It is unclear how long Bagby spent in the area before returning to the Police Station, but the record does not indicate that he arrested anyone. (Id., pp. 264–266.)

Although Bagby was not directed to take any specific action upon returning to the Police Station, he took charge of the makeshift "staging area" where patrol officers had transported arrestees. (Id., p. 266.) As the area supervisor, he initiated communications with Defendant McTaggart, the watch commander, about how to charge arrestees. (Id.; ECF 193, ¶ 339.) Bagby did not speak to anyone at the Polk County Attorney's Office about charging decisions, but he was "under the impression" that McTaggart had done so. (ECF 170-4, p. 266.) According to Bagby, McTaggart told him to charge the arrestees involved in "the Hy-Vee incident" with rioting and 2nd degree criminal mischief. (ECF 193, ¶ 340.) For his part, McTaggart does not recall telling

---

[9] He was promoted to Captain in March 2021. (ECF 170-4, p. 262.)

anyone that criminal mischief was an appropriate charge; rather, he recalls telling Bagby and Lieutenant Blom to charge the arrestees with rioting and failure to disperse. (Id., ¶¶ 335–36.)

Bagby's understanding was that all arrestees in his area were involved in "the Hy-Vee incident." (ECF 170-4, p. 267) However, he never spoke to the arrestees, talked to their arresting officers (many of whom were not present), or was told where each arrestee was arrested. (ECF 193, ¶¶ 343–46.) Bagby nevertheless communicated to other officers that all arrestees should be charged with rioting and 2nd degree criminal mischief. (ECF 170-4, pp. 266–67.) These officers were instructed to group all arrestees under one case number and charge them all with the same thing. (ECF 193, ¶ 341.) One officer described it as an instruction to give a "blanket charge of criminal mischief" to all arrestees. (Id., ¶ 352.) At least one officer, Officer Clark Allen, said he did not think the charges made sense and questioned Bagby, who instructed him to move forward with the rioting and criminal mischief charges. (Id., ¶¶ 348–51.)

Bagby supervised the charging process until approximately 4:00 a.m., when he finished his shift. (ECF 170-4, p. 267.) By that point, he recalled that all or most arrestees had been processed. (Id.) Twenty-six people were ultimately booked into jail for 2nd degree criminal mischief, including Plaintiffs DeBrossard, Dunn, Jacobsen, Johnson, Klingenberg, Lard, Patton, Timberlake, Woods, and Young. (ECF 193, ¶ 357.) Fifty people were booked into jail for rioting, including all fourteen Plaintiffs. (Id., ¶ 359.)

### 3. Des Moines Police Captain Michael McTaggart.

As of May 30, 2020, Defendant Michael McTaggart was a Captain of the First Watch Patrol for the Des Moines Police Department. (ECF 193, ¶ 326.)[10] His general responsibilities included supervising patrol officers during the 9:00 p.m. to 6:00 a.m. shift, as well as going on patrols himself after he finished administrative duties. (ECF 170-4, p. 38.) On May 30, he was directed to provide supervisory support at the Des Moines Police Station. (Id., p. 40.) He did so for the bulk of his shift until around 2:30 a.m. when reports came in regarding destructive activity in the Court Avenue District. (Id., p. 41; ECF 198-2, ¶ 124.) McTaggart drove to the Court Avenue District at some point to assist with the police response, which was "pretty much over" by the time he arrived. (ECF 170-4, p. 41; ECF 193, ¶ 329.) He could not recall the exact time, but it was after 2:37 a.m. (ECF 170-4, p. 44.)

---

[10] In June 2022, he was promoted to Major of the Operations Division. (ECF 170-4, p. 38.)

McTaggart said he was present in the Court Avenue District for "maybe [] five minutes" when he started considering how to charge all the arrestees. (Id., p. 41.) He described the scene as something "[he] had never come across before with so many people, and then the destruction just wasn't – it just hasn't been something [he had] dealt with." (Id.; ECF 198-2, ¶ 426.) McTaggart called Assistant Polk County Attorney Nan Horvat, described the situation, and asked, "[d]oes this fit rioting?" (ECF 198-2, ¶ 427.) McTaggart recalls Horvat instructing him to charge people with rioting and failure to disperse. (Id., ¶ 429; ECF 193, ¶ 334.) The Des Moines Police Department generally complies with the recommendations of an Assistant County Attorney (ECF 198-2, ¶ 432), so McTaggart passed Horvat's information along to Lieutenants Blom and Bagby, who he believed passed it along to others (id., ¶¶ 430–31). As noted above, Bagby disagrees with McTaggart in at least one respect: Bagby says McTaggart told him to charge the arrestees involved in "the Hy-Vee incident" with rioting and 2nd degree criminal mischief. (ECF 193, ¶ 340.) McTaggart does not recall mentioning criminal mischief, but he is "not saying [he] definitely didn't." (ECF 170-4, p. 42; ECF 193, ¶ 336.)

McTaggart spent approximately one hour in the Court Avenue District as police regained control of the situation, before leaving to patrol the rest of Des Moines. (ECF 170-4, p. 41.) He did not work the following day (still May 31), but he recalled Assistant Polk County Attorney Jeff Noble calling him about the charges from the prior night. (Id., p. 42.) McTaggart told Noble to discuss it with Defendant Chad Nicolino and was not directly involved thereafter. (Id.) Aside from Lieutenants Bagby and Blom, McTaggart did not recall anyone else involved in charging decisions in the early morning hours of May 31, 2020. (Id., p. 43.) McTaggart says Bagby spearheaded the charging process and directed other officers as to charging decisions. (Id., p. 44; ECF 198-2, ¶ 434.)

### 4. Government Entity Defendants.

Plaintiffs bring charges against four government entities: the City of Des Moines, City of West Des Moines, City of Altoona, and Polk County. Plaintiffs assert in Count XI that these entities are responsible under state law principles of *respondeat superior* for the actions of their respective employee-officers. (ECF 148.) Plaintiffs admit *respondeat superior* is not a viable theory of recovery on their federal section 1983 claims, but they assert the City of Des Moines is nonetheless liable under section 1983 based on an unlawful "custom or practice" or for showing deliberate indifference to Plaintiffs' constitutional rights by failing to provide adequate training

and supervision. (ECF 148.) *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Plaintiffs do not pursue federal law *Monell* claims against the City of West Des Moines, City of Altoona, or Polk County. Instead, the liability of those entities appears to be based solely on principles of *respondeat superior* in connection with allegedly unlawful acts by their employees.

Twenty-two individual Defendants are officers with the Des Moines Police Department: Herman, Wilshusen, Lawler, McCarthy, Coughennower, McTaggart, Armstrong, Chiodo, Egan, Betts, Hardy, Hedlund, Gruver, Valentine, Allen, Escobar Hernandez, Nicolino, George, Youngblut, Bagby, Holtan, and Wingert. Defendant Forrester is the only City of West Des Moines police officer named as an individual Defendant. Two City of Altoona officers are named as Defendants: Palmer and Moffatt. Two Polk County Deputy Sheriffs are named as Defendants: Smith and Callahan. Finally, Plaintiffs bring claims against the City of Des Moines with respect to twenty-two John Doe defendants who Plaintiffs were not able to identify during discovery. Plaintiffs assert that these John Doe officers are part of the "Metro STAR" unit, housed out of the Des Moines Police Department. (ECF 181, p. 79; ECF 173-1, p. 546.)

"Metro STAR" is the Metro Special Tactics and Response Team, a "tactical special unit" within the Des Moines Police Department and Polk County Sheriff's Office. (ECF 173-1, p. 540.) Metro STAR was created in February 2007 through an Agreement between the Homeland Security and Emergency Management Division of the State of Iowa ("HSEMD"), on one side, and the City of Des Moines and Polk County, on the other. (Id., pp. 530–39.) The Agreement was consummated pursuant to Chapter 28E of the Iowa Code and therefore is often referred to as a "28E Agreement." *See generally* Iowa Code § 28E.1 ("The purpose of this chapter is to permit state and local governments in Iowa to make efficient use of their powers by enabling them to provide joint services and facilities with other agencies and to cooperate in other ways of mutual advantage."). The 28E Agreement is largely designed to allow the Governor or HSEMD to make state-wide deployments of Metro STAR officers for "high-risk" situations[11] requiring "specialized weapons or extraordinary special operations." (ECF 173-1, p. 530.) It is not generally intended for the deployment of officers for local operations like the protests on May 30 and 31, 2020. (Id.) Nonetheless, local deployments are permitted at the request of political subdivisions who believe

---

[11] Metro STAR officers have expertise in responding to a variety of "critical incidents" that could arise on a state or local level, including active shooter attacks, hostage situations, water operations, bombings, hijackings, threats to commit a terrorist attack, and intentional releases of hazardous materials. *METRO STAR*, City of Des Moines, https://www.dsm.city/departments/police-division/operations/metro_star.php (last visited Mar. 7, 2023).

they need the added support, with those subdivisions then responsible for reimbursing the City of Des Moines and Polk County for associated costs. (Id., p. 534.)

There is a Memorandum of Understanding ("MOU") between the City of Des Moines and Polk County that provides additional detail regarding Metro STAR. (Id., pp. 540–42.) The Metro STAR team is managed by a Commander and Assistant Commander, appointed jointly by the Des Moines Police Chief and Polk County Sheriff. (Id., p. 540.) It pulls its members from a response pool of sworn and unsworn police officers from the Des Moines Police Department, Polk County Sheriff's Office, and outside political subdivisions if so authorized by that subdivision. (Id.) Members of the Metro STAR team are paid by their respective employing subdivisions for responding to local calls but may be reimbursed by the state or federal government when on state or federal deployments. (Id.) According to the MOU, Metro STAR officers are given the rights and obligations set forth in Iowa Code Chapter 670 (for subdivision employees) when responding to local emergencies, but Iowa Code Chapter 699 (for state employees) during state activation. (Id., p. 541.) Finally, the MOU provides for the development of written protocols covering deployments, activation, and team member requirements. (Id., p. 540.)

The protocols, or Standard Operating Procedures ("SOP"), apply to all Metro STAR members but do not circumvent the policies of a particular member's employing subdivision. (ECF 170-3, p. 88.) The SOP delineates the Metro STAR chain of command, which is comprised (from the top down) of a Uniformed Operations Division Headquarters Captain, Lieutenant, Sergeants, Team Leaders, and Assistant Team Leaders. (Id., p. 90.) On May 31, 2020, Lieutenant Russ Schafnitz was a Metro STAR Lieutenant who reported to Division Captain Mark Wessels. (ECF 173-1, p. 546.) Sergeant Chris Wellman was acting Assistant Commander. (Id., p. 296.) Because Metro STAR was responding to issues within the City of Des Moines, the Des Moines Police Department provided direction. (Id., p. 588.)

Most officers testified that they never received formal training from Metro STAR or their employing entities on the crimes of unlawful assembly, failure to disperse, or rioting. (*See, e.g.*, ECF 170-4, pp. 118, 180, 283, 322, 347, 927.) Some testified that although they did not receive specific training as to those crimes, they did receive riot response or crowd control training. (*See, e.g.*, ECF 170-4, pp. 171, 195, 210–11.) Others <u>did</u> recall training on those three crimes (ECF 170-3, p. 135; ECF 170-4, p. 150) or were otherwise aware of them (ECF 170-4, pp. 81, 222). Assistant

Des Moines Police Chief Allan Tunks testified that the Des Moines Police Department did not provide specific legal training on those three crimes prior to the protests. (Id., p. 63.)

Several officers testified that they received other relevant training. For instance, some received implicit bias training (id., p. 104), with Officer Forrester of West Des Moines saying he received such training annually (id., p. 168). Many received ongoing legal training during in-service days, sometimes with the involvement of the Polk County Attorney's Office. (Id., p. 186; ECF 170-3, p. 132.) Officers involved in Metro STAR had to attend at least one training day per month, sometimes two (ECF 170-4, pp. 99, 167, 194, 923), but this was not legal training, which Metro STAR did not separately provide (id., p. 26; ECF 170-3, pp. 120–21). Metro STAR expected officers to receive legal updates from their primary employing entities. (ECF 170-4, p. 26.)

## IV. Legal Background – Summary Judgment and Qualified Immunity Standards.

### A. Summary Judgment Standards.

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Smith v. Ashland, Inc.*, 250 F.3d 1167, 1171 (8th Cir. 2001). "When cross-motions for summary judgment are presented to the Court, the standard summary judgment principles apply with equal force." *Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 945–46 (S.D. Iowa 2005). "The court views the record in the light most favorable to plaintiff when considering defendant's motion, and the court views the record in the light most favorable to defendant when considering plaintiff's motion." *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 614 (N.D. Iowa 2019).

### B. Federal Law Qualified Immunity Standards.

#### 1. Qualified Immunity for Individual Officers under Federal Law.

All fourteen Plaintiffs bring claims pursuant to 42 U.S.C. § 1983, which imposes liability on any person who, acting under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." Government officials are protected against section 1983 claims by the doctrine of qualified immunity, which frees them from liability unless their conduct violates "clearly established statutory or constitutional rights of

which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"Qualified immunity 'is an immunity from suit rather than merely a defense to liability.'" *Solomon v. Petray*, 699 F.3d 1034, 1038 (8th Cir. 2012) (emphasis omitted) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526.

Law enforcement officers "are entitled to qualified immunity 'unless: (1) [they] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable officer would know of the right at the time of the alleged violation.'" *Garcia v. City of New Hope*, 984 F.3d 655, 663 (8th Cir. 2021) (quoting *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 982 (8th Cir. 2019)), *abrogated on other grounds by Nieves v. Bartlett*, 139 S.Ct. 1715 (2019). Courts may address these issues in either order, and a plaintiff must satisfy both prongs before a claim may proceed to trial. *See Pearson*, 555 U.S. at 241. "Under either prong of the inquiry, the district court 'may not resolve genuine disputes of fact' relevant to the issue of qualified immunity." *Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2017) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)). Moreover, all disputed facts must be interpreted in the plaintiff's favor when defendants move for summary judgment based on qualified immunity. *Tolan*, 572 U.S. at 657.

2. <u>Qualified Immunity for Supervisors and Government Entities under Federal Law.</u>

"Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016) (cleaned up) (quoting *Monell*, 436 U.S. at 694). Relatedly, "a supervisor may . . . be liable under section 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." *Jackson v. Nixon,* 747 F.3d 537, 543 (8th Cir. 2014) (quoting *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001)). "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions. *Id*. (quoting *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)).

"Policy and custom are not the same thing." *Corwin*, 829 F.3d at 699–700. "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Id.* (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)). To establish municipal liability through an official custom, Plaintiffs must demonstrate "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). For Defendants to be liable on a failure to train theory, Plaintiffs must show Defendants' failure to train amounted to "deliberate indifference" of Plaintiffs' constitutional rights. *Folkerts v. City of Waverly*, 707 F.3d 975, 982 (8th Cir. 2013). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

Ordinarily, deliberate indifference is shown through "a pattern of similar constitutional violations by untrained employees." *Id.* at 62 (cleaned up) (quoting *Brown*, 520 U.S. at 409). This pattern must show that Defendants "had either actual or constructive notice of the inadequacy of its training program and failed to take remedial steps. *Thelma D. By & Through Delores A. v. Bd. of Educ.*, 934 F.2d 929, 935 (8th Cir. 1991). Alternatively, "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Folkerts*, 707 F.3d at 982 (quoting *Brown*, 520 U.S. at 409). "[I]n this narrow range of circumstances, the violation may be a highly predictable consequence of the failure to train and thereby justify a finding of 'deliberate indifference' by policymakers." *Brown*, 520 U.S. at 398.

C. *State Law Qualified Immunity Standards.*

1. <u>Qualified Immunity for Individual Officers under Iowa Law.</u>

Iowa law on qualified immunity is still developing. In *Baldwin v. City of Estherville* (*Baldwin I*), 915 N.W.2d 259, 279 (Iowa 2018) (*Baldwin I*) the Iowa Supreme Court held that law enforcement officers are entitled to qualified immunity from state constitutional tort claims if they "exercised all due care to conform to the requirements of the law." This is intentionally narrower than qualified immunity under federal law, which the Iowa Supreme Court said "gives undue weight to[] one factor: how clear the underlying constitutional law was." *Id.* In other words, under *Baldwin I*, a violation of the Iowa Constitution can give rise to direct liability even if the underlying constitutional right was not "clearly established." *See id.*

The Iowa Legislature responded to *Baldwin I* and subsequent decisions by enacting Iowa Code § 670.4A, which became effective in June 2021 and grants qualified immunity to law enforcement officers and others if "[t]he right, privilege, or immunity secured by the law was not clearly established at the time of the alleged deprivation, or . . . the state of the law was not sufficiently clear that every reasonable employee would have understood that the conduct alleged constituted a violation of law." "In enacting § 670.4A, it appears the Iowa Legislature was adopting a state law version of qualified immunity that tracks the qualified immunity doctrine as it exists under federal law." *Stark v. Hamelton*, No. 3:18-CV-00069-RGE-SHL, 2021 WL 4056716, at *4 (S.D. Iowa Sept. 2, 2021).

The events in this case occurred during the gap period after the Iowa Supreme Court decided *Baldwin I* but before the Iowa Legislature enacted section 670.4A. Defendants argue section 670.4A should apply retroactively—i.e., that Plaintiffs must prove the "clearly established" element for both their federal and state constitutional claims. (ECF 180, pp. 14–15.) Plaintiffs argue that section 670.4A is substantive, not procedural, and therefore the narrower, *Baldwin* version of qualified immunity should apply to their claims.

To the extent Plaintiffs have shown the existence of a clearly established right under the United States Constitution (a topic addressed in detail in ensuing sections), the question of retroactivity of section 670.4A is irrelevant: the same right also would be "clearly established" for purposes of the Iowa Constitution given the overlap between state and federal constitutional rights. *See State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019) ("We generally 'interpret the scope and purpose of the Iowa Constitution's search and seizure provisions to track with federal interpretations of the Fourth Amendment' because of their nearly identical language." (quoting

*State v. Christopher*, 757 N.W.2d 247, 249 (Iowa 2008)); *see also Davis v. Dawson*, 33 F.4th 993, 1000 (8th Cir. 2022) ("The same evidence establishing the officers' violation of § 1983 and the Fourth Amendment establishes a violation of the Iowa Constitution."). Indeed, although the Iowa Supreme Court reserves the right to interpret article I, section 8 more narrowly than the Fourth Amendment, *see State v. Wright*, 961 N.W.2d 396, 403 (Iowa 2021), this Court is unaware of any relevant case in which it has done so. Instead, when the Iowa Supreme Court deviates from federal precedent, it has interpreted article I, section 8 more broadly. *See, e.g.*, *id.* at 419 (concluding warrantless trash pulls violate the Iowa Constitution despite United States Supreme Court precedent holding them lawful under the Fourth Amendment); *State v. Cline*, 617 N.W.2d 277, 292–93 (Iowa 2000) (concluding *Leon* "good faith" rule does not apply to violations of article I, section 8 despite United States Supreme Court precedent applying it to Fourth Amendment violations), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601 (Iowa 2001). It follows that Plaintiffs' success in proving a "clearly established right" under federal law will mean they have also proven the same clearly established right under state law.

By contrast, if the federal right is not "clearly established," the question of whether section 670.4A is retroactive becomes important. The Court therefore must analyze that issue.

"It is well established that a statute is presumed to be prospective only unless expressly made retrospective." *Anderson Fin. Servs., LLC v. Miller*, 769 N.W.2d 575, 578 (Iowa 2009) (quoting *Baldwin v. City of Waterloo,* 372 N.W.2d 486, 491 (Iowa 1985)). The City of Des Moines Defendants admit "[i]t is currently unclear when the legislature intended this immunity to be able to be used retroactively." (ECF 180, p. 14.) And, as Plaintiffs point out, Senate File 342, which gave rise to section 670.4A, expressly made certain provisions relating to law enforcement health insurance retroactive, but did not do the same for section 670.4A. (ECF 202, p. 8); *see also Kucera v. Baldazo*, 745 N.W.2d 481, 487 (Iowa 2008) ("[L]egislative intent is expressed by omission as well as by inclusion, and the express mention of one thing implies the exclusion of others not so mentioned." (quoting *Meinders v. Dunkerton Cmty. Sch. Dist.*, 645 N.W.2d 632, 637 (Iowa 2002))). This is enough in and of itself to conclude that section 670.4A is not retroactive.

This conclusion is reinforced by the fact that section 670.4A is substantive, not procedural. "Statutes which specifically affect substantive rights are construed to operate prospectively unless legislative intent to the contrary clearly appears from the express language or by necessary and unavoidable implication." *Anderson Fin. Servs.*, 769 N.W.2d at 578 (quoting *City of Waterloo,*

372 N.W.2d at 491). Qualified immunity affects substantive rights by providing municipal actors "immunity from suit rather than a mere defense to liability." *Pearson*, 555 U.S. at 231 (quoting *Mitchell*, 472 U.S. at 526). Accordingly, section 670.4A does not apply retroactively.

The Court rejects the argument made by some Defendants that section 670.4A applies anyway because the "conduct regulated [by the statute] is the ability to sue a municipal employee and the [statute's] legal consequence is now." (ECF 180, p. 14.) This argument misunderstands the difference between "prospective" and "retroactive" applications of a law. A law "is retroactive if it affects acts or facts which occurred, or rights which accrued, before the law came into force." *Frideres v. Schiltz*, 540 N.W.2d 261, 264 (Iowa 1995) (en banc). Section 670.4A went into effect on June 17, 2021, whereas Plaintiffs' claims accrued on May 31, 2020. *See* Iowa Code §§ 670.2, 670.4A. The "acts or facts" underlying the claims therefore predate the enactment of the legislation. *See, e.g.*, *Venckus v. City of Iowa City*, 930 N.W.2d 792, 807–08 (Iowa 2019) (holding the statute of limitations period for IMTCA claims "commences on the date of injury"). Accordingly, the Court will evaluate Plaintiffs' state law claims without reference to the qualified immunity standards set forth in section 670.4A. Instead, the Court will apply *Baldwin*'s "all due care" standard; meaning: Defendants must "plead and prove as an affirmative defense that they exercised all due care to conform to the requirements of the law." 915 N.W.2d at 279.

2. Qualified Immunity for Supervisors and Government Entities under *Baldwin*.

In *Baldwin v. City of Estherville*, 929 N.W.2d 691, 697–98 (Iowa 2019) ("*Baldwin II*"), the Iowa Supreme Court held that municipalities are entitled to qualified immunity if the individual officers involved in an arrest exercised "all due care" in enforcing the law. *Baldwin II* did not specifically address the governing standard for qualified immunity for supervisory-level officials, but the Court is comfortable concluding that they, too, are entitled to qualified immunity if they prove "all due care." After all, in successive *Baldwin* opinions, the Iowa Supreme Court applied the "all due care" standard both to the officers directly involved in an encounter and the government entities that employ them. There is no reason to believe the "all due care" standard would not also apply to the middle tier of supervising officers.

Finally, and similarly, the Court will apply the "all due care" standard to Polk County and its employees even though the *Baldwin* cases only involved municipalities and municipal officers. There is nothing in either *Baldwin* decision or subsequent cases to suggest counties or their officers would be treated differently; instead, the operative sentence of *Baldwin I* generically states that "a

government official" who has been sued for a constitutional violation shall be entitled to qualified immunity if he or she acted with all due care. 915 N.W.2d at 281; *cf.* Iowa Code § 670.1(2) (defining "municipality" to include a "county").

### D. State Law Statutory Immunity Standards.

In addition to "all due care" immunity as recognized in the *Baldwin* cases, some Defendants argue they are entitled to rely on other forms of immunity, including "emergency response" and "discretionary function" immunity. *See* Iowa Code §§ 670.4(1)(c), (k). These statutory immunities will be discussed below in the context of specific claims.

## V. Legal Background – Unlawful Seizure and False Arrest Claims (Counts I, II, and VIII).

### A. Federal Law Unlawful Seizure Claims (Count I).

All fourteen Plaintiffs allege illegal seizure of their persons without probable cause in violation of the Fourth Amendment. Some also allege illegal seizure of property. "To establish a Fourth Amendment violation, 'the claimant must demonstrate a seizure occurred and the seizure was unreasonable.'" *Quraishi v. St. Charles County*, 986 F.3d 831, 839 (8th Cir. 2021) (quoting *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003)). "A Fourth Amendment seizure [of a person] occurs when an officer restrains the liberty of an individual through physical force or show of authority." *McCoy*, 342 F.3d at 846. A seizure of property occurs "when there is some meaningful interference with an individual's possessory interests in that property." *Robbins v. City of Des Moines*, 984 F.3d 673, 680 (8th Cir. 2021) (quoting *Hansen v. Black*, 872 F.3d 554, 558 (8th Cir. 2017)).

A warrantless arrest is unreasonable if an officer lacks probable cause. *Robbins*, 984 F.3d at 679. "Officers are nonetheless entitled to qualified immunity if there is 'arguable probable cause,' which exists when an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'" *Id.* (cleaned up) (quoting *Ulrich v. Pope County*, 715 F.3d 1054, 1059 (8th Cir. 2013)). An officer who arrests an individual without arguable probable cause violates that individual's clearly established constitutional rights. *Schaffer v. Beringer*, 842 F.3d 585, 592 (8th Cir. 2016). Relatedly, "it is clearly established that using an arrest (that lacks arguable probable cause) to interfere with First Amendment activity is a constitutional violation." *Quraishi*, 986 F.3d at 839.

It is also clearly established that "[t]he warrantless seizure of property is per se unreasonable unless it falls within a well-defined exception to the warrant requirement." *Robbins*,

984 F.3d 673 at 680; *see also Dixon v. Lowery*, 302 F.3d 857, 862 (8th Cir. 2002) ("It is well settled that a seizure carried out without judicial authorization is per se unreasonable unless it falls within a well-defined exception to this requirement."). One of these exceptions is for "brief detentions of personal effects [which] may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime." *United States v. Place*, 462 U.S. 696, 706 (1983).

   B. *State Law Unlawful Seizure Claims (Count II).*

   Plaintiffs also bring unlawful seizure claims pursuant to article I, section 8 of the Iowa Constitution, which, like the Fourth Amendment, protects against unreasonable searches and seizures. See *Godfrey v. State*, 898 N.W.2d 844, 862 (Iowa 2017) (noting the "thoroughly well settled principle that violation of article I, section 8 gives rise to a cause of action"); *see also Baldwin I*, 915 N.W.2d at 272–73, 279. "Because of their nearly identical language," the Iowa Supreme Court "generally 'interpret[s] the scope and purpose of the Iowa Constitution's search and seizure provisions to track with federal interpretations of the Fourth Amendment.'" *Brown*, 930 N.W.2d at 847 (quoting *Christopher*, 757 N.W.2d at 249). The Iowa Supreme Court does, however, "jealously protect" its right to interpret rights under the Iowa Constitution more broadly than the United States Constitution. *State v. Brown*, 890 N.W.2d 315, 322 (Iowa 2017) (quoting *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011)); *see also Christopher*, 757 N.W.2d at 249 (holding cases interpreting the Fourth Amendment "are persuasive—but not binding").

   A warrantless arrest violates the Iowa Constitution if it is effectuated without probable cause. *Christopher*, 757 N.W.2d at 250 ("Probable cause for a warrantless arrest is the constitutional criterion by which its legality is measured." (cleaned up) (quoting *State v. Harvey,* 242 N.W.2d 330, 340 (Iowa 1976))). "Probable cause exists when the facts and circumstances within the arresting officer's knowledge would warrant a person of reasonable caution to believe that an offense is being committed." *State v. Harris*, 490 N.W.2d 561, 563 (Iowa 1992). When making a probable cause determination, "[a]ll of the evidence available to the arresting officer may be considered, regardless of whether or not each component would support a finding of probable cause by itself." *Id*.

   The Iowa Supreme Court has sometimes interpreted the rights set forth in article I, section 8 more broadly than Fourth Amendment rights with respect to property seizure. *See State v.*

*Ingram*, 914 N.W.2d 794, 816–17 (Iowa 2018) (comparing state and federal standards). The Iowa Supreme Court has "repeatedly embrace[d] what can only be characterized as a strong warrant preference interpretation of article I, section 8." *Id*. at 816 (collecting cases). An officer who seizes protected effects from a plaintiff violates the Iowa Constitution if the officer makes a physical trespass or invades the plaintiff's reasonable expectation of privacy in the process. *State v. Wright*, 961 N.W.2d 396, 412 (Iowa 2021); *see also State v. Kuuttila*, 965 N.W.2d 484, 486–87 (Iowa 2021) (same); *State v. Hahn*, 961 N.W.2d 370, 372 (Iowa 2021) (same).

The Iowa Supreme Court has long recognized a "probable cause and exigent circumstances" exception to the warrant requirement for the seizure of property. *See, e.g.*, *State v. Lewis*, 675 N.W.2d 516, 525 (Iowa 2004). The Iowa Court of Appeals has applied the exception to seizures of cellphones, citing similar federal precedent. *See, e.g.*, *State v. Sumpter*, No. 17-1622, 2018 WL 4360981, at *2 (Iowa Ct. App. Sept. 12, 2018) (collecting cases and denying motion to suppress when "the seizure of Sumpter's cell phone was supported by probable cause and exigent circumstances"). The Iowa Supreme Court recently wrestled with the scope of the exigent circumstances exception as it relates to the seizure of property in or around the home. *See State v. Wilson*, 968 N.W.2d 903, 913–14 (Iowa 2022) (concluding that exigent circumstances exception does not justify warrantless search of home in connection with misdemeanor arrest). Nothing in *Wilson* casts doubt, however, on whether an officer may seize property found on a person arrested in a public place when there is "a risk of serious injury, a threat to officer safety, [or] a likelihood of destruction of evidence" *Id*. at 913.

The Iowa Supreme Court has not specifically addressed whether "brief on-the-spot inquiries" supported by reasonable suspicion are excepted from the warrant requirement for seizures of property. *See Robbins v. Youngblut*, No. 4:18-CV-00289-SMR-SBJ, 2022 WL 3444885, at *10 (S.D. Iowa Aug. 4, 2022) ("One exception to the general rule that warrantless seizures are per se unreasonable is brief on-the-spot inquiries."). When it first recognized this exception, the United States Supreme Court applied investigatory stop principles articulated in *Terry v. Ohio* to permit law enforcement to seize personal effects and "pursu[e] a limited course of investigation . . . that would quickly confirm or dispel the authorities' suspicion." *Place*, 462 U.S. at 702. The Iowa Supreme Court has similarly held that investigatory stops are permitted under the Iowa Constitution, provided an officer has "reasonable suspicion . . . to believe criminal activity has occurred or is occurring." *State v. Tague*, 676 N.W.2d 197, 204 (Iowa 2004). This

Court therefore believes that the Iowa Supreme Court would recognize the "brief on-the-spot inquiry" exception if presented with the issue.

### C. State Law False Arrest Claims (Count VIII).

To prove a claim for false arrest under Iowa law, Plaintiffs must show: (1) they were detained or restrained against their will; and (2) the detention or restraint was unlawful. *Thomas v. Marion County*, 652 N.W.2d 183, 186 (Iowa 2002). Because Plaintiffs' arrests were all affected without a warrant, "the burden of proof shifts to the defendant to show justification for the arrest." *Children v. Burton*, 331 N.W.2d 673, 679 (Iowa 1983). Iowa Code § 804.7 permits warrantless arrests in several scenarios, two of which are relevant here: (1) "Where a public offense has in fact been committed, and the peace officer has reasonable ground for believing that the person to be arrested has committed it"; and (2) "Where the peace officer has reasonable ground for believing that an indictable public offense has been committed and has reasonable ground for believing that the person to be arrested has committed it." Iowa Code §§ 804.7(2)–(3).

"Reasonable ground" as used in section 804.7 is "equivalent to traditional 'probable cause.'" *Kraft v. City of Bettendorf*, 359 N.W.2d 466, 469 (Iowa 1984). However, "[t]he statutory standard for warrantless arrests under Iowa law is not identical to the federal constitutional standard." *Veatch v. City of Waverly*, 858 N.W.2d 1, 7–8 (Iowa 2015). An arrest that satisfies the Fourth Amendment "will not automatically satisfy the statutory requirements for warrantless arrests under section 804.7." *Id*. at 8. Conversely, Iowa courts apply a "less demanding" probable cause standard to civil false arrest claims than to those raised in connection with a criminal prosecution: "[i]f the officer acts in good faith and with reasonable belief that a crime has been committed and the person arrested committed it, his actions are justified and liability does not attach." *Children*, 331 N.W.2d at 680; *see also Veatch*, 858 N.W.2d at 7 (same). In other words, courts must give an officer greater latitude when the officer is defending civil claims for false arrest than when the officer is part of prosecuting a criminal case against the arrestee.

### VI. Overarching Legal Analysis – Federal and State Illegal Seizure Claims (Counts I and II) and State False Arrest Claims (Count VIII).

#### A. Officers Did Not Have Arguable Probable Cause to Arrest Plaintiffs for Failure to Disperse or Unlawful Assembly Based Solely on Plaintiffs' Presence Near 3rd Street and Court Avenue after 2:40 a.m.

Although the Court must address qualified immunity on an individualized basis as to each Plaintiff's claims against each Defendant (and will do so in ensuing sections), there is an important

overarching question common to all Plaintiffs: whether their mere presence after 2:40 a.m. in the area near 3rd Street and Court Avenue was enough, in and of itself, to give officers arguable probable cause for arrest for "failure to disperse" in violation of Iowa Code § 723.3 or "unlawful assembly" in violation of Iowa Code § 723.2 in light of the unlawful conduct in the area and the dispersal orders issued earlier in the night. In other words, *did officers have arguable probable cause to arrest <u>everyone</u> in the vicinity of the Court Avenue District*?

Iowa Code § 723.3 states: "A peace officer may order the participants in a riot or unlawful assembly or persons in the immediate vicinity of a riot or unlawful assembly to disperse. Any person within hearing distance of such command, who refuses to obey, commits a simple misdemeanor." As of May 2020, Iowa Code § 723.2 stated, in relevant part: "A person who willingly joins in or remains a part of an unlawful assembly, knowing or having reasonable grounds to believe that it is such, commits a simple misdemeanor."[12] If mere presence after 2:40 a.m. was enough to give arguable probable cause for arrest for failure to disperse or unlawful assembly, qualified immunity is appropriate for all Defendants on all section 1983 claims not involving allegations of excessive force.

The issue of mere presence as a basis for arrest is crucial for at least two reasons, which work in competing directions. <u>First</u>, with one or two possible exceptions, Defendants appear to admit that no law enforcement officer saw or had probable cause to believe any of the fourteen Plaintiffs personally engaged in acts of violence or other unlawful conduct beyond mere presence. This substantially limits the universe of potential crimes for which Defendants can claim arguable probable cause for arrest; indeed, in some instances, the facts are alarming when viewed in the light most favorable to Plaintiffs. Plaintiff Jaquan Patton and his friends, for example, were not present for any protests or ever ordered to disperse, yet they were arrested and hauled to jail overnight for simply parking a car and walking toward Patton's apartment. Similarly, Plaintiff Makenzie Moler, who intentionally stayed back from unruly protesters as they moved west down Court Avenue, affirmatively asked officers if she could leave, was told she could, and then was arrested while trying to do so. It is hard to imagine officers having probable cause to arrest someone for walking on the sidewalk with friends or doing what an officer has just said is ok. The unlawful

---

[12] The statute has since been amended to add the words ". . . or who joined a lawful assembly but willingly remains after the assembly becomes unlawful . . ." as part of the offense and to make it an aggravated misdemeanor. *See* 2021 Iowa Legis. Serv. Ch. 183 (S.F. 342) (West).

assembly and failure to disperse statutes offer a lifeline to Defendants to try to justify what otherwise would appear to be unlawful arrests.

Second, and conversely, Defendants argue that a recurring pattern emerged over the course of the night in Des Moines in which: (a) protestors would become violent and unruly; (b) law enforcement officers would tamp down the unlawful conduct through some combination of dispersal orders and dispersants like tear gas or pepper spray; (c) protestors would disperse or appear to disband; and (d) protestors would then emerge somewhere else and begin engaging in unlawful activity again. As one group of Defendants puts it, law enforcement officers were playing "whack-a-mole." Defendants essentially argue—although, interestingly, some stop short of doing so expressly—that given how events unfolded over the course of the night, by 2:40 a.m. law enforcement officers had arguable probable cause to believe that anyone still on the streets had heard a dispersal order at *some* point during the night but was refusing to obey it.

Iowa law establishes the parameters of the crimes of failure to disperse and unlawful assembly, as well as the related crime of riot, which plays a key role in the failure to disperse statute. As of May 2020, Iowa Code § 723.1 defined a "riot" as "three or more persons assembled together in a violent manner, to the disturbance of others, and with any use of unlawful force or violence by them or any of them against another person, or causing property damage."[13] As of May 2020, Iowa Code § 723.2 defined an "unlawful assembly" as three or more persons assembled together, with them or any of them acting in a violent manner, and with intent that they or any of them will commit a public offense." Consistent with each statute's plain language, the Iowa Supreme Court has held that "violence" is the touchstone of a riot or unlawful assembly: "[u]nder section 723.1, the prohibited activity is assembling together in a violent manner. . . . A reasonable person is on notice, as are the people charged with enforcing the statute, that the impermissible conduct under section 723.1 is violence . . . ." *Williams v. Osmundson*, 281 N.W.2d 622, 626 (Iowa 1979). "[M]ere presence at the scene of a riot is not punishable." *Id.* at 624.

The emphasis on violence under governing Iowa law for "riot" and "unlawful assembly" helps explain why Defendants are placing so much emphasis on events and dispersal orders from earlier in the night, as opposed to focusing solely on events around 2:30 a.m. Around that time,

---

[13] In 2021, the Iowa Legislature amended § 723.1 to make participation in a riot a Class D felony, rather than an aggravated misdemeanor. The Legislature also made what appear to be non-substantive edits to the definition of "riot." As the 2020 version of the law was in effect in May 2020, the Court will apply that version.

violent activity broke out in the Court Avenue District, including broken windows at the 3rd and Court Parking Garage and broken windows and looting as an unruly group moved down the street to the west, culminating with acts of vandalism and looting at the Hy-Vee between 4th Street and 5th Avenue at approximately 2:37 a.m. This is probably a "riot" or "unlawful assembly," but it does not mean officers *per se* had arguable probable cause to arrest everyone present in the area. Because, again, under well-established Iowa law, "mere presence at the scene of a riot is not punishable." *Id.* Instead, as to failure to disperse, mere presence would be a crime only if a person: (a) was "in the immediate vicinity of a riot or unlawful assembly;" (b) was "within hearing distance" of a law enforcement officer's command to disperse; and (c) "refuse[d] to obey" the command. Iowa Code § 723.3; *see also Small v. McCrystal*, 708 F.3d 997, 1004 (8th Cir. 2013) (denying qualified immunity where question of fact existed as to whether plaintiff was ordered to disperse), *abrogated on other grounds by Nieves*, 139 S.Ct. 1715. Similarly, mere presence is not a crime under the unlawful assembly statute unless the person "willingly joins in or remains a part of an unlawful assembly, knowing or having reasonable grounds to believe that it is such." Iowa Code § 723.2. The Court turns, then, to whether the earlier dispersal orders gave officers arguable probable cause to arrest anyone on the streets after 2:40 a.m. for failure to disperse or unlawful assembly.[14]

Recent Eighth Circuit cases provide guidance. In *Baude v. Leyshock*, a handful of individuals broke windows and flowerpots during protests on Olive Street in downtown St. Louis between 8:00 and 9:00 p.m. 23 F.4th 1065, 1069 (8th Cir. 2022). Officers gave dispersal orders at 8:48 and 8:51 p.m., but many people remained on the streets "loitering and milling about the area," with a small group also "loudly reminding the officers of their right to assemble." *Id.* Around 11:15 or 11:20 p.m., officers formed perimeter lines in the area for the purpose of blocking everyone in and arresting them, in a process described as "kettling." *Id.* at 1069–70. The plaintiff, Baude, was part of the "kettle" even though he allegedly had not heard the earlier dispersal orders or been part of the earlier destructive activity. *Id.* Baude was pepper-sprayed and arrested as part of a "mass

---

[14] Although officers gave additional dispersal orders starting around 2:40 a.m., there is a factual dispute about whether these were broadcast to everyone at once through a bullhorn, or if the dispersal orders were communicated solely on an *ad hoc* or decentralized basis as officers encountered individual people. For present purposes, viewing the facts in the light most favorable to Plaintiffs, the Court must assume (as some Defendants appear to admit) that the dispersal orders were issued in an *ad hoc* fashion. The significance of these *ad hoc* dispersal orders to the probable cause analysis as to each Plaintiff and Defendant will be discussed in the next sections. For now, in this section, the question is simply whether dispersal orders from <u>earlier</u> in the night were enough to give arguable probable cause to arrest anyone still present on the streets after 2:40 a.m.

arrest" of all individuals within the kettle. *Id.* His hands were zip-tied, and he was held in custody for fourteen hours until being released the following day. *Id.*

The Eighth Circuit held that Baude stated a plausible claim for unlawful seizure under section 1983, explaining:

> Here, Baude alleges, and the video included with the pleadings appears to confirm, that the group of people involved in the mass arrest not only included a few people noisily proclaiming their constitutional right to assemble, but others who were generally gawking and milling about, others on bikes riding through the area, some people sitting on the street and on the sidewalk, and even a person pushing a baby in a stroller. As noted by the district court, there are outstanding factual questions about who heard which declarations related to unlawful assembly and dispersal orders (if any), and whether the arrestees had the requisite intent to commit any of the alleged crimes.
>
> Until the kettle was effectuated by SLMPD officers, people were freely entering and exiting the area even after the Officers purportedly issued dispersal orders. The video evidence does not show any real sense of urgency or confrontation visible in the crowd. There was no attempt by SLMPD officers to separate the subset of people previously engaged in earlier acts of violence or vandalism or any unlawful assembly from the innocent bystanders milling about. The Officers' assertion that they had probable cause or arguable probable cause to believe some members of the crowd violated laws earlier in the day and that "many" were apparently violating the law by refusing to disperse is insufficient to establish a "unit" that may justify a mass arrest as a matter of law. Police may be entitled to qualified immunity protections if they arrest individual offenders with at least arguable probable cause, but officers cannot enjoy such protections by alleging that "the unlawful acts of a small group" justify the arrest of the mass.

*Id.* at 1072–73 (internal citations omitted) (quoting *Bernini v. City of St. Paul*, 665 F.3d 997, 1005 (8th Cir. 2012)). This analysis is highly relevant here given the evidence presented by Plaintiffs that, at most, they were simply "innocent bystanders milling about" in an area where people had been "freely entering and exiting" for hours despite earlier dispersal orders. *See id.* at 1073; *see also Welch v. Dempsey*, 51 F. 4th 809, 813 (8th Cir. 2022) (concluding officer did not have arguable probable cause for arrest for riot or unlawful assembly despite protester's presence in an area where unlawful activity recently occurred); *Small*, 708 F.3d at 1002, 1004 (denying qualified immunity for officer who arrested plaintiff despite plaintiff's presence near group in area where prior "disturbance" had been reported).

*Baude* distinguished the case primarily relied upon here by Defendants, *Bernini v. City of St. Paul*. In *Bernini*, there were widespread protests and acts of violence in St. Paul, Minnesota, during the 2008 Republican National Convention. 665 F.3d at 1001. One afternoon, after marches with permits had ended, the Senior Commander of the St. Paul police force issued an order that no one was allowed to enter the downtown area. *Id.* The Commander believed this was necessary to "reestablish control" and "reestablish law enforcement presence" downtown. *Id.* After the order had been issued, law enforcement officers became aware of a group of protesters moving en masse toward downtown. *Id.* Officers cut the group off and had a skirmish with them in an intersection, after which officers used non-lethal munitions to redirect the group away from downtown. *Id.* The group ended up encircled by officers in a park, where officers made a mass arrest of almost 400 people. *Id.* at 1001–02. A short time later, roughly half the arrestees were allowed to leave without being charged after officers finished a "sorting process" to determine who had been present for the skirmish in the intersection. *Id.* at 1002. The remaining 160 protesters were booked and taken into custody. *Id.* The plaintiffs fell into three groups: (1) those who were detained briefly in the park but released after the "sorting process"; (2) those who were arrested and booked but admitted to having been present in the intersection during the skirmish (although they claimed not to have participated); and (3) those who were arrested and booked but claimed not to have been present at the intersection. *Id.*

*Bernini* concluded the defendants were entitled to qualified immunity as to unlawful seizure claims brought by all three groups of plaintiffs. *Id.* at 1003–04. As to the first, *Bernini* concluded the seizure was only "temporary" and therefore justified while officers "sought to determine who were the members of the group at the intersection." *Id.* at 1005. As to the second, *Bernini* held that officers had a reasonable basis for concluding the plaintiffs who were present at the intersection during the skirmish had been part of a group that, "as a whole," had committed one or more offenses under state law. *Id.* at 1004. As to the third, *Bernini* concluded there was no "practical alternative" to mass arrests given the "precarious situation" in which officers were "clearly outnumbered" by a group that had "demonstrated an intent to charge the downtown area." *Id.* at 1004–05. The key to the Eighth Circuit's conclusion, as later reiterated in *Baude*, was that a crime was committed at the intersection by an entire group "acting as a unit." *Id.* at 1005.

The facts here are not exactly like *Baude* or *Bernini* because officers in downtown Des Moines did not engage in "kettling" or make a "mass arrest" of an entire group in the early morning

hours of May 31. Instead, as Plaintiffs' experiences show, arrests were made on more of a random or arbitrary basis in which officers arrested some people but not others despite no apparent difference in conduct. In fact, some Plaintiffs walked past one set of officers who told them they were free to leave only to have a second set of officers, just moments later, place them in zip-ties and take them into custody. None of this *per se* means qualified immunity should be denied: reasonable officers can disagree about whether there is probable cause for arrest, and there are situations where law enforcement may not have the resources to arrest everyone who is seen committing an offense. *See, e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760 (2005) (citing, *inter alia*, "insufficient resources" as a reason officers may lawfully decline to make an arrest). These facts do, however, raise serious doubts about whether officers believed a crime was committed by an entire group "acting as a unit" as occurred in *Bernini*.

Those doubts are reinforced by other important differences between *Bernini* and the events in Des Moines on May 30 and 31, all of which show *Baude* to be the closest on-point authority. First, unlike *Bernini*, there was no police order declaring the entire downtown Des Moines area off-limits for the entire night. Instead, there were dispersal orders at the Iowa Capitol Building at approximately 11:15 p.m. and near the Police Station at approximately 12:30 a.m. The Iowa Capitol Building is more than one mile east of where the fourteen Plaintiffs were eventually arrested after 2:40 a.m. The Court does not interpret *Bernini* to mean that an order directing people to leave the Iowa Capitol Building at 11:15 p.m. gave police arguable probable cause to make arrests for failure to disperse more than one mile away and several hours later in and around the Court Avenue District.

Similarly, the Police Station is across the Des Moines River from the Court Avenue District and three to six blocks away (or roughly one-third and one-half mile) from where most Plaintiffs were arrested two-plus hours later. It appears that the only broadcast dispersal order at the Police Station at 12:30 a.m. was to "clear the [Court Avenue] bridge and disperse," which, in context, was designed to protect the Police Station, not to declare the entire downtown off-limits for the rest of the night. Thus, again, the Court does not interpret *Bernini* to mean officers suddenly had arguable probable cause to arrest anyone near downtown Des Moines at any point after 12:30 a.m.

The following map shows the location of the earlier dispersal orders vis-à-vis the Court Avenue District and drives home why the Court does not interpret those orders as establishing arguable probable cause for arrest:



Second, and relatedly, the record shows that officers themselves did not view the earlier dispersal orders as placing the entire downtown area off-limits. To the contrary, officers appear to have been satisfied when protesters retreated from the Police Station to the Court Avenue District following the command to "clear the bridge" around 12:30 a.m. Over the next two hours, nothing was done to prevent ingress and egress to the Court Avenue District except in the limited sense that officers set up a skirmish line to prevent people from moving east across the Court Avenue Bridge again toward the Police Station—which, again, shows that the emphasis was on protecting the Police Station, not declaring the streets off-limits altogether. Other than this skirmish line, members of the public had unfettered access to the Court Avenue District, whether on foot or by car and whether from the north, south, or west. Video footage shows vehicle and foot traffic entering and exiting the area clear up to 2:30 a.m. and beyond.

Even after the disruptive activity around 2:30 a.m., Metro STAR Lieutenant Schafnitz did not direct officers to arrest everyone they saw, which is what one would expect if an entire group of protesters was believed to be engaging in unlawful activity "as a unit." *See Bernini*, 665 F.3d at

1005. Instead, Schafnitz instructed officers to "arrest individuals who were engaging in criminal activity or who did not clear the area from the crowd which had been declared an unlawful assembly." (ECF 193, ¶ 37.) There was good reason why Schafnitz and other officers did not operate as if the Court Avenue District was entirely off-limits: many people (including some Plaintiffs) live in or near that area, which is also home to many restaurants and bars that were open and had patrons until closing time at 2:00 a.m. (as well as employees who presumably would have needed to stay even later). Given these facts, as well as the free ingress and egress to the Court Avenue District throughout the night, the crowd in the area at 2:30 a.m. may very well have been comprised of different people than the crowds at the Iowa Capitol Building and near the Police Station hours earlier. In fact, as explained below, at least ten of the fourteen Plaintiffs were not in either of those locations at the time of the dispersal orders. The bottom line is that the facts here are far more like *Baude* than *Bernini*. *See Baude*, 23 F.4th at 1073 ("[P]eople were freely entering and exiting the area even after the Officers purportedly issued dispersal orders.").

Third, unlike *Bernini*, which involved a large crowd of determined protesters who moved together en masse in clear defiance of the order to stay away from downtown, the record here shows that the number of protesters in downtown Des Moines dwindled over the course of the night. By 1:00 a.m., video footage shows only approximately fifty protesters in a skirmish line near the Court Avenue Bridge, in contrast to roughly sixty officers. By 2:00 a.m., the atmosphere had calmed down so much that Des Moines Police Chief Dana Wingert was in the process of dismissing officers for the night. Even during the renewed disturbances around 2:30 a.m., the record shows that the unlawful activity was committed by a small subset of protesters, not the entire group. Thus, again, it is difficult to conclude that a single group committed a crime "as a unit" like the group in *Bernini*. Instead, the more apt legal principle comes from *Baude*: "[p]olice may be entitled to qualified immunity protections if they arrest individual offenders with at least arguable probable cause, but officers cannot enjoy such protections by alleging that 'the unlawful acts of a small group' justify the arrest of the mass." 23 F.4th at 1073 (internal citations omitted) (quoting and contrasting *Bernini*, 665 F.3d at 1005).

Fourth, and similarly, the closest thing to an unlawful group "acting as a unit" as of 2:40 a.m. was the crowd of people engaged in destructive acts while moving west down Court Avenue toward the Hy-Vee between 4th Street and 5th Avenue, before then dispersing to the west, south, or north. But none of the fourteen Plaintiffs were part of that group, and only two even got as far

west as 4th Street during the relevant timeframe. Of the remaining twelve Plaintiffs, four stayed behind at or near the 3rd and Court Parking Garage (i.e., one to two blocks east of Hy-Vee) and thus essentially chose <u>not</u> to be part of the riotous group. The other eight Plaintiffs were not on Court Avenue at all. This is far different than *Bernini*, where the unlawful group "acting as a unit" was arrested en masse at the same time and location. In fact, viewing the facts in the light most favorable to Plaintiffs, the situation here would be akin to the officers in *Bernini* choosing to ignore the group of protesters in the park in favor of arresting isolated bystanders who showed up later and/or were standing one or more blocks away.

In sum, *Baude* is far closer than *Bernini* to being on point. Like officers in *Baude*, officers in Des Moines issued dispersal orders hours before the arrests at issue but did not thereafter operate as if the Court Avenue District had been totally shut down. *See Baude*, 23 F.4th at 1073. Nor, in context, would it have been appropriate for officers to treat that area as being on shutdown given that the dispersal orders had been made in other places, at other times, and for other reasons—not to mention the many legitimate reasons people had for being in or near the Court Avenue District, including that they lived, worked, or wanted to patronize businesses there.

In these circumstances, and viewing disputed facts in the light most favorable to Plaintiffs, no reasonable officer could have interpreted the dispersal order at the Iowa Capitol Building at 11:15 p.m. to mean people could not be on the streets more than one mile away in the Court Avenue District more than three hours later. Similarly, no reasonable officer could interpret a directive to "clear the bridge" near the Police Station at 12:30 a.m. to mean people could not be several blocks away in the Court Avenue District more than two hours later, particularly when officers did nothing to control ingress or egress to the area during the intervening period. Indeed, following *Baude*, the Court doubts that a reasonable officer could have interpreted a dispersal order *in the Court Avenue District itself* at 11:15 p.m. or 12:30 a.m. to mean that it was illegal for people to be in that area two-plus hours later given the flow of traffic in and out during the intervening period.

For these reasons, the Court cannot conclude that qualified immunity exists based solely on Plaintiffs' mere presence in the vicinity of 3rd Street and Court Avenue after 2:40 a.m. It follows that the Court will not grant summary judgment to Defendants across-the-board on the unlawful seizure claims based on Plaintiffs' mere presence. Instead, the Court must go deeper and evaluate the specific details surrounding each Plaintiff's arrest.

*B. For Purposes of the State Law <u>Godfrey</u> Claims for Unlawful Seizure, Officers Did Not Have a Lawful Basis to Arrest Plaintiffs for Failure to Disperse or Unlawful Assembly Based Solely on Plaintiffs' Presence Near 3rd Street and Court Avenue after 2:40 a.m.*

As with the federal claims, the Court concludes that Defendants are not entitled to qualified immunity across-the-board on Plaintiffs' state law constitutional claims (hereinafter, the "*Godfrey* claims")[15] based solely on Plaintiffs' mere presence in the area of 3rd Street and Court Avenue after 2:40 a.m. Defendants have not cited, and the Court has not independently located, any authority suggesting law enforcement officers have greater freedom to make arrests under article I, section 8 of the Iowa Constitution than they would have under the Fourth Amendment of the United States Constitution. Instead, if anything, the opposite is true given the Iowa Supreme Court's willingness on some occasions to interpret the rights set forth in article I, section 8 more broadly than the Fourth Amendment. *See, e.g.*, *Christopher*, 757 N.W.2d at 249. The Court's conclusion that Plaintiffs' mere presence on the streets after 2:40 a.m. was not enough, in and of itself, to establish arguable probable cause for arrest for purposes of Plaintiffs' section 1983 claims therefore also precludes qualified immunity across-the-board on the *Godfrey* claims.

In reaching this conclusion, the Court assumes overlap between *Baldwin*'s "all due care" standard and the "arguable probable cause" standard applicable to section 1983 cases. That is, the Court concludes that government officials cannot successfully claim to have exercised all due care under Iowa law when they arrest people for crimes for which arguable probable cause did not exist. *Cf. Children*, 331 N.W.2d at 680 ("If the officer acts in good faith and with reasonable belief that a crime has been committed and the person arrested committed it, his actions are justified and liability does not attach."). For now, the Court need not decide whether the Iowa Supreme Court might go even further by concluding that officers need <u>actual</u> probable cause (rather than just <u>arguable</u> probable cause) before they can be deemed to have acted with "all due care."

Two other overarching issues also require attention. First, some Defendants argue that the Iowa Supreme Court may be poised to overrule or limit *Godfrey* and no longer permit direct constitutional tort claims against government officials or entities. (E.g., ECF 169-1, pp. 13–15.) Perhaps so, but this Court may not disregard existing precedent based on speculation about what the Iowa Supreme Court might do in the future. *See Travelers Prop. Cas. Ins. Co. of Am. v. Nat'l Union Ins. Co. of Pittsburg, Pa.*, 621 F.3d 697, 707 (8th Cir. 2010) ("In applying state law, we are

---

[15] So named in light of *Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017), which recognized that plaintiffs may, in some circumstances, bring direct claims for damages against government officials for violating the Iowa Constitution.

bound to apply the law of the state as articulated by the state's highest court."). Instead, the Court must treat *Godfrey* as good law until and unless the Iowa Supreme Court says otherwise.

Second, some Defendants argue they are protected by other forms of immunity, such as emergency response immunity under Iowa Code §§ 670.4(1)(k) and 670.12. Section 670.4(1)(k) protects municipalities from liability for the torts of officers and employees acting within the scope of their employment if the "claim [is] based upon or arising out of an act or omission of a municipality in connection with an emergency response. . . ." *See also Cubit v. Mahaska County*, 677 N.W.2d 777, 782 (Iowa 2004). Section 670.12 states that "officers and employees of municipalities are not personally liable for claims which are exempted under section 670.4, except claims for punitive damages, and actions permitted under section 85.20." Some Defendants also argue that discretionary function immunity applies pursuant to Iowa Code § 670.4(1)(c).

In *Baldwin I*, the Iowa Supreme Court held that statutory forms of immunity in Iowa Code § 670.4 are not available to defendants in constitutional tort claims arising under article I, section 8 of the Iowa Constitution. 915 N.W.2d at 280. Instead, a separate form of immunity is available in which the officer must "plead[] and prove[] as an affirmative defense that she or he exercised all due care to conform to the requirements of the law." *Id.* at 281. *Baldwin I* explained that statutory forms of immunity are a "grab bag of immunities reflecting certain *legislative* priorities. Some of these are unsuitable for *constitutional* torts." *Id.* at 280; *see also Wagner v. State*, 952 N.W.2d 843, 851–52 (Iowa 2020). Although *Baldwin I* did not specifically mention emergency response immunity as one such "unsuitable" type, it is difficult to interpret the case in any other way. *See, e.g.*, *Boone v. Livesay*, No. 3-21-CV-00046-SHL-SBJ, 2023 WL 2069003, at *5 (S.D. Iowa Jan. 4, 2023) ("[T]aken to its logical extreme, Defendants' position is that [the defendant] and other responding officers could have shot everyone in sight with no risk of liability in a direct constitutional claim simply because they were responding to an emergency. It is impossible to read *Baldwin* or its progeny as permitting this outcome."). The Court therefore rejects the argument that emergency response immunity applies to Plaintiffs' *Godfrey* claims.

The Court also interprets *Baldwin I* as holding that discretionary function immunity is not "suitable" for constitutional torts, as the opinion mentions discretionary function immunity just before holding that constitutional torts require a different standard. 915 N.W.2d at 280. The Court notes, however, that discretionary function immunity revolves in substantial part around whether the government official "exercis[ed] due care," and thus there is significant overlap between the

two forms of immunity even if they are not the same. Given this overlap, the Court will not analyze discretionary function immunity separately from "all due care" immunity because any difference between the two would not affect the outcome of any Plaintiff's claims against any Defendant.

### C.  The Emergency Response Immunity Defense Is Available on Plaintiffs' False Arrest Claims.

The Court's conclusion for purposes of the section 1983 and *Godfrey* claims that officers did not have arguable probable cause for arrest based solely on Plaintiffs' presence in the streets after 2:40 a.m. applies with equal force to Plaintiffs' false arrest claims. Again, the Court cannot conclude as a matter of law that Plaintiffs' mere presence was enough, in and of itself, to make their detention or restraint "lawful."

Nonetheless, the Court must revisit the defense of emergency response immunity. False arrest is a common law claim, not a constitutional tort. Accordingly, the Iowa Supreme Court's conclusion in *Baldwin I* that statutory immunities are "unsuitable" for *Godfrey* claims does not mean they are also "unsuitable" for common law claims. To the contrary, emergency response immunity is clearly available as a defense to common law tort claims. *See, e.g.*, *Cubit*, 677 N.W.2d at 782. The question turns, then, to whether the undisputed facts require application of emergency response immunity to some or all Defendants here.

The Iowa Supreme Court has interpreted emergency response immunity broadly. *Cubit* held that it applies if there is "some causal connection between the 'claim' and 'an act or omission in connection with an emergency response.'" 677 N.W.2d at 784 (quoting now-Iowa Code 670.4(1)(k)). In turn, "[a]n 'emergency' is commonly defined as an 'unforeseen combination of circumstances or the resulting state that calls for immediate action,' or 'an urgent need for assistance or relief.'" *State v. Iowa Dist. Ct. for Scott Cnty.*, 889 N.W.2d 467, 475 (Iowa 2017) (quoting *Emergency*, *Merriam-Webster's Collegiate Dictionary* (10th ed. 2002)). "[I]t is the occurrence and continuation of an emergency response, rather than just an emergency, that extends the city's immunity from liability." *Adams v. City of Des Moines*, 629 N.W.2d 367, 370 (Iowa 2001). "Thus, only if the plaintiff's claim . . . may be proved without reference to or reliance upon the [defendant's] acts or omissions during the emergency . . . will the plaintiff avoid the statutory immunity of section 670.4[(1)(k)]." *Cubit*, 677 N.W.2d at 784.

Courts applying Iowa law have held that emergency response immunity is often available when law enforcement officers respond to ongoing criminal activity. *See, e.g.*, *Williams v. City of Burlington, Iowa*, 516 F. Supp. 3d 851, 875 (S.D. Iowa 2021) (applying emergency response

immunity to officers' pursuit of fleeing suspect), *aff'd*, 27 F.4th 1346 (8th Cir. 2022). "In contrast, a routine stop for traffic violations is not generally considered an emergency." *Iowa Dist. Ct. for Scott Cnty.*, 889 N.W.2d at 475; *see also Stych v. City of Muscatine*, 655 F. Supp. 2d 928, 936 (S.D. Iowa 2009) ("If routine traffic violations such as failure to stop at a stop sign are deemed emergencies, there is little doubt that the emergency response exception would swallow the rule that municipalities are ordinarily liable for tortious acts under the statutory waiver of sovereign immunity.").

Here, the Court concludes there was an "emergency" for purposes of Iowa Code § 670.4(1)(k) when an unruly group broke windows and entered businesses while moving west on Court Avenue toward Hy-Vee between 2:30 and 2:40 a.m. As all fourteen Plaintiffs were arrested in the eighty minutes that followed, the emergency response immunity defense is available. However, rather than applying the defense across-the-board on the false arrest claims, the Court believes the better approach is to evaluate emergency response immunity as to each Plaintiff's claims against each Defendant. This also will allow the Court to conduct individualized analysis on the related issue of punitive damages, which requires each Plaintiff to show "actual malice or willful, wanton and reckless misconduct" by each Defendant. Any Defendant for whom such a showing is made will face potential liability for punitive damages even if emergency response immunity applies. *See* Iowa Code § 670.12.

**VII.    Specific Legal Analysis –Unlawful Seizure and False Arrest Claims.**

The Court now turns to the details of each Plaintiff's claims against each Defendant. The Court will start by evaluating the federal (Count I) and state (Count II) unlawful seizure claims, as well as the state false arrest claims (Count VIII). Other state and federal claims will be analyzed in ensuing sections. The Court will proceed in chronological order based on the time of each Plaintiff's arrest.

### A.  *Plaintiff Harrison Woods.*

#### 1.  Facts Specific to Woods.

Plaintiff Harrison Woods, who lived in downtown Des Moines approximately one mile south of the Court Avenue District, actively participated in protests near the Iowa Capitol Building on the night of May 30. (ECF 198-2, ¶¶ 312–22; ECF 170-4, p. 630.) He wore dark pants and an orange mid-length sleeved shirt and is seen on news footage moving among crowds at the Capitol. (ECF 198-2, ¶¶ 313–14.) When law enforcement began deploying teargas at the Capitol, Woods

jogged up the Capitol steps, carrying what appears to be a jug of milk, then slowly walked back toward protesters congregated below. (Id., ¶ 315; Register Footage 1[16], 1:09:36–1:09:52.) Officers are obscured by tear gas or other dispersants, so it is unclear how close Woods was to the police line. (Id.)

Woods was in the middle of a group of protesters on a lower landing at least one tier of steps below officers. (ECF 198-2, ¶ 316; Register Footage 1, 1:11:15–1:11:40.) He moved around the landing and on the stairs, raising his fist at one point toward approaching officers. (ECF 198-2, ¶ 318; Register Footage 1, 1:13:34–1:14:07.) A protester to his right threw an object—purportedly a firework. (ECF 198-2, ¶ 317; Register Footage 1, 1:13:45.) Officers began launching teargas canisters over Woods's head, prompting him to back down the Capitol steps with his fist still raised. (ECF 198-2, ¶ 319; Register Footage 1, 1:14:08–1:14:11.) A few seconds later, he lowered his fist, turned, and walked down to the landing. (ECF 198-2, ¶ 319; Register Footage 1, 1:14:12–1:15:21.) As officers moved down to the landing one set of stairs away from Woods, he moved back several steps and paused on the stairs immediately adjacent to the sidewalk running parallel to the Capitol steps. (ECF 198-2, ¶ 320; Register Footage 1, 1:15:23–1:17:46.) Officers deployed more teargas, and Woods turned and appeared to be leaving the Capitol, walking across the road and out of sight. (Register Footage 1, 1:17:47–1:17:58.)

Woods said that because of where he was standing at the Capitol, he did not know whether dispersal orders were given, although he "imagine[d] there was an order given at some point":

> Q.     [T]he reason there was tear gas was to clear people who probably were not leaving pursuant to dispersal orders?
>
> A.     I was further away from the head of the crowd, I would say, so I don't know whether or not dispersal orders were given, when they were given, what exactly the order was. All I remember is being tear gassed at the Capitol, or however we want to frame that.
>
> Q.     Sure. So would I be fair in stating you were far enough away that you wouldn't be able to state one way or the other whether a dispersal order was given?
>
> A.     That would be correct; at the Capitol, yes.
>
> Q.     So after that happened, you thought it was best to leave?

---

[16] "Register Footage 1" refers to footage taken by the Des Moines Register and titled "Demonstrators gather to protest death of George Floyd in Des Moines." It is found in the record at ECF 170-4, p. 911. The timestamp on Register Footage 1 appears to bear no relationship to the time of day.

A.     After that the demonstration was pretty much over at that point. I think everybody did disperse so I imagine there was an order given at some point.

(ECF 170-4, p. 633.) Woods returned home around 11:30 p.m., catching a ride with a friend, Bailey Reese. (Id., p. 632; ECF 198-2, ¶ 322.)

After he arrived home, Woods saw videos showing "another demonstration kind of forming closer to downtown" and "people gathering" at the "bus station," "bridges," and "then around the Court Avenue bar scene." (ECF 198-2, ¶ 323; ECF 170-4, p. 633.) Woods testified he was "feeling touristy" and "decided to walk back down towards downtown." (ECF 198-2, ¶ 323.) He also testified he left because "Bailey [Reese] had reached out to me when she was downtown . . . [and] indicated to me—or maybe it was just my speculation that she did not feel safe. So my intention was to go and kind of walk her away from the situation." (ECF 170-4, p. 638.) Woods was not sure when he left his apartment, but "it had to have been after midnight." (Id., p. 634.)

Woods walked from his apartment to Court Avenue, in or around the block between 2nd Avenue and 3rd Street.  (Id.; ECF 198-2, ¶ 325.) At some point, people started using garbage cans to block traffic on Court Avenue. (ECF 198-2, ¶ 325.) Woods said he was standing near the 3rd and Court Parking Garage when demonstrators began setting off fireworks in the intersection of 2nd and Court Avenues. (Id., ¶¶ 326–27.) He thought this happened between 1:30 a.m. and 1:50 a.m., although other evidence suggests it was well after 2:00 a.m.; regardless, Woods said "it kind of all went downhill" from there. (Id., ¶¶ 113, 328; ECF 170-4, p. 634.)

After the fireworks went off, Woods "was looking for anybody [he] knew" and "anybody that appeared injured . . . from anything." (ECF 170-4, p. 634.) He "continued westbound on Court Avenue, maybe a half block or so." (Id., p. 635; ECF 198-2, ¶ 330.) "And then . . . maybe five, ten minutes later is when we started seeing the big armored vehicles roll up and stuff like that, and then it turned into Star Wars." (ECF 198-2, ¶ 330–32; ECF 170-4, p. 635.)[17] When law enforcement arrived, Woods believed he was "on the northeast corner of Fourth and Court, maybe Third and Court[,] . . . underneath that parking structure that's across the street from Johnny's Hall of Fame." (ECF 170-4, p. 635.)

Woods's testimony is largely corroborated by video footage from the early morning hours of May 31, which shows him walking west along the south side of Court Avenue at 2:36 a.m. by

---

[17] The comment about "Star Wars" was presumably in reference to a large, square-shaped wheeled police transport vehicle that, to Woods, resembled something a viewer might see in a Star Wars film.

himself. (NE-SW Cam, 2:36:09–2:37:05.) After pausing briefly on the southeast corner of the 3rd Street and Court Avenue intersection, he continued west across the intersection to the southwest corner and eventually out of sight while various police vehicles, including armored vehicles, drove past him. (Id.) Several seconds later, Woods headed back to the east on the south side of Court Avenue and back into frame. (NE-SW Cam, 2:37:24–2:37:48.) Woods stopped on the southwest corner of the 3rd Street and Court Avenue intersection and appeared to look down at his cellphone. (NE-SW Cam, 2:37:48–2:38:22.) He then walked east on Court Avenue to the southeast corner of the intersection, turned north, and crossed the intersection in the vicinity of the 3rd and Court Parking Garage. (NE-SW Cam, 2:38:22–2:39:04.) Less than two minutes later, Woods briefly reappeared on a different camera on the same northeast corner of the intersection. (Downtown Camera 3rd-Court NE-SE Cam[18], 2:40:46–2:41:38.)

Woods testified that at some unspecified time he reencountered Reese near the 3rd and Court Parking Garage, and the two of them remained there. (ECF 193, ¶ 79.) Woods then saw officers moving in "from every direction I could possibly see." (Id., ¶ 80; ECF 170-4, p. 635.) Hands raised, he asked officers which way they wanted him to go and was told to head north on 3rd Street. (ECF 193, ¶¶ 82–83.) According to Woods, this was the first dispersal order he heard while in the Court Avenue District. (ECF 205-1, ¶ 15.) As Woods turned right from Court Avenue onto 3rd Street "to follow the dispersal order," he testified that he "saw an individual on the ground," and "[i]t was [his] perception that an officer was being a little too rough." (ECF 198-2, ¶ 335; ECF 170-4, pp. 635–37.) Woods turned toward the officer, said "hey," and was "immediately . . . pepper sprayed [by unidentified Metro STAR officers] and thrown into the wall [of the Parking Garage]." (ECF 198-2, ¶ 339; ECF 193, ¶ 86; ECF 170-4, p. 640.) Woods alleges that he suffered "significant bruising" on his arms and chest. (Id.) Woods was in the custody of Metro STAR officers by 2:45 a.m. and was walked west on Court Avenue to a police transport vehicle by two unidentified officers. (ECF 198-2, ¶ 340; ECF 193, ¶¶ 89–90; NE-SW Cam, 2:45:36–2:46:28; 3rd_4th Cam, 2:46:28–2:46:45.) The City of Des Moines Defendants allege that Woods was pepper sprayed after he "protested and interfered with police interacting with another individual," although they rely only on Woods's deposition testimony to support this proposition. (ECF 193-1,

---

[18] "NE-SE Cam" refers to footage from a second security camera on the northeast corner of the 3rd and Court intersection, this time facing southeast. It is found in the record at ECF 170-4, p. 891. Again, the parties appear to agree that the timestamp accurately represents the time of day.

¶ 13.) The Court concludes that the cited testimony does not support the proposition, and thus will assume he did nothing more than say "hey."

Woods was charged with participating in a riot and 2nd degree criminal mischief. (ECF ECF 198-2, ¶ 342.) The parties agree that none of the officers who encountered Woods on Court Avenue had any knowledge of his prior activity, nor did they attempt to determine whether Woods had heard a dispersal order, joined in an unlawful assembly, participated in a riot, or committed any acts of vandalism. (ECF 213-1, ¶¶ 35, 45.) For his part, Woods denies having been given a dispersal order at any point prior to the moments before his arrest. (ECF 205-1, ¶ 15.) All charges against Woods were ultimately dismissed. (ECF 148, ¶¶ 341–43; ECF 152, ¶¶ 342 –43.)

Defendants allege Woods was taken into custody "approximately 10 minutes after officers' arrival and dispersal orders." (ECF 205-1, ¶ 15.) Plaintiffs "[d]ispute dispersal orders were given to Woods prior to his arrest or that dispersal orders were given at the 3rd and Court intersection when officers arrived at 2:37 [a.m.]." (Id.) Woods's deposition testimony does not reference either general or specific dispersal orders in the Court Avenue District other than those he received from officers immediately before he was pepper sprayed and arrested. (ECF 170-4, p. 635.)

  2. The Court Grants Summary Judgment in Favor of Defendants McTaggart and
     Bagby on Count I as to Woods.

Woods is unable to identify the specific officer(s) who arrested him, and thus his unlawful seizure claim under section 1983 is solely against Defendants McTaggart and Bagby. Woods's theory is that McTaggart and Bagby became directly involved in his arrest at the Police Station when they instructed other officers to write up charges against him for participating in a riot and 2nd degree criminal mischief.

Woods has not cited, and the Court cannot independently locate, any cases holding that an officer can be liable for illegal seizure under section 1983 based on the officer's involvement in writing up charges at the police station against a suspect who was arrested by someone else at a different location. Instead, liability for illegal seizure is typically based on the officer's own, personal involvement at the arrest scene. Woods therefore has not established a "clearly established" constitutional rule that McTaggart and Bagby allegedly violated.

The closest authority the Court can find undermines Woods's attempt to impose liability on McTaggart and Bagby in Count I. In *Tracy v. Neuberger*, the District of Minnesota granted qualified immunity to an officer who took control of a suspect and oversaw the booking process after the suspect had been arrested. 840 F. Supp. 2d 1183, 1187, 1189–90 (D. Minn. 2012). *Tracy*

held that although the arresting officer likely lacked probable cause for arrest, this was not the relevant issue for determining liability of the later-involved officer. *Id.* at 1190. As to that officer, "the Court cannot conclude that the officer violates the Fourth Amendment by failing to question the suspect and independently confirm that the officer who arrested him had probable cause." *Id.*

*Tracy* is consistent with Supreme Court precedent like *White v. Pauly*, which held that "[c]early established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures, such as officer identification, have already been followed." 580 U.S. 73, 80 (2017). "No settled Fourth Amendment principle requires that officer to second-guess the earlier steps already taken by his or her fellow officers in instances like the one [the defendant] confronted here." *Id.*; *see also, e.g.*, *Ransom v. Grisafe*, 790 F.3d 804, 814 (8th Cir. 2015) ("Sergeant Dearing is not liable for the unauthorized, unconstitutional actions of others.")

In essence, Woods is arguing that McTaggart and Bagby should have realized there was not probable cause to arrest him, yet they kept him in custody and moved forward with charges anyway. The Court cannot accept this argument without concluding that McTaggart and Bagby had an obligation to second-guess the decision of arresting officers to take Woods into custody. As there is no "clearly established" law imposing such an obligation on McTaggart and Bagby in circumstances like those presented here, the Court must conclude they are protected by qualified immunity. *See Pearson*, 555 U.S. at 231.

In arguing otherwise, Woods focuses on alleged deficiencies in communication between McTaggart, Bagby, the arresting officers, and others. For example, although Bagby recalls talking with arresting officers, he was not able to provide any meaningful details about these conversations beyond a vague understanding that Woods and other arrestees were "involved" in the Hy-Vee incident. McTaggart, for his part, appears not to have spoken with arresting officers at all, although he did call Assistant Polk County Attorney Nan Horvat to seek guidance on charges. The record is unclear as to the exact substance of their conversation, but McTaggart apparently described events on Court Avenue and asked whether they constituted a "riot" without making any distinction between direct participants in the unlawful activity and people like Woods who were mere bystanders more than one block away. Horvat said "riot" was an appropriate charge.

McTaggart informed Bagby that the riot charge was appropriate, with Bagby passing some version of the message along to subordinate officers. Bagby also told subordinate officers to charge

criminal mischief, although the record is unclear on whether McTaggart directed this. Overall, viewing the facts in the light most favorable to Plaintiffs, it was a sloppy sequence of events in which incomplete or misleading messages were passed from one person to the next. Plaintiffs characterize it as a case of "compounding ignorance and willful blindness," which, in their view, resulted in Woods and other detainees being charged in a "blanket" fashion with offenses they clearly did not commit. Plaintiffs argue that McTaggart and Bagby would have uncovered the problem if they performed an individualized analysis as to each arrestee.

The Court agrees that Woods does not appear to have committed the offenses of riot or criminal mischief. Nonetheless, even with the breakdowns in communication, Woods has not shown that McTaggart and Bagby, as non-arresting officers who did not encounter Woods until he was brought to the Police Station several blocks away from the site of his arrest, had a clearly established constitutional obligation to perform further investigation. After all, McTaggart and Bagby knew Woods had been arrested at least somewhat near the arguably riotous group at Hy-Vee. In these circumstances, there is no clearly established constitutional principle requiring Bagby or McTaggart to do something more.

In reaching this conclusion, it is important to emphasize the difference between the <u>fact</u> of arrest and the <u>reason</u> for arrest. Woods has presented compelling evidence that there was no basis for him to be charged with riot and criminal mischief in a situation where he was arrested more than one block from the riotous group and in the wrong direction from where that group dispersed. However, the relevant question in an unlawful seizure claim is not whether the officer responsible for the paperwork ultimately charged the arrestee with the correct offense, but rather whether the <u>arresting</u> officer had arguable probable cause that <u>some</u> offense had been committed. *See Wood v. Wooten*, 986 F.3d 1079, 1081 (8th Cir. 2021) ("[A]n officer's wrongly-stated reason for an arrest does not nullify an otherwise lawful arrest."); *White v. Jackson*, 865 F.3d 1064, 1079 (8th Cir. 2017) (rejecting plaintiffs' argument that "since they were charged with refusal to disperse, defendants cannot now argue that they had probable cause to arrest them for the separate crime of interfering with the duties of a police officer"). Thus, the fact that McTaggart and Bagby made "blanket" charging decisions is largely beside the point. The more pertinent question is whether there is clearly established constitutional authority requiring them to conduct further investigation into whether there was <u>any</u> basis for arrest in a situation where other officers arrested Woods outside their presence. Plaintiffs have failed to identify any such authority, and thus the Court must

grant summary judgment to Defendants McTaggart and Bagby on qualified immunity grounds on Woods's Count I.

      3.   <u>The Court Denies Both Sides' Motions for Summary Judgment on Count II as to Woods.</u>

Although the relevant facts are largely the same, the Court must take a different analytical approach to Woods's *Godfrey* claim for unlawful seizure (Count II) than it did for his section 1983 claim (Count I). This is because, under *Baldwin I*, the absence of a clearly established constitutional rule is not enough to entitle a government official to qualified immunity. Instead, under Iowa law, qualified immunity is an affirmative defense for which the officer bears the burden of proving that he or she exercised "all due care to conform to the requirements of the law." 915 N.W.2d at 279.

The different standard is enough to cause the Court to deny qualified immunity as to McTaggart and Bagby on Count II, particularly given the disputes and gaps in the record on what they knew and did. *See, e.g.*, *Ohlson-Townsend v. Wolf*, No. 18-CV-4093-CJW-MAR, 2019 WL 6609695, at *9 (N.D. Iowa Dec. 5, 2019) ("[T]he Iowa standard for qualified immunity is more stringent than the federal standard."). Viewed in the light most favorable to Woods, the facts show that McTaggart and Bagby were directly involved at a supervisory level in keeping him detained at the Police Station despite having, at most, only a vague sense of what Woods allegedly had done wrong. McTaggart and Bagby ultimately caused other officers to charge Woods with two offenses he clearly did not commit in a situation where even a modest level of additional investigation— such as, for example, pinning down the location of his arrest—likely would have shown he had not committed them. These facts are not enough to allow Woods to overcome qualified immunity on his section 1983 claim given the absence of any clearly established constitutional principle requiring McTaggart and Bagby to investigate further. Conversely, however, the facts are enough to prevent the Court from concluding that McTaggart and Bagby acted with "all due care to conform to the requirements of the law" for purposes of the Iowa law *Godfrey* claim. *See Saunders v. Thies*, No. 4:19-CV-00191-JAJ-HCA, 2020 WL 10731253, at *17 (S.D. Iowa Sept. 8, 2020) (granting qualified immunity on federal claim but not state claim where officer prolonged stop through actions that arguably did not conform to the law); *Lee v. Dawson*, No. C17-4073-LTS, 2019 WL 3068456, at *13 (N.D. Iowa July 12, 2019) (denying qualified immunity on *Godfrey* claim where alleged facts, if proven, would show officer failed to conduct adequate investigation).

Other federal courts applying Iowa law have explained that officers must affirmatively "*tak[e] reasonable action* to 'conform' to the requirements of the law" to have qualified immunity on *Godfrey* claims, in contrast to federal claims where qualified immunity depends on "*avoiding action* one should reasonably know would violate the law." *Baldwin v. City of Estherville*, 333 F. Supp. 3d 817, 843 (N.D. Iowa 2018); *accord Clinton v. Garrett*, 551 F. Supp. 3d 929, 952 (S.D. Iowa 2021), *aff'd*, 49 F.4th 1132 (8th Cir. 2022). The Court finds the distinction between taking reasonable action (*Godfrey*) versus avoiding unreasonable action (section 1983) to be crucial here. Bagby reasonably could have obtained more information to make sure there was a lawful basis for keeping Woods and other arrestees in custody. For example, two of the officers who transported Woods to the Police Station, Officers Ernesto Escobar-Hernandez and Clark Allen[19], were involved in writing up charges and appeared to have concerns about the validity of what they were being asked to do. Yet Bagby did not solicit information from them or respond in more than perfunctory fashion when Allen asked whether criminal mischief was truly an appropriate charge. This casts doubt on whether Bagby acted with "all due care" in a situation where he was not present for the arrests and is unable to provide meaningful details about his conversations with the officers who were. *See Lee*, 2019 WL 3068456, at *13. In these circumstances, the Court cannot grant qualified immunity to Bagby as a matter of law under the "all due care" standard. *See Saunders*, 2020 WL 10731253, at *17.

The Court reaches a similar conclusion as to McTaggart. The record is unclear on why, during his discussion with Assistant County Attorney Horvat, he did not make a distinction between people directly involved in the unlawful activity at Hy-Vee and those (like Woods) who were arrested somewhere else. One explanation is that McTaggart mistakenly believed <u>all</u> arrestees had been directly involved at Hy-Vee. If so, and if this belief was reasonable, he almost certainly would not be liable on Count II. However, a second plausible explanation is that McTaggart knew the situation was more complicated but failed to communicate the same to Horvat. In that scenario, a reasonable juror could conclude McTaggart had not acted with all due care. After all, had he explained to Horvat that some people had been arrested despite being more than one block away from the arguably riotous group at Hy-Vee (and in the wrong direction from where the members of that riotous group had fled), Horvat may have raised doubts about whether there was a lawful

---

[19] Although Escobar-Hernandez and Allen are named Defendants, Plaintiffs have stipulated to their dismissal on Counts I and II. (ECF 202, p. 40.)

basis for arrest for riot or any other offense. In turn, this might have prompted additional investigation as to each arrestee, including, for example, a discussion with Allen and Escobar-Hernandez in which their concerns would have surfaced. As the record is incomplete on these issues, the Court must conclude that McTaggart, like Bagby, has not met his burden of proving the "all due care" defense as a matter of law. *See id.*

In analyzing the situation, it is important to understand the geography pertaining to Woods's arrest. When the first wave of officers entered the Court Avenue District shortly after 2:35 a.m., they headed down Court Avenue from east to west in pursuit of the unruly crowd that was breaking windows and entering Hy-Vee between 4th Street and 5th Avenue. That unruly crowd responded by dispersing from Hy-Vee to the north, south, or further to the west. But Woods was arrested more than one block to the <u>east</u>, near the 3rd and Court Parking Garage, as illustrated in this diagram:



It would have been difficult—not to mention illogical—for Woods to have reached the site of his arrest in such a short amount of time if he had been part of the criminal mischief at Hy-Vee. Doing so would have required him to break away from the unruly crowd and head straight into the path of the wave of officers coming down Court Avenue. Any reasonable officer, upon encountering Woods at the 3rd and Court Parking Garage, should have recognized the implausibility of him

having reached that location if he had been part of the violent group at Hy-Vee. Yet officers arrested Woods anyway without even bothering to investigate where he had been or whether he had violated the law, followed by Bagby and McTaggart taking steps to keep him in custody by having Woods charged with two offenses he did not commit. Had Bagby or McTaggart done more to evaluate the situation, they may have released Woods after concluding there was no lawful basis for arrest for <u>any</u> reason. For these reasons, the Court denies McTaggart's and Bagby's Motions for Summary Judgment on Count II as to Woods.

The Court also denies Woods's Motion for Summary Judgment on Count II. Although a reasonable juror could resolve disputed facts in a way that shows McTaggart and Bagby did not act with all due care, the same juror also could find facts showing they <u>did</u> act with all due care. Either way, the jury must decide the facts.

4. <u>The Court Grants Summary Judgment in Favor of Defendants McTaggart and Bagby on Count VIII as to Woods.</u>

Unlike Woods's section 1983 and *Godfrey* claims, the Court must consider emergency response immunity in connection with his false arrest claim. The undisputed facts show that arresting officers were responding to an "emergency" when they moved into the Court Avenue District in response to reports of an unruly crowd breaking windows and entering businesses. *See Iowa Dist. Ct. for Scott Cnty.*, 889 N.W.2d at 475. As Woods was arrested during that emergency response, there is a causal relationship between his claim for false arrest and the actions of the arresting officers. *See Cubit*, 677 N.W.2d at 784. Emergency response immunity therefore applies.

Emergency response immunity extends not just to the arresting officers, but also to McTaggart and Bagby. Although they were not directly involved in the arrest, their actions still arose as part of the emergency response. *See Adams*, 629 N.W.2d at 371 (holding that emergency response immunity is not limited to "actions taken contemporaneously with the emergency; it immunizes actions that are part of the emergency response"). It follows that there is a sufficient causal relationship between Woods's Count VIII claim against them and the emergency response. *See Cubit*, 677 N.W.2d at 784.

Woods could overcome emergency response immunity for purposes of punitive damages by offering evidence that McTaggart and/or Bagby acted with "actual malice" or engaged in "willful, wanton and reckless misconduct." Iowa Code § 670.12. However, even interpreting the facts in the light most favorable to Woods, no reasonable juror could reach such a conclusion here. McTaggart and Bagby were arguably negligent in failing to do more to make sure there was

probable cause for arrest, but there is no evidence that they harbored actual malice toward Woods or engaged in willful, wanton and reckless misconduct. *See id.* The Court therefore grants summary judgment in favor of Defendants McTaggart and Bagby on Count VIII as to Woods.

### B. *Plaintiff Michael Klingenberg.*

#### 1. Facts Specific to Klingenberg.

Plaintiff Michael Klingenberg lived near the intersection of MLK Parkway and SW 7th Street, approximately four or five blocks southwest of Court Avenue. (ECF 170-4, p. 650.) On May 30, he went downtown to "investigate" the protests, reaching the pedestrian bridge over the Des Moines River—roughly two blocks south of Court Avenue—around 11:30 p.m. (ECF 198-2, ¶¶ 343–44.) He wore a dark blue short-sleeve shirt, dark shorts, a white and grey checkered scarf, and black sandals. (Id., ¶ 345.) From the pedestrian bridge, Klingenberg walked to the 3rd and Court Parking Garage, a journey which took "between 30 and 45 minutes." (Id., ¶ 346; ECF 170-4, p. 651.) Klingenberg testified that he spent "most of this night" at the top of the Parking Garage. (ECF 198-2, ¶¶ 347–48.) It is unclear, however, when he arrived there or whether he left and returned at some point, as he is visible on surveillance footage walking around Court Avenue between 2nd Avenue and 4th Street at various times. (ECF 198-2, ¶ 349–53.)

For example, at approximately 1:45 a.m., video captured Klingenberg on the northeast corner of the 3rd and Court intersection checking his phone and adjusting his face covering. (ECF 198-2, ¶ 349; NE-SW Cam, 1:45:12–1:46:15.) He then made his way across the street to the southwest corner of the intersection. (ECF 198-2, ¶ 350; NE-SW Cam, 1:46:15–1:47:16.) He stood on the corner for several minutes and then walked across the intersection to the southeast corner. (ECF 198-2, ¶¶ 351–53; NE-SW Cam, 1:47:16–1:51:40.) After reaching the southeast corner, he stopped to speak with a group of individuals, one of whom appeared to be carrying a bottle in one hand and a milk jug in the other. (ECF 198-2, ¶ 353; NE-SW Cam, 1:51:40–1:53:58.) Klingenberg then continued east down the sidewalk and out of view of the surveillance camera. (ECF 198-2, ¶ 353; NE-SW Cam, 1:53:58–1:54:03.)

Klingenberg eventually made his way to (or back to) the top floor of the 3rd and Court Parking Garage and was there until approximately 2:40 a.m. (ECF 198-2, ¶ 361.) His arrival time is not apparent from surveillance footage, nor did he testify to a specific arrival time. (ECF 198-2, ¶ 354.) There were others on the top floor as well; Klingenberg said there were "no more than 15 [people] up there at any one time, but people would rotate out." (ECF 170-4, p. 652.) At some

point after 2:00 a.m., Klingenberg could see people placing garbage cans in the street and breaking windows. (ECF 198-2, ¶¶ 355–57.) At approximately 2:35 a.m., Klingenberg saw officers come down Court Avenue and begin dispersing people. (Id., ¶¶ 135, 358–59.) He testified there were "probably 12 people on the roof of the parking garage" at the time and "everybody started voicing, you know, like, 'oh, this is a good time to get out of here.'" (Id., ¶ 359; ECF 170-4, p. 654.)

When police arrived on Court Avenue, several officers were dispatched to the 3rd and Court Parking Garage. (ECF 198-2, ¶ 363.) In audio captured by Officer Luke Hastie's body camera, an officer stated: "We have several participants in the garage at 3rd and Court on the 3rd floor." (ECF 198-2, ¶ 364.) Seconds later, this was corrected to the "4th floor" and "in the stairway." (Id., ¶¶ 366–67; Hastie[20], 8:56–9:11.) Officers entered the garage to clear it around 2:44 a.m. (ECF 193, ¶ 97.) Earlier that morning (around 12:45 a.m., according to an injury report), an officer had been struck on the head by an object thrown from the top of the Parking Garage. (ECF 198-2, ¶ 354.) Officers testified that objects being thrown from that location had been a recurring problem throughout the evening. (Id., ¶ 365.) In his deposition, Klingenberg said he was unaware of anyone throwing objects from the garage and "had no awareness that anyone in the parking garage would be up to anything nefarious." (ECF 170-4, p. 654.)

Klingenberg was the last person to leave the roof of the Parking Garage because he wanted to "make sure [others] were solid" and was "just trying to keep people calm." (Id., p. 656.) He began making his way down and out of the Garage, meeting the "first team of officers [in] the stairwell just as they got up to the roof." (Id.; ECF 198-2, ¶ 368.) Klingenberg continued down, encountering Hastie on the third floor at 2:47 a.m. (ECF 193, ¶¶ 98–100; Hastie, 10:32–10:38.) Hastie told him to "get outta here" to which Klingenberg responded: "I'm outta here. Thanks for everything you're doing." (ECF 198-2, ¶ 369.) Hastie asked how many people were still on the roof, with Klingenberg telling him there were none. (Id., ¶ 373.) On the next floor down, while passing Des Moines Police Officer Aaron Entrekin, Klingenberg raised his hands and told Entrekin he was "getting out of there" while continuing down the stairs. (ECF 193, ¶¶ 101–02.) Neither the first group of officers nor Hastie or Entrekin attempted to detain Klingenberg. (Id., ¶ 103.)

---

[20] "Hastie" refers to Officer Hastie's body-worn camera, which is found in the record at ECF 170-4, p. 919. The video does not contain a timestamp. The citations are to the minute and second marker of the video, which does not correspond to the time of day.

At 2:48 a.m., Klingenberg exited the garage and walked south on 3rd Street across Court Avenue. (ECF 198-2, ¶ 374; NE-SW Cam, 2:48:52–2:48:56.) He walked past two officers in the crosswalk, Defendant McCarthy and an unidentified officer. (ECF 198-2, ¶¶ 374–75; NE-SW Cam 2:48:56–2:48:59.) As he did so, two different officers, Defendants Herman and Holtan, gestured in Klingenberg's direction while they were walking across the east side of the intersection along Court Avenue. (ECF 198-2, ¶ 375; ECF 193, ¶ 107; NE-SW Cam, 2:48:56–2:48:59.) McCarthy and the other officer then arrested Klingenberg. (ECF 198-2, ¶ 374; NE-SW Cam, 2:49:00–2:49:42.) According to McCarthy, Herman and Holtan said Klingenberg "was involved with this stuff . . . he needs to be put in cuffs. He needs to be arrested." (ECF 198-2, ¶ 375; ECF 193, ¶ 107.) Herman and Holtan did not, however, say when or where they had seen Klingenberg or what they saw him doing, nor did McCarthy ask for additional information. (ECF 193, ¶¶ 112–13.) Importantly, the City of Des Moines Defendants assert that, at the time of his arrest, Klingenberg said, "I mest [sic.] up and made a big mistake." (ECF 170-1, ¶ 376.) Klingenberg disputes this. (ECF 198-2, ¶ 376.)

After making the arrest, McCarthy and the unidentified officer escorted Klingenberg west on Court Avenue to where officers were gathering other arrestees. (Id., ¶ 377; NE-SW Cam, 2:49:42–2:50:13.) Allen and Escobar-Hernandez transported Klingenberg away from the scene. (ECF 152, ¶ 258; ECF 173-1, p. 487.) Klingenberg was charged with 2nd degree criminal mischief, participating in a riot, failure to disperse, and unlawful assembly. (ECF 198-2, ¶ 378.) The State dismissed all charges on September 4, 2020. (ECF 152, ¶¶ 266–67.)

2. The Court Denies Both Sides' Motions for Summary Judgment on Klingenberg's Count I Except as to Defendants Bagby and McTaggart, Both of Whom Are Entitled to Summary Judgment.

The facts surrounding Klingenberg's arrest help demonstrate why the Court felt it was necessary to start, above, with the overarching issue of whether mere presence on the streets after 2:40 a.m. was enough to give officers arguable probable cause for arrest. Beyond mere presence, with one partial exception, officers had nothing as to Klingenberg when the facts are viewed in the light most favorable to him (as, at this stage, they must be). Klingenberg was not involved in the violent activity on Court Avenue between 2:30 and 2:40 a.m., nor was he part of the crowd that moved west toward Hy-Vee. Instead, he stayed at the 3rd and Court Parking Garage. No officer claims to have seen Klingenberg anywhere else during the night, much less to have told him to disperse at any point prior to when Klingenberg was already exiting the Parking Garage moments

before his arrest. Nor does any officer claim to have seen another officer tell Klingenberg to disperse at any point during the night or, with the exception of Defendant McCarthy at the time of arrest, to have been <u>told</u> by anyone else that Klingenberg had been told to disperse or otherwise had done something unlawful. No officer claims to have witnessed Klingenberg doing anything threatening; to the contrary, viewing the facts in the light most favorable to him, Klingenberg left the 3rd and Court Parking Garage within approximately three minutes of officers entering that structure, during which time he encountered three different officers (or groups of officers), none of whom did anything to suggest he should be arrested.

It was only once Klingenberg reached street level that Holtan and Herman identified him as someone who should be arrested. Beyond his mere presence, however, the record is devoid of any reason <u>why</u> they believed Klingenberg should be arrested when the facts are viewed in the light most favorable to him. Holtan and Herman did not tell McCarthy what Klingenberg had allegedly done wrong, for example, nor do Defendants' summary judgment filings offer any explanation. Moreover, at the time of arrest, Holtan and Herman appear to have disregarded the readily available fact that Klingenberg had just exited the 3rd and Court Parking Garage, which is more than one block east of the unruly crowd at Hy-Vee and in the wrong direction from where that unruly crowd dispersed when officers arrived. The following diagram shows the geographic discrepancy between the site of Klingenberg's arrest and the location of the unruly crowd:



This discrepancy should have raised serious doubts to any reasonable officer about whether Klingenberg had been part of the violent group, as opposed to being a mere bystander or gawker. *See Kuehl v. Burtis*, 173 F.3d 646, 651 (8th Cir. 1999) (denying qualified immunity where officer "ignored plainly exculpatory evidence that negated the intent required [to commit the crime]"); *see also Williams*, 281 N.W.2d at 624 ("[M]ere presence at the scene of a riot is not punishable."). Indeed, a bystander was captured on video shortly before Klingenberg's arrest telling police, "[y]ou're getting the wrong ones. You guys are picking off the stragglers, that's crazy." (ECF 193, ¶ 1.) Yet Holtan and Herman directed McCarthy to arrest Klingenberg anyway. Viewing the facts in the light most favorable to Klingenberg, the situation fits what *Johnson v. City of Minneapolis* described as the "paradigmatic case" where probable cause is lacking: officers did not speak to Klingenberg before arresting him, ignored exculpatory evidence, and, potentially, disregarded an eyewitness account. 901 F.3d 963, 971 (8th Cir. 2018) (denying qualified immunity); *see also Watkins v. Arkansas*, 725 F. App'x 428, 429 (8th Cir. 2018) ("And, of course, an officer lacks probable cause to arrest someone he hasn't seen do anything wrong."). The Court therefore denies qualified immunity as to Holtan and Herman.

The result is the same for McCarthy, although the analysis is slightly different. In the midst of a relatively fast-moving situation, it might have been reasonable for McCarthy to rely on the statements of Holtan and Herman in arresting Klingenberg if they had provided even a modest

level of detail about what they believed he had done wrong. *See United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011) ("When multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based on the information within the knowledge of the arresting officer as long as there is some degree of communication."). But they provided no detail at all. Instead, they simply said Klingenberg "was involved in this stuff" and should be arrested. Given the time and location of Klingenberg's arrest—i.e., more than one block <u>east</u> of the unruly crowd at Hy-Vee, and in a different direction from where that crowd dispersed— a reasonable officer in McCarthy's position should have made at least some additional inquiry into Klingenberg's conduct before arresting him, particularly given Klingenberg's protestations that he was a mere bystander. By making the arrest without conducting any such further inquiry, McCarthy violated Klingenberg's clearly established right not to be arrested without probable cause when the facts are viewed in the light most favorable to Klingenberg. *See Chestnut v. Wallace*, 947 F.3d 1085, 1092 (8th Cir. 2020) ("A vague, conclusory statement that a person is suspicious is insufficiently specific to support his detention by the police, and merely observing police officers at work cannot give rise to a reasonable inference that criminal mischief is afoot."). The Court therefore denies McCarthy's Motion for Summary Judgment on Count I as well.

Conversely, when disputed facts are resolved in favor of Defendants, the Court concludes that Holtan, Herman, and McCarthy have offered sufficient evidence to withstand Klingenberg's Motion for Summary Judgment. The Court continues to have concerns about their decision to arrest Klingenberg in a situation where he was crossing the street by himself in a location far enough away (and in the wrong direction) from the unruly crowd at Hy-Vee to make clear to a reasonable law enforcement officer that he had not been part of that crowd. Nonetheless, there is one disputed fact that, if resolved in Defendants' favor, tips the scale into showing the existence of arguable probable cause: Klingenberg's alleged statement that he "mes[sed] up and made a big mistake." (ECF 170-1, ¶ 376; ECF 198-2, ¶ 376.) Officers of course are entitled to consider a person's inculpatory statements when deciding whether probable cause exists. *See, e.g.*, *United States v. Condelee*, 915 F.2d 1206, 1210 (8th Cir. 1990) (holding that suspect's statement established probable cause for arrest). Accordingly, if a juror concludes that Klingenberg made the statement attributed to him (which Klingenberg denies), the relevant Defendants would have had arguable probable cause to arrest him. The issue is for the jury to decide.

The outcome is different on Defendants McTaggart's and Bagby's Motions for Summary Judgment as to Count I. Like Plaintiff Woods, Klingenberg has failed to identify a "clearly established" constitutional rule requiring officers who are booking suspects to make an independent investigation of probable cause as to a person arrested by other officers at a different location. *See Tracy*, 840 F. Supp. 2d at 1190. This is fatal to Klingenberg's Count I as against McTaggart and Bagby. The Court therefore grants summary judgment in their favor on qualified immunity grounds on Count I.

3. <u>The Court Denies Both Sides' Motions for Summary Judgment on Klingenberg's Count II.</u>

The Court denies qualified immunity to Holtan, Herman, and McCarthy on Klingenberg's *Godfrey* claim for unlawful seizure for the same reason it denied qualified immunity on his section 1983 claim. At the time of Klingenberg's arrest, and viewing disputed facts in his favor, none of those officers had arguable probable cause to believe Klingenberg committed a crime. It follows that Holtan and Herman did not act with "all due care" in directing McCarthy to arrest Klingenberg, and McCarthy did not act with "all due care" in complying with this directive. *See Davis*, 33 F.4th at 1000 ("The same evidence establishing the officers' violation of § 1983 and the Fourth Amendment establishes a violation of the Iowa Constitution."). Instead, their arrest-on-sight approach violates article I, section 8 of the Iowa Constitution if disputed facts are resolved in Klingenberg's favor. The Court therefore denies Defendants' Motion for Summary Judgment on Count II as it relates to Holtan, Herman, and McCarthy.

Conversely, the Court also denies Klingenberg's Motion for Summary Judgment on Count II as to those Defendants. If a juror concludes that Klingenberg said he "mes[sed] up and made a big mistake" at the time of his arrest, it would mean a reasonable officer in the position of Holtan, Herman, and McCarthy had at least arguable probable cause for arrest, and thus that Klingenberg's rights were not violated under article I, section 8 of the Iowa Constitution.

The Court also denies both sides' Motions for Summary Judgment as to Defendants McTaggart and Bagby. As explained in connection with Plaintiff Woods above, the record is both incomplete and in dispute as to whether McTaggart and Bagby acted with "all due care" once they assumed control of arrestees like Klingenberg at the Police Station despite having minimal information about he and other arrestees had done or where they were arrested. The issue of their liability (or lack thereof) therefore is for the jury to decide with the benefit of a more complete factual record. *See Saunders*, 2020 WL 10731253, at *17.

4.  The Court Grants Summary Judgment in Favor of Relevant Defendants on Klingenberg's Count VIII except Defendants Holtan and Herman on the Issue of Punitive Damages.

Unlike the section 1983 and *Godfrey* claims, all Defendants are entitled to summary judgment on Klingenberg's false arrest claim based on emergency response immunity except as to the issue of punitive damages. The undisputed facts show that Holtan, Herman, and McCarthy were responding to an "emergency" when they joined the large group of officers responding to reports of an unruly crowd at Hy-Vee. *See Iowa Dist. Ct. for Scott Cnty.*, 889 N.W.2d at 475. As Klingenberg was arrested during that emergency response, there is a causal relationship between his common law claim for false arrest and the actions of Holtan, Herman, and McCarthy. *See Cubit*, 677 N.W.2d at 784. The same is true for Bagby and McTaggart, notwithstanding that their involvement was one step removed from the arrest scene. Their alleged conduct was still part of the emergency response. *See Seymour v. City of Des Moines*, 519 F.3d 790, 802 (8th Cir. 2008) ("In light of the broad construction accorded the immunity statutes, we do not believe that emergency response can be parsed so finely.").

Summary judgment is also appropriate for McCarthy, Bagby, and McTaggart on the issue of punitive damages in Count VIII. As to Bagby and McTaggart, the record is devoid of any evidence of direct interactions between them and Klingenberg. At most, they were simply negligent in failing to do more to investigate what arrestees like Klingenberg had done in a situation where they cannot identify any meaningful information they received from arresting officers. No reasonable juror could find them to have harbored actual malice toward Klingenberg in these circumstances or to have engaged in willful, wanton, and reckless misconduct. *See, e.g.*, *Veatch v. City of Waverly*, No. 13-0417, 2013 WL 5962970, at *10 (Iowa Ct. App. 2013) (affirming summary judgment for defendant-officer on claim for punitive damages where record did not show any "personal spite, hatred, or ill will" toward the arrestee), *vacated on other grounds,* 858 N.W.2d 1 (Iowa 2015).

As to McCarthy, the Court concluded above that he should have done more than simply accept the vague and unsubstantiated word of Holtan and Herman before arresting Klingenberg. The record does not, however, support Klingenberg's position that McCarthy harbored "actual malice" or engaged in "willful, wanton and reckless misconduct." Iowa Code § 670.12. To the contrary, it appears that McCarthy did not intend to arrest Klingenberg until being told by others

to do so. The Court therefore concludes as a matter of law that he is not liable for punitive damages on the state law false arrest claim.

By contrast, the Court denies summary judgment on Klingenberg's claim for punitive damages against Holtan and Herman. Viewing the facts in the light most favorable to Klingenberg, Holtan and Herman targeted him for arrest despite having no basis for doing so. They knew this would result in him being handcuffed and taken into custody, and to this day neither Holtan, Herman, nor any other Defendant has offered any valid justification for their decision beyond simply that Klingenberg was present on the streets and the disputed fact about whether he said he "mes[sed] up and made a big mistake." If a juror concludes that Klingenberg did not make this statement, the same juror could conclude that Holtan's and Herman's conduct satisfies the standard in Iowa Code § 670.12. The protests during the last week of May 2020 were unique, but no amount of novelty gives officers a basis for arresting people for simply walking across the street alone. The issue of punitive damages is therefore for the jury to decide as against Holtan and Herman.

### C. Plaintiff Mackenzie Moler

#### 1. Facts Specific to Moler.

On May 30, 2020, Plaintiff Mackenzie Moler was in Pleasant Hill, Iowa, for the weekend visiting her boyfriend, Dylan Robinson. (ECF 198-2, ¶¶ 262–63.) At approximately 10:00 p.m., Moler, Robinson, and Robinson's mom and sister decided to drive downtown to "scoop the loop"[21] and see the protests. (Id., ¶ 263; ECF 170-4, p. 609.) They spent thirty to forty-five minutes driving the downtown loop before deciding, while in the East Village, that it was too crowded and they should return to Pleasant Hill. (ECF 198-2, ¶¶ 264–65; ECF 170-4, p. 610.) After the group returned home, Moler and Robinson decided to go back out again. (ECF 198-2, ¶ 266.)

Moler and Robinson drove to the sculpture park in the Western Gateway area of downtown Des Moines, arriving sometime around midnight or shortly thereafter on May 31. (Id., ¶ 267.) They stayed at the sculpture park for fifteen to twenty minutes, then drove east to the Court Avenue District. (Id., ¶ 268.) They parked on the first floor of the 3rd and Court Parking Garage. (Id., ¶ 269.) Moler was wearing an orange tank top, black leggings, sandals, and a gray jacket. (ECF 185-

---

[21] "Scooping the loop" is a local term used to describe driving a circle on Grand Avenue and Locust Street near the sculpture park on the western edge of downtown. *See* Dani Hindman, *Scooping the loop part of metro history*, Black & White (May 13, 2016), https://jhsblackandwhite.com/continuing-a-metro-tradition/.

2, ¶ 35.) She is captured for the first time by security cameras at 12:22 a.m., walking south down 3rd Street on along the western wall of the Parking Garage. (Id.; Moler Montage[22], :00–:53.)

A short time after arriving, Moler and Robinson went to the top floor of the 3rd and Court Parking Garage to people watch. (ECF 198-2, ¶ 271; ECF 170-4, p. 611.) From there, they could see protests across the river near the Police Station, as well as officers throughout the area, some in riot gear with shields and helmets. (ECF 185-2, ¶¶ 38–39; ECF 198-2, ¶ 271.) Moler's and Robinson's movements within the Parking Garage were not recorded, but they did not go to any bars and therefore presumably stayed in the Parking Garage until 2:02 a.m., when they were recorded on the street near a small crowd of protesters on the corner of 2nd and Court Avenues. (Moler Montage, :57; ECF 170-4, p. 611, 619.) The parties agree that, by 2:00 a.m., the protests had generally wound down and a relatively small crowd of approximately fifty to one hundred people were gathered in the Court Avenue District. (ECF 198-2, ¶ 112; Carmichael, :00–7:37.) Moler and Robinson were set back at least fifteen feet from the crowd and were not engaging; instead, they were talking to each other and checking their phones. (Moler Montage, :57–2:27.)

Security footage next captures Moler and Robinson at 2:21 a.m., outside the southeast entrance to the 3rd and Court Parking Garage. (Moler Montage, 2:28.) Robinson is near Moler as she sat on a bench, apparently watching activity on Court Avenue. (Moler Montage, 2:28–4:23.) The parties agree that by approximately 2:25 a.m., the previously peaceful crowd was becoming agitated, creating barricades, blocking traffic, throwing objects, setting off fireworks, and painting graffiti. (ECF 198-2, ¶¶ 113–15.) Moler and Robinson returned to the 3rd and Court Parking Garage a few minutes later and were briefly visible on the second floor at 2:31 a.m., just as someone was breaking the glass at an entrance on the first floor. (Id., ¶ 273; Moler Montage, 4:24–4:49.)

At 2:33 a.m., Moler and Robinson went back on the street, this time near the Parking Garage's southwest entrance on the corner of 3rd Street and Court Avenue. (Moler Montage, 4:49–6:37.) By now, police had received reports of destructive activity and were approaching the area in response to the unruly crowd that had migrated west down Court Avenue to Hy-Vee. (ECF 198-2, ¶¶ 124–28.) Some of the people outside Hy-Vee were smashing windows and entering the store.

---

[22] The "Moler Montage" is one continuous video comprised of several shorter video clips showing Moler's movements on May 31, 2020, in chronological order. It is found in the record at ECF 160-2, p. 107.

(Id., ¶ 127–28, 131–33, 137). Police arrived in force at Hy-Vee at 2:37 a.m. (Downtown Camera 4th Court Looking East[23], 2:37:00.)

Robinson and Moler were never at or near Hy-Vee; instead, they were more than one block to the east, near the southwest entrance of the 3rd and Court Parking Garage. (Moler Montage, 4:49–6:37.) Around 2:35 a.m., Moler walked north up 3rd Street and into the Parking Garage through the northwest entrance. (Moler Montage, 6:46–7:06.) She returned a few seconds later with Robinson, and they crossed 3rd Street and stood outside at 2:38 a.m., popping in and out of an adjacent alley. (Moler Montage, 7:49–10:28.) Two minutes later, they crossed the street again and walked south down the east side of 3rd Street to where it intersected Court Avenue; once there, they crossed 3rd Street again. (Moler Montage, 10:29–11:52.) Moler described herself and Robinson as just "standing there" and "people watching" at this time, as "a lot of the officers" came down Court Avenue. (ECF 170-4, p. 611.)

At 2:42 a.m., Moler and Robinson ran back across 3rd Street and walked quickly north on the east side of the street while fifteen to twenty officers walked south down the west side, prompting Moler to raise her hands as she walked. (Moler Montage, 13:40–14:32; ECF 185-2, ¶ 43.) She had not heard any dispersal orders, but she "assumed that that's what was going on." (ECF 170-4, p. 612.) She and Robinson paused briefly along the western wall of the 3rd and Court Parking Garage at 2:43 a.m. after seeing a woman who had just been pepper sprayed or teargassed; she was crying and looking for her boyfriend, so Moler and Robinson talked with her for a few minutes. (Id.; Moler Montage, 14:32–17:26.) Three officers witnessed the interaction and asked if anyone needed medical attention, which they all declined. (ECF 198-2, ¶¶ 290–91; Moler Montage, 16:25–16:50.)

After spending another minute or so with the woman, Moler and Robinson walked south down 3rd Street. (Moler Montage, 17:27–17:49.) Moler raised her hands again as she approached a group of officers at the 3rd and Court Avenue intersection. (Moler Montage, 17:50–17:57.) She asked them, "are we okay and safe to leave?" and was told, "yes." (ECF 170-4, p. 612; ECF 190-1, ¶ 124; ECF 198-2, ¶ 296.) Moler waited at the corner of 3rd and Court Avenue with her hands in the air until approximately 2:48 a.m., when she and Robinson turned to leave. (Moler Montage,

---

[23] "4th Court Looking East" refers to an east-facing camera located at the intersection of 4th Street and Court Avenue. The video is found in the record at ECF 170-4, p. 888. The parties appear to agree that the timestamp accurately captures the time of day.

17:57–19:18.) With their hands still in the air, they walked north up the east side of 3rd Street to the Parking Garage's northwest entrance. (Moler Montage, 19:19–19:33.) They had nearly reached the entrance when an officer threw a munition—either a "handball," "stinger ball," or "triple chaser"—to their immediate left. (Moler Montage, 19:33; ECF 198-2, ¶¶ 297–304; ECF 190-1, ¶ 129.) Defendant Forrester, who was walking behind the group and directing them to leave, recalled seeing the munition fly over his shoulder. (ECF 190-1, ¶ 130; ECF 193, ¶ 130.)

The munition (or perhaps some projectile released from it) hit Robinson in the back of the leg, prompting Moler to scream. (ECF 170-4, p. 612.) Scared, the two ran into the 3rd and Court Parking Garage to their car. (Id.; ECF 198-2, ¶¶ 305–06; ECF 190-1, ¶ 132.) Sixteen officers, most in full riot gear, followed them. (Moler Montage, 19:38–20:20.) Moler and Robinson reached their car and got inside, only to have approximately eight officers surround the vehicle and demand they open their doors. (ECF 198-2, ¶¶ 307–08.) After Moler and Robinson complied, officers pulled Moler from the car and "threw [her] against the back of it" while she "told the officer [] multiple times [] 'I'm not resisting.'" (ECF 170-4, p. 613; ECF 185-2, ¶ 47.) Moler described the experience as painful. (ECF 170-4, p. 613.) Officers zip-tied her hands and escorted her out of the Parking Garage. (ECF 198-2, ¶ 310.) Security footage captures two officers walking Moler and Robinson south down 3rd Street at 2:51 a.m., approximately three minutes after two of them ran into the Parking Garage. (Moler Montage, 22:34–22:59.)

Moler could not identify all the officers involved in her arrest, many of whom were wearing face shields. (ECF 170-4, pp. 612–14.) The parties agree, however, that Forrester escorted her out of the garage in zip ties to where the jail transport vehicles were parked. (ECF 198-2, ¶ 310; ECF 190-1, ¶ 138; ECF 185-2, ¶¶ 53, 55.) Forrester and the City of West Des Moines maintain that he did nothing more. (ECF 185-2, ¶ 55.) According to them, Forrester entered the Parking Garage only after he observed Moler being zip-tied; once there, she was "passed" to him by another officer with instructions to take her to the transport vehicle. (Id., ¶¶ 49, 51–53, 55.) Forrester could not recall who passed her off, as they were all wearing masks. (ECF 160-2, p. 77.) He and the City of West Des Moines suggest it was Defendant Escobar, who is identified as the arresting officer on Moler's booking report. (ECF 185-2, ¶ 59.)

Moler disputes Forrester's claim of non-involvement. She points out that Forrester admits he was walking behind Moler when the munition was thrown; if so, based on security footage video, she says he must be one of the first three officers who pursued her into the parking garage

at 2:48 a.m. (ECF 185-2, ¶ 51; Moler Montage, 19:34–20:03.) Furthermore, Moler testified that "the two [officers] that got me out of the car were the ones that put me against the car – I want to say it was the same guy the entire time that walked me down [] [b]ecause I don't remember anybody switching." (ECF 170-4, p. 624.) This testimony is enough to allow a reasonable juror to conclude Forrester arrested Moler. As for the booking report's identification of Escobar as her arresting officer, Moler asserts that he merely drove the transport vehicle and booked her into jail. (ECF 185-2, ¶ 59.) The City of Des Moines Defendants, for their part, do not dispute that Forrester detained Moler in the parking garage. (ECF 193, ¶ 134.)

The parties agree that during the encounter (however extensive it was), Forrester never asked Moler about her whereabouts earlier in the night or did any investigation into the circumstances prompting her arrest. (ECF 190-1, ¶ 135; ECF 210, ¶ 44.) He therefore did not know whether Moler heard or ignored previous dispersal orders or was with the crowd at the Iowa Capitol Building, Polk County Courthouse, or elsewhere. (ECF 190-1, ¶¶ 136–37; ECF 210, ¶¶ 45–46.) Forrester also did not convey any information or instruction about her to the drivers of the transport vehicle. (ECF 190-1, ¶ 139.) Moler was nevertheless charged with participating in a riot, unlawful assembly, failure to disperse, and 2nd degree criminal mischief. (ECF 198-2, ¶ 311.) All charges were later dismissed. (ECF 170-4, p. 616.)

2. The Court Denies Both Sides' Motions for Summary Judgment on Moler's Count I as to Defendant Forrester but Grants Summary Judgment in Favor of Defendants McTaggart and Bagby.

Like Plaintiff Klingenberg, the facts surrounding Moler's arrest help demonstrate why the Court started its analysis with the overarching issue of whether mere presence on the streets after 2:40 a.m. was enough to establish arguable probable cause for arrest. *See supra*, Section V.A. Beyond mere presence, officers had nothing as to Moler. She was not involved in the violent activity on Court Avenue between 2:30 and 2:40 a.m., nor was she part of the crowd that moved west toward Hy-Vee. Instead, she stayed at the 3rd and Court Parking Garage. No officer claims to have seen her anywhere else during the night, much less having told her to disperse. Nor does any officer claim to have seen another officer tell her to disperse at any point during the night, or even to having been <u>told</u> by someone that she previously had been directed to disperse. Finally, no officer claims to have witnessed Moler doing anything even remotely threatening; to the contrary, video footage from immediately before her arrest shows Moler walking around in a small area with her hands up and affirmatively asking officers if she could leave (which they said was ok).

She was the paradigmatic example of what the concerned bystander had in mind when he told officers, "[y]ou're getting the wrong ones. You guys are picking off the stragglers, that's crazy." (ECF 193, ¶ 1.)

Tellingly, Moler passed more than a dozen officers (and directly interacted with at least three of them), none of whom gave any indication that she should be arrested. It was only after the munition was inexplicably thrown in her direction as she walked down the street toward the entrance to the Parking Garage with her hands up that a group of officers suddenly raced after her as she ran, scared, to her car. Viewing the facts in the light most favorable to her, the Court cannot conclude officers had even arguable probable cause to arrest her for failure to disperse, unlawful assembly, or any other crime. *See Watkins*, 725 F. App'x at 429–30; *Molina v. City of St. Louis*, 59 F.4th 334, 343–44 (8th Cir. 2023) (affirming denial of qualified immunity where officers "cannot identify any crime that [the plaintiff] allegedly committed").

This conclusion is reinforced by the arresting officers' failure to take into account exculpatory evidence. Like other Plaintiffs, Moler was arrested more than one block from the unruly crowd at Hy-Vee and in the wrong direction from where that crowd had dispersed when police arrived. *See Walker v. City of Pine Bluff*, 414 F.3d 989, 993 (8th Cir. 2005) ("No reasonable police officer could believe that he had arguable probable cause to arrest such an on-looker in this situation . . . ."). The following diagram illustrates the location of her arrest vis-à-vis Hy-Vee:



Moreover, at the moment of arrest, Moler was literally in her vehicle, which is remarkably strong evidence that she was attempting to disperse as directed. *See Kuehl*, 173 F.3d at 651 (denying qualified immunity where officers "ignored plainly exculpatory evidence"). Finally, there was no exigency that might have left officers with no practical alternative but to make an arrest. Security footage makes clear that officers were in full control of the area by the time of Moler's arrest, and thus they had ample opportunity to conduct further investigation before deciding whether to take her into custody. *See Small*, 708 F.3d at 1003–04; *Quraishi,* 986 F.3d at 836, 839 (finding no probable cause for arrest at "peaceful scene"). Indeed, there were eight officers at the site of arrest and only two suspects: Moler and Robinson.

The question turns, then, to <u>who</u> arrested her. *See Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006) ("[E]ach defendant's conduct must be independently assessed."). The record is not definitive, but Moler has submitted sufficient evidence to allow a reasonable juror to conclude it was Forrester, notwithstanding his assertion that he did not become involved until a different officer arrested her and handed her off. Moler presented evidence that Forrester was one of the first individuals to follow her into the Parking Garage, and she testified that the officer who arrested her never passed her off to anyone else before she was walked out of the Parking Garage and to the police vehicle. As it is undisputed that Forrester was the officer who walked her out of the Parking Garage, Moler's testimony is enough to create a genuine issue of fact as to whether Forrester was indeed the arresting officer, particularly when her testimony is viewed in conjunction with video footage appearing to show Forrester among the first small group of officers following her into the Parking Garage. Moreover, and in any event, a jury could conclude that Forrester was sufficiently involved in Moler's arrest to be liable even if he did not personally place her in handcuffs. *See Molina*, 59 F.4th at 344 ("But with multiple 'officers present,' the jury could find that each one of them participated in the decision [to arrest] or that one did it 'while the other[s] failed to intervene.'" (quoting *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1342 (11th Cir. 2007))). Given these factual disputes, the Court cannot grant summary judgment in favor of Forrester or Moler on Count I. *See id.*

The Court does, however, grant summary judgment in favor of Defendants McTaggart and Bagby on Moler's Count I. Like other Plaintiffs, and as discussed in detail in Section VI.A.2, Moler has not identified a clearly established constitutional rule requiring McTaggart and Bagby

to make an independent investigation at the Police Station into whether officers who arrested her at a different time and place had probable cause for doing so. *See Tracy*, 840 F. Supp. 2d at 1190.

### 3. The Court Denies Both Sides' Motions for Summary Judgment on Moler's Count II.

The Court denies qualified immunity to Forrester on Moler's *Godfrey* claim for unlawful seizure for the reasons it denied qualified immunity on the section 1983 claim. Viewing the facts in the light most favorable to Moler, she has established that Forrester was sufficiently involved in an unlawful arrest to give rise to liability under federal and state law alike. *See Davis*, 33 F.4th at 1000. Moreover, the facts do not establish as a matter of law that he acted with "all due care." *See id.* The Court therefore denies Forrester's Motion for Summary Judgment on Moler's *Godfrey* claim. The Court also, however, denies Moler's Motion for Summary Judgment on the same claim given the factual dispute regarding Forrester's involvement.

The Court also denies both sides' Motions for Summary Judgment as to Defendants McTaggart and Bagby, albeit for different reasons. As explained in connection with Plaintiffs Woods and Klingenberg, the existing record does not establish as a matter of law that McTaggart and Bagby acted with all due care in keeping Moler in custody despite limited and vague information from arresting officers. Instead, the jury must make factual findings to help determine whether they reasonably could have and should have done something more to satisfy the "all due care" standard. *See Saunders*, 2020 WL 10731253, at *17.

### 4. The Court Grants Summary Judgment in Favor of Relevant Defendants on Moler's Count VIII except Defendant Forrester on the Issue of Punitive Damages.

The Court concludes that all Defendants are entitled to summary judgment on Moler's common law false arrest claims other than in connection with punitive damages. The undisputed facts show that Forrester and other officers were responding to an emergency at the time of Moler's arrest, and thus those officers (whoever they are) are entitled to immunity under Iowa Code § 670.4(1)(k). *See Cubit*, 677 N.W.2d at 784; *Williams*, 516 F. Supp. 3d at 875. Moreover, emergency response immunity extends to McTaggart and Bagby given the "broad construction" of the statute and causal relationship between Moler's claim against them and the emergency response. *Seymour*, 519 F.3d at 802.

The Court also grants summary judgment in favor of McTaggart and Bagby on Moler's claim for punitive damages in Count VIII. They were, at most, negligent in failing to investigate the circumstances of her arrest more carefully to make sure there was a lawful basis for keeping

her in custody. This is not enough to show actual malice or willful, wanton, and reckless misconduct. *See* Iowa Code § 670.12.

Conversely, the Court denies summary judgment as to Forrester on the punitive damages claim. Viewed in the light most favorable to Moler, the record puts Forrester in Moler's immediate vicinity as she walked harmlessly with her hands up in the direction of the Parking Garage after asking for (and receiving) permission to leave from other officers. Forrester also appears to have seen the munition that landed near Moler and prompted her to run in fear to her car. Finally, he knew Moler was in her car attempting to leave—i.e., to "disperse"—at the time of arrest. A reasonable juror could interpret these facts to mean that Forrester's decision to participate in the unlawful arrest amounted to willful, wanton, and reckless misconduct for which punitive damages are appropriate. *See id.*

### D. Plaintiff Joshua Petefish.

#### 1. Facts Specific to Petefish.

Plaintiff Joshua Petefish lived on 2nd Avenue in downtown Des Moines, roughly one block south of Court Avenue. (ECF 198-2, ¶ 379; ECF 170-4, p. 666.) During the evening of May 30, 2020, he was in West Des Moines celebrating a friend's birthday. (ECF 198-2, ¶ 379; ECF 170-4, pp. 668–69.) He returned home and stayed there until after midnight. (ECF 170-4, p. 669.)

In the early morning hours of May 31, Petefish "could hear things going on on the street. . . . Crowds of people shouting." (Id., p. 671.) He left his apartment out of curiosity and to record what was going on, walking to the parking garage on the southeast corner of 2nd Avenue and Court Avenue (the "2nd and Court Parking Garage"). (ECF 198-2, ¶¶ 379, 381; ECF 170-4, pp. 670, 686.) He wore a bluish long-sleeved shirt and khaki pants. (ECF 198-2, ¶ 380.) Petefish could not recall when he left his apartment, but it was likely around 2:25 a.m. given that the first event he "probably" witnessed was windows being shattered at the 3rd and Court Parking Garage. (Id., ¶ 113; ECF 170-4, p. 671.)

The 2nd and Court Parking Garage was roughly "ten paces" to the north of Petefish's apartment building, with a narrow alley separating the two buildings. (ECF 170-4, p. 671.) Petefish walked to the top of the 2nd and Court Parking Garage because it had a "[g]ood vantage point." (Id.; ECF 198-2, ¶ 381.) He decided against walking to the 3rd and Court Parking Garage despite it being taller because "[p]eople were breaking glass and throwing things" in that area. (ECF 198-2, ¶ 382; ECF 170-4, p. 671.)

Petefish reached the top of the 2nd and Court Parking Garage around 2:31 a.m. and recorded the first of four videos (the "Petefish Footage[24]"). (ECF 198-2, ¶ 383; ECF 170-4, pp. 668, 672.) The first video shows a crowd gathered in the intersection of 2nd and Court Avenues, and people breaking windows in the 3rd and Court Parking Garage near the northwest corner of the intersection. (ECF 198-2, ¶ 383; Petefish Footage 1.) These were "the things that [Petefish] heard when [he] walked outside." (ECF 170-4, p. 668.) Petefish began filming soon after he reached the top of the garage:

> Q.   How long had you been out watching what was going on at Court Avenue prior to the glass breaking in the parking [garage] that you recorded?
>
> A.   That was probably the first thing I could see because you leave my apartment and you're immediately in that parking garage."

(Id., p. 671.)

The second video Petefish recorded was taken at approximately 2:36 a.m. (Id., p. 667; ECF 198-2, ¶ 384; NE-SE Cam, 2:36:20.) In it, the crowd in the intersection had dispersed, and an armored police vehicle can be seen driving west on Court Avenue through a row of garbage cans in the street. (ECF 198-2, ¶ 384; Petefish Footage 2.) The police vehicle slowed as it reached the northwest corner of the intersection, and a white police van pulled up behind it. (Petefish Footage 2.) The two vehicles then headed west down Court Avenue toward Hy-Vee. (Petefish Footage 2.)

Petefish left the 2nd and Court Parking Garage because "[e]verything that was happening had moved further down the street." (ECF 198-2, ¶ 386; ECF 170-4, p. 672.) He is seen on surveillance footage at approximately 2:44 a.m. walking west along the south side of Court Avenue to the southeast corner of the 3rd Street and Court Avenue intersection. (NE-SE Cam, 2:44:02–2:44:24.) Officers can be seen moving south on 3rd Street toward him, and Petefish turned south onto 3rd Street and jogged ahead of them. (ECF 198-2, ¶¶ 387–88; NE-SE Cam, 2:44:24–2:44:27.) Petefish stopped in a parking lot on the east side of 3rd Street roughly one block south of the 3rd and Court intersection. (ECF 170-4, p. 673.) He took a third video there, which looks west onto

---

[24] The Petefish Footage can be found in the record at ECF 170-4, pp. 912–15. The videos are referred to as follows: (1) Petefish Footage 1 correlates to Joshua Petefish Video VID_2020531_023156 at ECF 170-4, p. 913; (2) Petefish Footage 2 correlates to Joshua Petefish Video VID_2020531_023617 at ECF 170-4, p. 912; (3) Petefish Footage 3 correlates to Joshua Petefish Video VID_20200531_024535 at ECF 170-4, p. 915; and (4) Petefish Footage 4 correlates to Joshua Petefish Video VID_20200531_025024 at ECF 170-4, p. 914. There is no relationship between the timestamp on the videos and the time of day. Each clip is relatively short, and any reference to Petefish Footage is a reference to the whole video.

3rd Street as clouds of tear gas or smoke flow down the street and three vehicles drive past (all apparently belonging to private citizens, not law enforcement). (Petefish Footage 3.)

After taking the third video, Petefish walked east to a parking lot on the southwest corner of 2nd and Court Avenues (the "2nd and Court Lot"). (ECF 198-2, ¶¶ 388–89; ECF 170-4, p. 673.) At this point, he was more than two blocks east of Hy-Vee where the unruly group had ended up. (ECF 198-2, ¶¶ 116, 120, 126.) It took Petefish approximately four or five minutes to make the circuit from the southeast corner of 3rd and Court intersection, south to the parking lot on 3rd Street, and east to the 2nd and Court Lot. (ECF 170-4, p. 676.) Once there, to see over passing traffic, Petefish stood on top of a bench near the intersection of 2nd and Court Avenues. (ECF 198-2, ¶ 389.) There were two men standing near him, about ten to fifteen feet away. (ECF 170-4, pp. 674, 687.) In total, there were only five to ten people in the area, including Petefish, none of whom were holding protest signs or doing anything illegal; they were just standing and sitting. (ECF 193, ¶ 144; ECF 173-1, p. 252.)

Petefish stood on the bench for "a few minutes maximum," during which he took his fourth and final video. (ECF 170-4, pp. 673–74.) It shows a group of five officers walking east on the north side of Court Avenue toward the northwest corner of the 2nd and Court intersection. (Petefish Footage 4.) The footage also shows a second group of five officers congregated on the same corner, apparently preparing to head south through the intersection. (Petefish Footage 4.) "Traffic was moving normally" at that point. (ECF 170-4, p. 674; Petefish Footage 4.) Aside from the five to ten people on the south sidewalk with Petefish, the area was basically clear of civilians. (Petefish Footage 4; ECF 173-1, p. 252.) In fact, no civilians are recorded at all on the north sidewalk in Petefish's fourth video, which pans the eastern half of the 2nd and Court intersection. (Petefish Footage 4.)

At this point, the parties' respective views of the facts diverge. Petefish said the first group of officers began crossing the street toward him and, when they were "halfway across the street, or maybe just about to the sidewalk, they told us to go home. So I turned around and started walking home." (ECF 198-2, ¶ 391; ECF 170-4, pp. 674–75.) Petefish says he did this immediately: "They asked us to go home. That's when I turned around and started walking away." (ECF 170-4, pp. 675, 677.) He had walked ten or fifteen feet when "the guy who was . . . on my left, was pepper sprayed and I turned over my left shoulder to say 'What [the fu**] did he do wrong?' And then I was pepper sprayed over my left shoulder in my left eye." (Id., pp. 675–76; ECF 198-2, ¶ 392.)

Petefish testified there was "hardly any time" between when he was told to go home and when he was pepper sprayed. (ECF 170-4, p. 677.)

The City of Des Moines Defendants agree that "Petefish was pepper sprayed by some law enforcement officer after [verbally] protesting another being so restrained." (ECF 193, ¶ 148.) They assert, however, that this happened after "Petefish was still filming on Court Avenue . . . at 2:50 a.m." despite having been told to disperse. (Id.) The City of Des Moines Defendants cite solely to the fourth Petefish video to support their assertion that this occurred at 2:50 a.m. (id.), but the video is not timestamped, nor have Defendants offered any other evidence to support the time. The audio does not capture any officer telling Petefish or anyone else to go home, nor does the footage show officers gesturing in a way that could be interpreted as a direction to leave the area. (Petefish Footage 4.) The video concludes before officers begin crossing Court Avenue to where Petefish was standing. (Petefish Footage 4.)

Lawler, the officer who took Petefish to a prisoner transport vehicle after his arrest (ECF 198-2, ¶ 393), tells a slightly different version of what happened, which Petefish relies upon in his Motion for Summary Judgment. (ECF 173-2, ¶¶ 141–48, 58–62.) Lawler was among the group of officers standing on the northwest corner of 2nd and Court. (ECF 193, ¶ 141.) Lawler testified that he and other officers were telling individuals to leave the area, but Petefish remained seated in the 2nd and Court Lot after others left. (Id., ¶¶ 142, 145–47.) Lawler said Petefish remained seated for "[t]he amount of time it took [officers] to walk across a fairly decent size sidewalk . . . and cross the street," and until officers were ten feet away from him. (Id., ¶ 147; ECF 173-1, p. 254.) At that point Petefish "started to stand up, and then another officer deployed pepper spray on him, and another officer grabbed him, pushed him down on the ground, and handcuffed him." (ECF 173-1, p. 253.) There is no audio or video footage conclusively establishing whose version of events is accurate.

Given that both sides have moved for summary judgment on Petefish's claims, the parties' competing versions of events creates the dichotomous situation in which the Court must interpret the facts in Petefish's favor on Defendants' Motion for Summary Judgment but in Defendants' favor on Petefish's Motion for Summary Judgment. Specifically, in evaluating Defendants' Motion for Summary Judgment, the Court must assume that Petefish started heading home immediately upon being directed by officers to do so. Conversely, in evaluating Petefish's Motion

for Summary Judgment, the Court must assume Petefish remained seated for some period of time after others in the vicinity began to leave.

Relatedly, and as noted in other places in this Order, there is also a factual dispute as to how Defendants communicated dispersal orders after arriving in the Court Avenue District after 2:35 a.m., with Plaintiffs arguing that dispersal orders were issued only on an *ad hoc* basis as officers encountered individuals but some Defendants (but not others) suggesting there was a bullhorn or broadcast. Regardless, Defendants do not appear to allege that Petefish was in violation of a broadcast dispersal order; instead, they rely on dispersal orders allegedly given directly to him or others in his immediate vicinity. (ECF 170-1, ¶¶ 390–91; ECF 213-1, ¶ 30.)

The parties agree Petefish was pepper sprayed and ended up on the ground—either in obedience to an order or by being pushed. (ECF 198-2, ¶ 393; ECF 193, ¶ 148.) It is also undisputed that Petefish repeatedly told the officer he "was going home" and could "see my window from here." (ECF 213-1, ¶ 33; ECF 170-4, p. 676.) Officers nevertheless handcuffed him and took him into custody. (ECF 198-2, ¶ 393.) The parties were unable to identify the officers who pepper sprayed and handcuffed Petefish, but they were either Des Moines Police Department or Metro STAR officers. (ECF 193, ¶ 150.) Petefish was arrested between 2:51 and 2:54 a.m. (ECF 198-2, ¶ 395; ECF 193, ¶ 155.) The parties agree he did not resist arrest. (ECF 193, ¶ 149.)

After Petefish was handcuffed, Lawler took custody of him and walked him west along Court Avenue to a prisoner transport vehicle. (ECF 198-2, ¶ 393; ECF 193, ¶ 158.) Defendant Nicolino subsequently filed a criminal complaint against Petefish charging him with participating in a riot, unlawful assembly, failure to disperse, and 2nd degree criminal mischief. (ECF 198-2, ¶ 396.) All charges were later dismissed, including the riot charge on July 10, 2020, and the remaining charges on November 30, 2020. (ECF 152, ¶¶ 317–19.)

2.  The Court Denies Both Sides' Motions for Summary Judgment on Petefish's Count I as to Defendant Lawler but Grants Summary Judgment in Favor of Defendants Bagby and McTaggart.

As with other Plaintiffs, Petefish's mere presence in the Court Avenue District after 2:40 a.m. was not enough to give officers arguable probable cause for arrest. *See Williams*, 281 N.W.2d at 626. Instead, Defendant Lawler must show something more to be entitled to qualified immunity on Petefish's Count I. Viewing the facts in the light most favorable to Petefish, Lawler has not met his burden. There is no evidence that Petefish was present for any protests or heard any dispersal orders prior to the moments immediately before his arrest. To the contrary, he was either away

from downtown or at his apartment until after 2 a.m. Indeed, to the extent Defendants are claiming the Court Avenue District was off-limits for the entire night due to dispersal orders at the Iowa Capitol Building and near the Police Station, Petefish had no warning of this whatsoever. He is essentially the poster child for why *Baude*, not *Bernini*, is the closest on-point authority. In fact, Petefish's position is even stronger than the arrestees in *Baude* because officers there made arrests in the same place where the dispersal orders were given, whereas the closest dispersal order to where Petefish was arrested (not counting the order made immediately prior to his arrest) was to "clear the [Court Avenue] bridge" near the Police Station, some two blocks to his east.

Officers also did not see Petefish do anything violent, threatening, or otherwise illegal once he finally reached the Court Avenue District after 2:00 a.m. Instead, he was more than two blocks away from the unlawful group at Hy-Vee and in the wrong direction from where the members of that group had dispersed when police arrived at 2:37 a.m., as illustrated here:



At most, Petefish simply walked around in a roughly one-block area while taking videos before, according to him, turning to leave immediately after being directed by officers to do so. Nothing about this establishes arguable probable cause for arrest if the Court accepts Petefish's version of events as true, which, at this stage, it must do. The Court therefore concludes that Defendant

Lawler has not proven sufficient undisputed facts to justify qualified immunity. *See Baude*, 23 F.4th at 1073; *Welch*, 51 F.4th at 813 ("Dempsey did not, during the twelve seconds that he was on the scene, develop arguable probable cause that Welch was rioting or engaged in an unlawful assembly under Iowa law.").

The fact that Petefish complained about how an officer was treating a different arrestee immediately prior to being arrested himself does not change this conclusion. There is no evidence that Petefish made threatening movements toward the other officer; instead, Petefish simply asked why the other arrestee had been pepper sprayed. Given video footage showing misuse of pepper spray on other occasions that night, Petefish may very well have had a legitimate basis for raising the question. Regardless, "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out . . . ." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). A reasonable officer therefore should have known that Petefish's verbal criticism did not create arguable probable cause. *See City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.").

The closer question is whether, even viewing the facts in the light most favorable to Lawler, the Court nonetheless should grant summary judgment in Petefish's favor on Count I. According to Lawler, Petefish did not leave immediately upon being directed to do so by officers, but rather remained by himself in the 2nd and Court Lot. Lawler interprets this as a "failure to disperse," but it is unclear why. The crimes of unlawful assembly and riot—from which the crime of failure to disperse derives—are committed by a <u>group</u> of persons. *See* Iowa Code §§ 723.1, 723.2. An order of "dispersal" from such a group therefore presumably requires the person to do whatever it takes to *no longer be part of that group. See Disperse, Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/disperse (last accessed April 1, 2023) (defining "disperse" to mean, *inter alia*, "to cause to break up" or "to cause to become spread widely"). Whether someone like Petefish accomplishes this by walking away from the group or by staying behind as the group walks away from him seems to be immaterial under the plain language of the statute: either way, he has complied with both the language and spirit of the statute when he ends up alone so quickly.

Nonetheless, the Court will deny Petefish's Motion for Summary Judgment on Count I against Lawler in light of uncertainty in the record regarding the extent of Lawler's involvement in the arrest. It appears to be undisputed that Lawler did not place handcuffs on Petefish or pepper spray him, but it is not clear where Lawler was vis-à-vis the officers who did engage in those acts. Thus, although Lawler arguably should have intervened to stop the unlawful arrest, the Court cannot say as a matter of law that Lawler was enough of a participant in the arrest to be liable for failing to do so. The extent of his involvement instead must be resolved by the jury. *See Molina*, 59 F.4th at 344.

The outcome is different for Defendants McTaggart and Bagby. Like other Plaintiffs, Petefish has not identified a clearly established constitutional rule requiring McTaggart and Bagby to perform an independent investigation of probable cause after assuming custody of Petefish at the Police Station following his arrest by other officers in a different location. *See Tracy*, 840 F. Supp. 2d at 1190. The Court therefore grants summary judgment in favor of McTaggart and Bagby on Petefish's Count I on qualified immunity grounds.

3.   The Court Denies Both Sides' Motions for Summary Judgment on Petefish's Count II.

The Court denies both sides' Motions for Summary Judgment on Petefish's Count II as against Lawler for essentially the same reasons that it both sides' Motions on Count I. Lawler's Motion is denied because he had no information that Petefish had done anything wrong at the time of arrest, and thus Lawler failed to act with "all due care" if he was sufficiently involved in that arrest. This is particularly true when the alleged crime was unlawful assembly or failure to disperse and yet Petefish was standing alone at the time of arrest more than two blocks from the epicenter of unlawful activity. The Court also must, however, deny Petefish's Motion for Summary Judgment against Lawler on Count II given the lack of clarity in the record regarding the latter's involvement in the arrest.

The Court also denies summary judgment to both sides on Petefish's Count II as it relates to Defendants McTaggart and Bagby, albeit for different reasons. As explained in connection with other Plaintiffs, the existing record does not establish as a matter of law that McTaggart and Bagby acted with all due care by keeping Petefish in custody despite the absence of meaningful information from the arresting officer(s) about what he had done wrong. Instead, the question of all due care hinges on additional findings of fact. *See Saunders*, 2020 WL 10731253, at *17.

4. The Court Grants Summary Judgment in Favor of Relevant Defendants on Petefish's Count VIII except Defendant Lawler on the Issue of Punitive Damages.

Petefish's arrest occurred in connection with an emergency response, and thus Defendants Lawler, McTaggart, and Bagby are immunized by Iowa Code § 670.4(k)(1). Moreover, the record contains no evidence of actual malice or willful, wanton, and reckless misconduct by McTaggart and Bagby, and thus the Court concludes as a matter of law that they are not liable for punitive damages. *See* Iowa Code § 670.12. The Court denies summary judgment on the punitive damages claim as to Lawler. Viewing the facts in the light most favorable to Petefish, Lawler participated in Petefish's arrest despite seeing Petefish leave immediately after being directed to do so and even though Petefish was more than two blocks east (and in the wrong direction) of the riotous group at Hy-Vee. As neither Lawler nor any other officer saw (or heard of) Petefish doing anything illegal, a reasonable juror could conclude that Lawler engaged in willful, wanton, and reckless misconduct by participating in the arrest if the jury finds that he was involved.

E. *Plaintiffs Cameron Lard and Verchon DeBrossard.*

1. Facts Specific to Lard and DeBrossard.

Cameron Lard and Verchon DeBrossard are friends. (ECF 198-2, ¶ 397.) On May 31, 2020, they were staying at the Civic Center Court Apartments on 3rd Street and Grand Avenue in downtown Des Moines. (Id.) Lard, a 6' 9" former college basketball player, had recently suffered a sports injury and was temporarily staying in Des Moines to rehabilitate and visit a trainer. (ECF 170-4, pp. 692, 695.) DeBrossard lived in West Des Moines at the time and had come to the Civic Center Court Apartments that night to socialize with Lard. (Id., p. 849.)

Debrossard arrived at the apartment between 10:00 and 11:00 p.m. on May 30, 2020, and he and Lard played video games in the apartment until a third individual, Peter, contacted Lard to come out to the Court Avenue District. (Id., pp. 702, 850; ECF 198-2, ¶ 397.) Lard accepted the invitation; shortly before 2:00 a.m. on May 31, 2020, he and Debrossard walked south down 3rd Street to meet Peter at Beer Can Alley, a bar on the corner of 3rd Street and Court Avenue.[25] (ECF 198-2, ¶ 398.) Lard was dressed in a white hoodie, dark pants, and white shoes; DeBrossard wore a white cap, white shirt, gray-tone pants, and white shoes. (Id., ¶ 400.) The parties agree that, at

---

[25] Beer Can Alley is currently located at 409 Court Avenue, across the street from the Hy-Vee grocery store at 420 Court Avenue. On May 31, 2020, however, Beer Can Alley was located two blocks east at 216 Court Avenue.

the time of their arrival in the Court Avenue District, a relatively small crowd was still there but the protests had generally wound down. (Id., ¶ 112.)

Since Lard and DeBrossard did not get to the Court Avenue District until after bar close, they could not enter any businesses and instead met Peter outside. (ECF 170-4, pp. 702–03, 851.) The first video footage where they can be seen places them in the Second and Court Lot at 2:09 a.m. (ECF 198-2, ¶ 400.) They were standing together near a small but growing crowd of protesters on Court Avenue, but they were not interacting with that crowd. (Carmichael, 7:13–9:08.) At 2:11 a.m., Lard and DeBrossard crossed Court Avenue to the north. (ECF 198-2, ¶ 401; Carmichael, 9:09–9:50.) This required them to cut the crowd, but they didn't join in; in fact, they appeared to rebuff two protesters who tried to engage with them as they crossed the Court Avenue center line. (Carmichael, 9:40–9:46.)

Lard is not captured on video again until approximately 2:30 a.m., when the previously peaceful crowd was becoming agitated and creating barricades, blocking traffic, throwing objects, setting off fireworks, and painting graffiti. (ECF 198-2, ¶¶ 113–15, 404.) Lard is seen standing on something near individuals who were smashing glass out of the 3rd and Court Parking Garage. (Id., ¶ 404.) When the destructive acts ended, he stepped down and headed west on the north side of Court Avenue, where much of the crowd was flowing. (Id., ¶¶ 116, 126; Register Footage 2[26], 20:24–20:27.) By now, police had received reports of the destructive activity and were re-entering the area. (ECF 198-2, ¶¶ 124–25.)

At 2:36 a.m., Lard and DeBrossard walked across 3rd Street together, heading east to west on the north side of Court Avenue. (Id., ¶¶ 407–08.) Within seconds, video half a block west shows Lard running toward the intersection of 4th Street and Court Avenue, with DeBrossard walking behind him. (3rd_4th Cam, 2:36:33–2:36:58.) Half a block further west, people were congregating at the Hy-Vee on the south side of Court Avenue, smashing windows and entering the store. (ECF 198-2, ¶¶ 127–28, 131–33, 137.) Neither Lard nor DeBrossard crossed the street or participated in this activity. (Hy-Vee Cam West, 2:36:38–2:37:08.) Instead, when they reached the 4th Street and Court Avenue intersection, they turned and headed north on 4th Street. (ECF 198-2, ¶ 414.) Police

---

[26] "Register Footage 2" refers to footage taken by the Des Moines Register and titled "Scenes from the Second Night of Unrest in Des Moines, Iowa." It is found in the record at ECF 170-4, p. 909. The timestamp on Register Footage 2 appears to bear no relationship to the time of day.

arrived at the same time DeBrossard reached the intersection and, when he saw them, he broke into a run. (4th Court Looking East, 2:37:07–2:37:12.)

Lard and DeBrossard's next movements were not captured on camera, but they describe running through alleyways between 3rd and 4th Street after Lard heard police yelling for everyone to "leave" and "go home." (ECF 170-4, pp. 705, 852.) DeBrossard alleges he did not hear police telling people to disperse but only joined Lard in running when he saw police begin arresting people. (Id., p. 853.) The two stood around in the alley for a bit until they exited onto 3rd Street at 2:45 a.m., directly to the north of a bar called Outlaws. (Id., p. 852; Downtown Camera 3rd-Court NE-N Remote[27], 2:45:03.) At that point, Lard and DeBrossard started north up 3rd Street to return to the Civic Center Court Apartments. (ECF 198-2, ¶ 416.)

Meanwhile, the officers responding to Hy-Vee received reports that windows also were being broken at the Plaza Condominiums at 3rd and Walnut Streets. (Id., ¶ 412.) Walnut Street is one block north of Hy-Vee and at least one block south of the Civic Center Court Apartments. (Id.) Presumably, Lard and DeBrossard passed the Plaza Condominiums as they walked north on 3rd Street on their way home. Des Moines Police Captain Chris Hardy saw Lard and DeBrossard walking from what appeared to be the direction of the Plaza Condominiums, identified them as suspects, and ordered them detained. (Id., ¶ 417.) Approximately one minute before he did so, however, dispatch stated that the people who vandalized the Plaza Condominiums were entering the parking ramp at 4th and Locust Street, which was one block east of where the armored Bearcat filled with Hardy and other officers encountered Lard and DeBrossard walking home. (ECF 193, ¶ 177; ECF 170-4, pp. 706, 855.) The dispatch notification was recorded on Valentine's body-worn camera, and Defendants concede that officers received it. (ECF 193, ¶ 177.) In any event, Lard and DeBrossard were at their apartment gate when Officers Hardy, Egan, Betts, Gruver, Valentine, and Coughennower approached to arrest them at 2:56 a.m. (ECF 198-2, ¶¶ 417–18.)

Throughout their arrests, the parties agree that Lard and DeBrossard repeatedly explained to their arresting officers that they were at their apartment and had keys to enter, inviting the officers to verify this. (ECF 213-1, ¶¶ 21–22.) The officers took no actions to investigate whether this was true—not even after the leaseholder came outside and told them Lard was staying there. (Id., ¶¶ 23–24.)

---

[27] "NE-N Remote" refers to footage from a camera located at the northeast intersection of 3rd and Court Avenue, facing northwest, which is found in the record at ECF 170-4, p. 890.

Both men were transported to Polk County Jail following their arrests (e.g., ECF 170-2, pp. 170–73), and Officer Youngblut seized their phones (ECF 198-2, ¶ 424.) Youngblut retained the phones until June 2, 2020, when they were made available for pick-up. (ECF 213-1, ¶ 58.) Lard was charged with participating in a riot, failure to disperse, and 2nd degree criminal mischief. (ECF 198-2, ¶ 422.) The charges were all dismissed following a bench trial. (ECF 173-1, pp. 390–98.) DeBrossard was charged with participating in a riot, failure to disperse, unlawful assembly, 2nd degree criminal mischief, and possession of a controlled substance (marijuana). (ECF 198-2, ¶ 423.) The State dismissed all charges. (ECF 152, ¶¶ 236–37.)

The record is incomplete and in dispute regarding what officers knew, and when they knew it, with respect to Lard and DeBrossard. The parties appear to agree that none of Lard and DeBrossard's arresting officers remembered seeing them on Court Avenue prior to their arrest, (ECF 213-1, ¶ 14), although Defendant Valentine's body camera contains audio from an unidentified officer stating that one or both of Lard and Debrossard "were running from them guys when they deployed over there and looked back and they like oh, we're not doing nothing, and we're like come here man, and they were like no uhhuh" (Valentine[28], 10:23–10:32). This audio is consistent with the video footage mentioned above showing DeBrossard break into a run when officers arrived at the intersection of 4th Street and Court Avenue. (4th Court Looking East, 2:37:07–2:37:12.) But the record is unclear on whether officers realized this or took it into account at the time of arrest. In any event, some Defendants agree that the arresting officers had not seen Lard or DeBrossard damage anything or assemble with others who were vandalizing anything. (ECF 213-1, ¶ 15.) The arresting officers also did not know if Lard and DeBrossard heard prior dispersal orders. (Id., ¶ 8.) In fact, no dispersal orders were issued during the time Lard and DeBrossard were downtown near the protesting group (id., ¶ 11) until, at best, around 2:40 a.m., nor did arresting officers issue a dispersal order upon encountering the two men near the apartment a short time later (id., ¶ 18). Instead, officers simply arrested them.

The parties also disagree about whether either of Lard or DeBrossard had a bottle in his hand prior to being arrested. Captain Hardy claims he observed Lard carrying a bottle (ECF 198-2, ¶ 415), but it is unclear where he believes he saw this or whether he discussed it with other

---

[28] "Valentine" refers to Officer Valentine's body-worn camera, which is found in the record at ECF 170-4, p. 921. The video does not contain a timestamp. The citations are to the minute and second marker of the video, which does not correspond to the time of day.

officers. Defendants admit that neither man is seen carrying a bottle on the various security camera videos, and no other officer claims to have seen them with a bottle. (ECF 213-1, ¶¶ 26, 28.) DeBrossard is "110%" certain neither he nor Lard were carrying a bottle. (Id., ¶ 27.) There was, however, a bottle on the ground near the arrest site. (Valentine, 9:42.)

<ol start="2">
<li><u>The Court Denies Both Sides' Motions for Summary Judgment on Lard's and DeBrossard's Count I except as to Defendants Bagby and McTaggart, Both of Whom Are Entitled to Summary Judgment.</u></li>
</ol>

There are a few facts unique to Lard and DeBrossard that might differentiate them from other Plaintiffs with respect to probable cause. For example, video footage captures Lard and DeBrossard moving west in the direction of the unruly crowd along Court Avenue toward Hy-Vee at approximately 2:35 a.m., eventually reaching 4th Street. This puts them noticeably closer than other Plaintiffs to the riotous group. Moreover, DeBrossard broke into a run north on 4th Street from the Court Avenue intersection when officers arrived at Hy-Vee, with Lard apparently following. Courts have reached different conclusions on whether flight from law enforcement *per se* gives reasonable suspicion or probable cause for arrest, but it "is certainly suggestive of wrongdoing and can be treated as suspicious behavior that factors into the totality of the circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 587 (2018) (cleaned up) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000)).

The problem for Defendants, however, is that the record is ambiguous as to what officers actually knew about these facts at the time of arrest. For example, although careful review of video footage makes it clear <u>now</u> that Lard and DeBrossard were relatively close to Hy-Vee around 2:35 a.m., Defendants appear to admit that the arresting officers did not see the two men in that location that night, nor did arresting officers see them damage any property or assemble with others who damaged property. Thus, Lard's and DeBrossard's proximity to the riotous activity may not have been known to officers. Similarly, the Court cannot tell whether officers knew about DeBrossard's flight on 4th Street. An officer appears to say something about it on the audio from Valentine's body camera during the arrests, but this would imply that an officer <u>did</u> see Lard and DeBrossard on Court Avenue, which is inconsistent with Defendants' admissions elsewhere. Finally, although Hardy testified later that he believed Lard was carrying a bottle, it is unclear how he formed this belief or whether he communicated it to anyone else at the time of the arrest. This makes it difficult to determine whether his belief was reasonable, particularly given that video footage does not

appear to show Lard carrying a bottle. It follows that the Court cannot determine how much significance, if any, to place in Hardy's testimony when making the probable cause analysis.

With this much uncertainty in the record, the Court cannot conclude that Defendants have proven sufficient predicate facts to have qualified immunity as a matter of law. *See Gainor v. Rogers*, 973 F.2d 1379, 1385 (8th Cir. 1992) ("The cases are legion in this and other circuits which establish that where there are genuine issues of material fact surrounding an arrestee's conduct it is impossible for the court to determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law."). When the Court views the facts in the light most favorable to Lard and DeBrossard, the record shows that they were arrested more than three blocks away from Hy-Vee and at the door of their apartment complex—which is presumably where people would go if they were trying to disperse—despite not having heard any dispersal orders until the very end of the night or having been involved in any riotous activity. The geography alone raises doubts about the existence of probable cause, as shown here:



Moreover, officers arrested Lard and DeBrossard without investigation, disregarded their protestations of innocence, and disregarded exculpatory information from a building tenant who reported that the two men were staying with him. The situation therefore approaches the

"paradigmatic case" described in *Johnson* in which officers did not speak to the suspects before arresting them, ignored exculpatory evidence (e.g., the fact that Lard and DeBrossard were at the doorstep of their residence and more than three blocks away from Hy-Vee), and disregarded exculpatory information from a third party. *See* 901 F.3d at 971.

The Court similarly cannot conclude that Lard and DeBrossard have proven their section 1983 claim as a matter of law. Viewing the facts in the light most favorable to Defendants, Lard and DeBrossard were in close proximity to the riotous activity at Hy-Vee, fled from police in a suspicious fashion, and ended up being spotted near the site of other unlawful activity while Lard appeared to be carrying a bottle, which either could have been stolen from one of the businesses that some rioters had entered or could have been used to break windows as had occurred in various places. This might be enough to give officers arguable probable cause for arrest if a juror found the facts in their favor. *See, e.g.*, *United States v. Welch*, 951 F.3d 901, 905–06 (8th Cir. 2020) (concluding that the defendant's proximity to criminal activity, when coupled with other evidence, was sufficient to establish probable cause). The Court therefore denies both sides' Motions for Summary Judgment on Count I as to Defendants Hardy, Egan, Betts, Gruver, Valentine, and Coughennower, all of whom were directly involved in the arrests. *See Gainor*, 973 F.2d at 1385.

The Court grants summary judgment in favor of Defendants McTaggart and Bagby on Count I on qualified immunity grounds for the same reason it has done so with respect to other Plaintiffs; namely, that Lard and DeBrossard have not identified a clearly established rule requiring McTaggart and Bagby to conduct an independent investigation into probable cause for arrests made by other officers at other locations. *See Tracy*, 840 F. Supp. 2d at 1190.

There is one other issue on Lard's and DeBrossard's Count I. They argue that Defendant Youngblut seized their cell phones without probable cause or a warrant, in violation of the Fourth Amendment. The Court has already concluded that factual disputes make it impossible to determine as a matter of law whether there was arguable probable cause for arrest, and thus Youngblut is not entitled at this stage to use probable cause as a basis for the seizure of the phones. The City of Des Moines Defendants argue, however, that the seizures nonetheless were lawful based on reasonable suspicion and the evidentiary value of the phones. (ECF 198-2, ¶ 424; ECF 171-1, pp. 38–39.)

In a recent case arising out of different events, the Eighth Circuit held that Youngblut was not entitled to qualified immunity when he seized a cell phone without probable cause and retained

it for twelve days. *See Robbins*, 984 F.3d at 681. *Robbins* defeats Youngblut's argument that the seizure and retention of cell phones can be justified by reasonable suspicion or because the phone had potential evidentiary value. *See id.* The Fourth Amendment requires more. *Id.*

There are, to be clear, a few factual differences between *Robbins* and the present case. In *Robbins*, Youngblut retained the phones for twelve days, whereas he only did so for one or two days here. But this distinction is not material. *Robbins* cited favorably to an Eleventh Circuit case holding that a two-day seizure of a cell phone was unlawful when officers had nothing more than reasonable suspicion that a crime had been committed. *See id.* (citing *United States v. Babcock*, 924 F.3d 1180, 1190–91 (11th Cir. 2019)). The Eighth Circuit "agree[d] with the Eleventh Circuit that 'it's no stretch to hazard that a modern-day traveler would likely rather arrive in a strange place without her luggage than without her phone.'" *Id.* (quoting *Babcock*, 924 F.3d at 1191). The Court is comfortable concluding that the length of the seizure was equally unlawful here even if there was reasonable suspicion; indeed, in *Babcock*, the Eleventh Circuit recognized that the United States Supreme Court had never approved the seizure of person or property beyond ninety minutes based solely on reasonable suspicion. 924 F.3d at 1188. The seizure here lasted at least twenty-four to forty-eight hours.

Other distinctions between *Robbins* and the present case are similarly immaterial, or, if anything, weigh in Lard's and DeBrossard's favor. The City of Des Moines Defendants emphasize, for example, that Youngblut had not experienced anything like the protest-related mass arrests that occurred in the early morning hours of May 31. Perhaps not, but no reasonable officer in his position could believe the Fourth Amendment is suspended if enough people are arrested all at once. *Cf. Davis*, 33 F.4th at 1005 (Stras, J., concurring) ("We once again reject the argument that investigatory need justifies suspicionless seizures. No Fourth Amendment principle is more clearly established."). Instead, Youngblut still needed probable cause or a warrant. Moreover, there is nothing in the record to suggest Youngblut or any other officer did anything on May 31 to start the process of trying to obtain warrants for any of the cell phones he seized. If he was working diligently to obtain warrants but simply could not complete the paperwork in time, the Court might entertain arguments about the complexity of the situation. But this was not the case. It follows that Youngblut violated Lard's and DeBrossard's clearly established Fourth Amendment rights if he seized the cell phone despite the absence of probable cause for arrest. *See Robbins*, 984 F.3d at 681; *Babcock*, 924 F.3d at 1190 ("[T]he officers' two-day seizure of Babcock's phone was not just

a brief 'investigatory stop' but rather a full-blown seizure that required a showing of full-blown probable cause."). Lard's and DeBrossard's claims against Youngblut therefore revolve around the resolution of disputed facts regarding probable cause.

> 3. <u>The Court Denies Both Sides' Motions for Summary Judgment on Lard's and DeBrossard's Count II.</u>

The same factual dispute that precluded the Court from granting summary judgment on Count I prevents summary judgment in either direction on Count II, as well. The Court cannot conclude that the arresting officers are entitled to qualified immunity under the *Baldwin* "all due care" standard without knowing whether arresting officer(s) saw or knew about Lard's and DeBrossard's close proximity to Hy-Vee and flight on 4th Street. Similarly, the Court needs clarity on why Hardy believed Lard was carrying a bottle and whether that belief was reasonable. Until these ambiguous and disputed facts are clarified or resolved, the Court cannot decide one way or the other whether officers exercised "all due care." *See Saunders*, 2020 WL 10731253, at *17.

The outcome is the same as to Defendants McTaggart and Bagby. As with other Plaintiffs, a reasonable juror could conclude McTaggart and Bagby did not act with "all due care" as to Lard and DeBrossard by keeping them in custody on charges of, *inter alia*, participating in a riot and 2nd degree criminal mischief. The Court therefore denies both sides' Motions for Summary Judgment in all respects on Count II.

The Court's ruling applies equally to Lard's and DeBrossard's claims against Youngblut for unlawful seizure of the cell phones. The Iowa Supreme Court has "repeatedly embrace[d] what can only be characterized as a strong warrant preference interpretation of article I, section 8." *Ingram*, 914 N.W.2d at 816. Thus, Youngblut needed either a warrant or probable cause to seize the cell phone. He clearly did not have a warrant, and the facts do not prove the existence of probable cause when viewed in the light most favorable to Plaintiffs. Thus, Youngblut's liability also cannot be decided as a matter of law.

> 4. <u>The Court Grants Summary Judgment in Favor of Defendants Bagby and McTaggart on Count VIII but Denies Summary Judgment as to Other Relevant Defendants on the Issue of Punitive Damages.</u>

Finally, the Court will grant summary judgment for all relevant Defendants on DeBrossard's and Lard's state common law claims for false arrest except as to punitive damages. Officers made the arrests while carrying out an emergency response and thus are protected by emergency response immunity under Iowa Code § 670.4(k)(1).

As to punitive damages, the same factual disputes that preclude summary judgment in either side's favor on Counts I and II are enough to preclude summary judgment on the claim for punitive damages as well. If the facts are resolved in Defendants' favor, officers may have had arguable probable cause and there would be no basis for punitive damages. Conversely, if the facts are resolved in Lard's and DeBrossard's favor, officers arrested them for serious offenses without probable cause despite their protestations of innocence and exculpatory evidence from a third-party. *See Johnson*, 901 F.3d at 971. This is enough to allow a reasonable juror to conclude the officers engaged in willful, wanton, and reckless misconduct. *See* Iowa Code § 670.12.

The only exceptions are Defendants McTaggart and Bagby. They were arguably negligent in handling custody and charging decisions, but the evidence is not enough, even viewed in the light most favorable to Plaintiffs, to allow a juror to conclude that they acted with actual malice or engaged in willful, wanton, and reckless misconduct. The Court therefore grants summary judgment in their favor on Count VIII in its entirety as to Lard and DeBrossard.

### F.  Plaintiffs Jaquan Patton, Emma Timberlake, Tony Young, Sophia Jacobsen, Jivonte Johnson, and Jayvione Lewis

#### 1.  Facts Specific to Patton, Timberlake, Young, Jacobsen, Johnson, and Lewis.

At approximately 3:00 a.m. on May 31, Plaintiffs Jaquan Patton, Jayvione Lewis, Jivonte Johnson, Emma Timberlake, Sophia Jacobsen, and Tony Young (collectively, the "Patton group") left a party on the east side of Des Moines and drove down Grand Avenue toward Patton's apartment, which was at the intersection of 3rd Street and Grand Avenue. (ECF 198-2, ¶ 219; ECF 186-2, ¶¶ 37–39; ECF 187-2, ¶ 66; ECF 196-1, ¶¶ 38–39.) Patton's normal parking spot was blocked by law enforcement, and thus the group parked further west on Locust, near Splash restaurant and 5th Avenue, and began walking east along Locust toward the residence. (ECF 198-2, ¶¶ 222, 225–26; ECF 186-2, ¶ 40; ECF 187-2, ¶ 66; ECF 196-1, ¶ 41.)

Plaintiffs assert that there were no crowds in the area at the time, and the City of West Des Moines Defendants, City of Altoona Defendants, and Polk County Defendants agree. (ECF 190-1, ¶ 208; ECF 194-1, ¶ 208.) The City of Des Moines Defendants dispute this, implying that the Patton group itself was a "crowd." (ECF 193, ¶ 208.) The City of Des Moines Defendants appear to admit, however, that there were no <u>other</u> civilians in the immediate vicinity.

In any event, the Patton group walked along Locust Avenue at around 3:20 a.m., which is roughly forty minutes after the unlawful acts on Court Avenue that prompted the large police presence in the area. (ECF 198-2, ¶¶ 134, 139.) As the Patton group was about halfway to Patton's

apartment, a police box-van went by. (Id., ¶ 227; ECF 196-1, ¶ 43.) Someone in the Patton group yelled at the box-van, prompting Des Moines Police Officer Dave Chiodo, who was in the van, to yell for it to stop. (ECF 193, ¶¶ 209–10; ECF 190-1, ¶¶ 209–10.; ECF 194-1, ¶¶ 209–10.)

The parties dispute whether anyone in the Patton group used expletives or obscene gestures. (ECF 198-2, ¶ 230; ECF 186-2, ¶ 41; ECF 187-2, ¶ 68; ECF 196-1, ¶ 44.) It is not disputed, however, that approximately eight officers hopped out of the back of the van, including Des Moines Police Officer Ryan Armstrong, who directed officers to detain all six members of the Patton group. (ECF 198-2, ¶ 227; ECF 193, ¶ 211; ECF 190-1, ¶ 211; ECF 194-1, ¶ 211.) The record shows the following officers participated in the arrests: (1) City of Altoona Officers Tyler Palmer and Tyler Moffatt (ECF 162-2, p. 90); (2) City of West Des Moines Officer Forrester (ECF 170-3, p. 79); (3) Polk County Deputy Nick Smith (ECF 196-1, ¶ 47), and (4) City of Des Moines Officers Holton (ECF 162-2, p. 89), Armstrong (id., p. 85), Jacob Hedlund (id., p. 89), and Chiodo (ECF 170-4, p. 227). Additionally, Officers Todd Wilshusen (Des Moines), Ken Callahan (Polk County), Adam Herman (Des Moines), Myles Schrage (Johnston), Harless (unknown), and Jared Underwood (Des Moines) were present in some capacity. (ECF 193, ¶ 231; ECF 190-1, ¶ 231; ECF 194-1, ¶ 231.)

The City of Des Moines Defendants admit that all six members of the Patton group were arrested despite none of the arresting officers having seen any of them earlier that night. (ECF 193, ¶ 212.) Other Defendants dispute this, asserting that at least one officer believed someone had prior contact with one or more members of the group. (ECF 190-1, ¶ 212; ECF 194-1, ¶ 212.) These Defendants apparently base their position on the following testimony from Officer Armstrong:

> Q.  Who was it that said they interacted with these people?
>
> A.  I don't remember who. I just remember when we had got him out, someone had made the comment, "Hey, you've been told already," something to that effect, like, you know, they had been seen or dealt with earlier. I don't know specifics on that. . . . I knew there was a previous encounter at some point with them.
>
> Q.  What made you think there was a previous encounter?
>
> A.  Based on the reaction of the other officers—I couldn't tell you specifically who, but on that reaction.

(ECF 170-3, pp. 140–41.) Defendants do not otherwise substantiate this testimony in any way. For example, it does not appear that anyone else in the box-van claimed to have told Armstrong that the Patton group had been seen earlier in the evening; to the contrary, again, the City of Des Moines

Defendants admit members of the group had <u>not</u> been seen earlier by the arresting officers. (ECF 193, ¶ 212.) Nor does the extensive video footage from other locations throughout the night capture any of the members of the Patton group at the site of any dispersal orders, although Plaintiff Jacobsen did spend time in bars near 3rd Street and Court Avenue. (ECF 198-2, ¶¶ 208–15.)

The parties agree that officers did not give the members of the Patton group the opportunity to disperse before arresting them; instead, officers told them there already had been repeated dispersal orders in the area and they were being arrested for failure to comply. (ECF 173-2, ¶ 215[29]; ECF 190-1, ¶ 215; ECF 194-1, ¶ 215; ECF 198-2, ¶¶ 233, 238.) The parties further agree that when officers approached, members of the Patton group said they were headed across the street to Patton's home in the Civic Center Apartments. (ECF 185-2, ¶ 69; ECF 186-2, ¶ 44; ECF 187-2, ¶ 72; ECF 196-1, ¶ 48; ECF 198-2, ¶ 235.) From there, disagreements arise as to whether or to what extent officers performed any investigation before making arrests.

Defendants allege that the officers checked IDs of the members of the Patton group, but none of them listed a Civic Center Apartments address. (ECF 185-2, ¶ 70; ECF 186-2, ¶ 45; ECF 187-2, ¶ 73; ECF 196-1, ¶ 48; ECF 198-2, ¶ 236.) Plaintiffs allege that no such investigation occurred, and officers instead "immediately detained" the group while ignoring their pleas that they were simply heading to Patton's apartment. (Id.) In deposition testimony, each member of the Patton group said officers arrested them without investigation:

> Jaquan was yelling out, "We were just walking to our apartment, we're going back to our place, here's the key." Like, "Do you want us to prove to you that he actually lives there? We're about 15, 20 yards away from the apartment." And [the officer] just said, "You guys are lying," and just started accusing us again for stuff we didn't do.

(ECF 170-4, p. 578 (Young Dep.).)

> Like I said, they came running at us with the riot shields and everything. They literally just told us to "turn around and put your hands behind your back."

(Id., p. 595 (Timberlake Dep.).)

> And as soon as they drove past us, they immediately stopped, reversed their car—or their truck and—I mean, what looked like 15 to 20, maybe 10 to 15, I don't know how many officers were there, but a lot of officers got out and came up to us, approached us, kind of pushed us back up onto the wall of

---

[29] Plaintiffs allege the officers did not give the group the opportunity to disperse before detaining them (ECF 173-2, ¶ 215), but the City of Des Moines Defendants' Response to Plaintiffs' Statement of Facts fails to admit or deny this fact (ECF 193). The Court therefore treats the allegation as being undisputed.

Splash and from there just started arresting us. We had no idea why or what was going on.

(Id., p. 480 (Jacobsen Dep.).)

I start to back up, and then they split and then kind of pinch us in together. And from that moment, they push us up against the wall, they're searching us, they're doing all this stuff saying that we were getting charged with failure to disperse and rioting even though there wasn't any type of vandalism, we didn't have on any clothes that looked like they were rioting, nothing like that. So I just—and they didn't ask us to go anywhere. They just came and grabbed us.

(Id., p. 519 (Johnson Dep.).)

We tried to tell them that I live right where I said I lived, and they told me that I was lying. They told us that we were lying and that we weren't going to this apartment. So we tried to say where I lived. Even showed them—I believe showed them my key.

(Id., p. 555 (Patton Dep.).)

Q.  Did anybody say, "We're going to an apartment?" . . .

A.  Jaquan. We all said it actually.

Q.  And what did the police officers say?

A.  They said, "You don't live there."

A.  [Jaquan replied:] "I do live there."

Q.  What happens next?

A.  It just went back and forth of who lives where and where we're from and that we're going to jail."

(Id., p. 499 (Lewis Dep.).)

Patton said officers told the group they "were supposed to be dispersing," but only after the group had already been arrested:

Q.  Among the things that at least some of them were saying that you could make out were "disperse." Is that right?

A.  [T]hey weren't giving us the option to do that. They were basically saying we didn't—from the way we were treated, it was, like, they had already saw us on Court, for example, protesting and they had already told us to disperse and then they arrested us because we hadn't dispersed. So it was more so, like, I don't know, if they were—"Get your hands behind your back. We told you guys to leave." As if we were told to leave. Or "You guys were supposed to be dispersing" as if we knew there had been a disperse order or whatever.

(Id., p. 561.) Lewis recalled officers telling the group to disperse <u>prior</u> to making arrests, but without giving the group an actual opportunity to do so:

> Q. One point of clarification. If I'm paraphrasing your testimony correctly, as the van went by with the police officers, they told you to disperse?
>
> A. Once they hopped out, yes.
>
> Q. They told you to disperse after they hopped out.
>
> A. Yes.
>
> Q. And then what happened right after they told you to disperse?
>
> A. We kept walking. And then they just, like, surrounded us. There was really nowhere to go.
>
> Q. So you're saying that after they got out of the van and told you to disperse, you did not have the opportunity to disperse?
>
> A. Right.

(Id., pp. 507–08.)

For their part, the officers generally agree that the Patton group was immediately detained:

> Q. Who do you remember that was with you when you first went up to that group?
>
> A. Myself, Officer Palmer. Beyond that, I can't specifically recall. I believe Officer Holtan was there as well.
>
> Q. How did this go? Did you go up and immediately detain them, or did you question these five at all before you detained them?
>
> A. To the best of my recollection, they were immediately detained.

(Id., p. 185 (Forrester Dep.).)

> Q. What do you recall about that initial interaction?
>
> A. They were pretty compliant. I remember none of us ran up to them. We all just got out and walked up to them. They all just stopped walking and then they started placing people in handcuffs or zip tie wrist restraints, and that's it. . . .
>
> Q. With the group that got arrested by Splash, was there anything about them that gave you concern that they were starting stuff back up?
>
> A. No.
>
> Q. And when you guys went up to them, did you guys tell them to leave and they, like, didn't or were they pretty much immediately detained?

A.      From what I remember, they were pretty much immediately detained. . . .

Q.      Do you recall whether or not there was any attempt to verify whether those individuals were telling the truth about whether—for example, did you check any IDs or do you recall any of that being done?

A.      I do recall IDs being checked. I didn't physically check anybody's identification, but I do know that they identified everybody and nobody had an address listed at the Civic Center Apartments.

(Id., pp. 251, 253, 255 (Smith Dep.).)

I didn't personally [check IDs]. I know IDs were checked, and none of them matched anywhere. That's kind of a common thing, you know, because it's also a common excuse we run into, "Well, my cousin played there" or "I lived there or there." We check IDs, it doesn't match, and we've even—we didn't in this instance, but you knock on the door, and that's not the case. So they gave us a universal excuse that is very common to give law enforcement when they are someone where they are not supposed to be.

(Id., p. 12 (Armstrong Dep.).)

Q.      How long did you talk to [the Patton group] before having hands on and it being more of a formal detention?

A.      I'd say probably 20 to 30 seconds maybe.

(Id., p. 84 (Hedlund Dep.).)

Both sides point to Patton's arrest report, which was filled out by Forrester, to support their respective positions regarding the extent of any "investigation" before arrests were made:

At approximately 0300 hours, my STAR team element was traveling in our rapid deployment vehicle (RDV) in the 300 block of Locust Street in Des Moines, ensuring the streets were clear of any further rioters, and ensuring the preservation of property to local businesses. We passed a group of several individuals, still on the street who shouted expletives and made gestures towards our vehicle. As officers stopped, the group was advised they had been given orders to disperse and no one was to be on the street. The subjects were stopped, detained, and subsequently arrested.

During this encounter I detained a subject, identified by Iowa driver's license as Jaquan Patton. I patted Patton down for weapons and detained him in flex cuffs. Once the determination from Team Leader Armstrong was made that the group was to be arrested, I searched Patton's person before placing him in the Polk County Sheriff's Office prisoner transport van.

(ECF 160-2, pp. 47–48.) Plaintiffs argue the report shows Patton's ID "was checked simply to identify him for arrest." (ECF 208, ¶ 47; ECF 209, ¶ 51.) Defendants argue it shows members of the Patton group were informed they were in violation of a dispersal order prior to their arrests. (ECF 208, ¶ 45; ECF 209, ¶¶ 49, 60.) Defendants also note that the arrest report identifies Patton's address as 1628 23rd St., Des Moines, which is more than two miles from the Civic Center Apartments. (ECF 160-2, p. 46.)

In any event, setting aside questions regarding the scope of the investigation, it is undisputed that officers put all six members of the Patton group into handcuffs or zip ties. (ECF 193, ¶ 221; ECF 190-1, ¶ 221; ; ECF 194-1, ¶ 221.) Armstrong supervised the arrests. (ECF 193, ¶¶ 228–29; ECF 190-1, ¶¶ 228–29; ECF 194-1, ¶¶ 228–29.) Chiodo did not know if any officer investigated whether the group had heard dispersal orders. (ECF 193, ¶ 226.) Forrester did not know whether anyone in the group had heard dispersal orders or vandalized anything. (ECF 190-1, ¶¶ 245–46.) Armstrong did not try to determine whether anyone in the group heard a dispersal order, but still directed each person to be charged with Failure to Disperse. (ECF 193, ¶¶ 248–49.)

It is undisputed that Defendant Armstrong directed other officers to arrest the six members of the Patton group. (ECF 193, ¶ 211; ECF 190-1, ¶ 211; ECF 194-1, ¶ 211.) Beyond this, the identity of the arresting officer(s) is undisputed as to some Plaintiffs in the Patton group but not others. There is also confusion in the record regarding the involvement of Defendant Jeffrey George. Four members of the Patton group—Plaintiffs Jacobsen, Johnson, Young, and Patton—bring claims of unlawful seizure against George. However, the Court cannot find anything in the record suggesting he was present for the arrests. Instead, it seems clear that George was not even on duty at the time, and instead simply filled out criminal complaints for Jacobsen and Patton (but not Johnson or Young) many hours later. (ECF 162-2, pp. 45–46; ECF 173-1, pp. 473–74.)

As to other officers allegedly involved in the arrests of the Patton group, the Court will summarize the evidence as to each Plaintiff one-at-a-time.

**Plaintiff Lewis.** The parties agree that Hedlund arrested Lewis and Holtan, Wilshusen, and Chiodo all interacted with Lewis in some capacity. (ECF 193, ¶¶ 236–41; ECF 170-4, p. 84 (Hedlund Dep.) ("I believe I placed—who I later identified as Jayvione Lewis, placed him in a set of FlexiCuffs and told him that he was under arrest for the failure to disperse.").) Holtan testified that Lewis was the "first" and "only" person he had contact with among the Patton group, but that "Hedlund was the individual who had immediate contact with [Lewis]." (ECF 193, ¶ 239–40; ECF

173-1, pp. 318–19.) After Lewis had been detained and was standing with Hedlund, Wilshusen helped Hedlund search Lewis. (ECF 193, ¶ 238; Hedlund[30], 2:12–2:34.) The Des Moines Defendants admit Chiodo "assisted in Lewis's arrest" in the sense that Chiodo took possession of Lewis's wallet and firearm. (ECF 193, ¶ 241.)

**Plaintiff Patton**. West Des Moines Officer Forrester arrested Patton. (ECF 190-1, § 244.)

**Plaintiff Timberlake**. Plaintiff Timberlake is unable to say who detained her, placed her in wrist restraints, or escorted her to the prisoner transport vehicle. (ECF 196-1, ¶¶ 49–53.) Timberlake nevertheless asserts that Polk County Deputy Smith was her arresting officer based on his deposition testimony that he "assisted" with the arrest. (ECF 173-2, ¶ 232.) Specifically, it appears to be undisputed that "Smith held onto Ms. Timberlake for three to five minutes after she had already been arrested and restrained by another officer to ensure she did not flee." (ECF 196-1, ¶ 58.) The Polk County Defendants deny that Smith arrested Timberlake, maintaining that his interactions with her were limited to briefly taking custody post-arrest. (ECF 169-2, ¶ 58; ECF 194-1, ¶ 232.)

In his deposition, Smith testified that he assisted in Timberlake's arrest and remembered "holding onto [her] arm so she wouldn't try to go anywhere," although he did not think he placed her in wrist restraints. (ECF 170-4, p. 250.) Plaintiffs admit Smith was not "part of the initial officers who approached the group." (ECF 196-1, ¶ 47.) Smith testified "[t]here were people ahead of me so I think as they approached the initial six, everybody just kind of went down the line and somebody put [Timberlake] in wrist restraints . . . ." (ECF 170-4, p. 251.) It was at that point that Smith "just stepped up and held her arm so she wouldn't try to go anywhere." (Id.) Later in his deposition, Smith again confirmed that he only "approached [Timberlake] for the purpose of just detaining her to make sure she didn't run," and that she was already arrested. (Id., p. 257.)

**Plaintiff Young**. It is unclear who arrested Young, but Plaintiffs allege it was either a City of Des Moines or Metro STAR Officer, which the City of Des Moines Defendants admit. (ECF 193, ¶ 251.)

**Plaintiff Jacobsen**. The parties dispute who arrested Jacobsen, with Plaintiffs alleging it was Altoona Police Officer Palmer, but Palmer disputing this. (ECF 190-1, ¶ 234; ECF 186-2, ¶

---

[30] "Hedlund" refers to Officer Hedlund's body-worn camera, which is found in the record at ECF 170-4, p. 920. The video does not contain a timestamp. The citations are to the minute and second marker of the video, which does not correspond to the time of day.

50.) The City of Altoona Defendants admit Palmer was "present" for the arrests of the Patton group but say he "did not participate in the arrest or detention of anyone in the group." (ECF 190-1, ¶¶ 219, 231.) In her deposition, Jacobsen was unable to say whether Palmer arrested her:

> Q.      Okay. What about Officer Tyler Palmer? Are you familiar with that name?
>
> A.      I do not recall.
>
> Q.      As we sit here today are you claiming that Officer Tyler Palmer participated in your arrest at all?
>
> A.      I do not recall, so no.

(ECF 170-4, p. 485.) Jacobsen later submitted an affidavit for summary judgment purposes stating that after she saw Palmer's photograph, she was able to identify him as the arresting officer. (ECF 186-3, p. 6.) The City of Altoona Defendants urge the Court to reject this "sham affidavit" because it conflicts with Jacobsen's deposition testimony. (ECF 209, ¶ 39.)

Jacobsen supports her identification of Palmer as the arresting officer through footage from Hedlund's body camera, which depicts a bald officer wearing a face mask apparently putting his hands on an arrestee. (Hedlund, 1:06–1:44.) The arrestee is blocked from view, but Jacobsen claims it is her. (Hedlund, 1:06–1:44; ECF 186-1, ¶ 31.) The Altoona Defendants dispute this. (ECF 209, ¶ 31.) The bald officer is, in any event, later seen standing near Jacobsen. (Hedlund, 13:07–13:09.) Armstrong identified this officer as Palmer but acknowledged that he did not "know specifically" who Palmer arrested. (ECF 170-4, pp. 9, 17.) Palmer could not "100 percent say" whether this officer was him, but he also "wouldn't disagree" with it being him and could not think of any other Metro STAR officer that it could be. (ECF 170-4, p. 320.) Jacobsen's arrest report identifies her arresting officer as Officer George, (ECF 162-2, p. 45), although it appears to be undisputed that George was not on duty at the time of the arrest and simply completed paperwork afterward (ECF 173-1, pp. 473–74).

**Plaintiff Johnson**. Plaintiffs allege that Altoona Police Officer Moffatt arrested Johnson, but Moffatt disputes this. (ECF 190-1, ¶ 242.) As with Palmer, the Altoona Defendants admit Moffatt was "present" for the arrests of the Patton group but allege he "did not participate in the arrest or detention of anyone in the group." (Id., ¶¶ 219, 231.) Although Johnson stated in his deposition that he did "not really" know who arrested him, he also described Moffatt as being one of two officers who detained him and put zip ties on his wrists:

> Q.      Do you know who arrested you?

| | |
|---|---|
| A. | Not really. |
| Q. | Do you know who put cuffs on you? Or zip ties? |
| A. | Him [referring to Moffatt] and another guy. There was two guys hugged me. One standing behind me. |
| Q. | So tell me what you know about Moffatt there. What you saw him do, what his role was. |
| A. | He was the one who had my hoodie like this (indicating) as the other one was pushing me up against the window of Splash. |
| Q. | You're sure of that. |
| A. | Or he was the one pushing me up against the window and the other one had my hoodie. |
| Q. | How do you know that that was Moffatt? |
| A. | Because I told you I watched the video. And that's who I saw and I asked his name. |

(ECF 170-4, pp. 520–21.)

Johnson later clarified that the officer who grabbed his hoodie "pulled [him] to the left" while the other officer was "pushing [him] forward" and put zip ties on his hands. (Id., p. 528.) The City of Altoona Defendants admit "Moffatt held Johnson by his clothes, searched him, and escorted him to the paddy wagon." (ECF 208, ¶ 57.) They also admit Hedlund's body-worn-camera footage shows Moffatt standing next to Johnson. (Id., ¶ 32.) They claim, however, that "Moffatt's involvement was limited to assisting other officers and standing with Johnson as he waited for the paddy wagon." (ECF 190-1, ¶ 242.) Hedlund's footage shows Johnson, wearing a yellow jacket, being pushed or held against up against a brick wall by two officers. (Hedlund, 0:52–1:02.) Armstrong identified one of these officers as Moffatt. (ECF 208, ¶ 32.) The video shows a third officer approach Johnson and partially obscure him from view as either Moffatt or the other officer remove Johnson's hat and search him. (Hedlund, 1:02–1:32.)

To cast doubt on Johnson's identification of Moffatt, the City of Altoona Defendants point out that Johnson said he "could only see the face of one of the officers who was behind him while he was being arrested." (ECF 187-2, ¶ 77.) It is clear, however, from the context of Johnson's statement that he was referring to his ability to see officers other than Moffatt and the second officer involved in the arrest:

| | |
|---|---|
| Q. | [C]ould you actually see the faces of the officers that were behind you or were they too far behind? |

A.      I saw the face of one. Like, again, it was like—I may have seen him, I may
        not. Like, I've seen him after the fact, but I know there was one behind me
        that wasn't, like, arresting me but he was holding pepper spray.

(ECF 170-4, p. 528.) The City of Altoona Defendants also note that Johnson's arrest report identifies Chris Colbert as Johnson's arresting officer. (ECF 187-2, ¶ 80.) Plaintiffs admit this but argue "Johnson has no information suggesting that Colbert was present when he was arrested." (Id.) Colbert was not identified by any parties as having been present for the arrests of the members of the Patton group. (ECF 190-1, ¶ 231.) Instead, as with other arrestees, Colbert simply appears to be the officer who completed charging paperwork

Patton, Lewis, Johnson, Timberlake, Jacobsen, and Young were all taken to the Polk County Jail, and charged with participating in a riot, failure to disperse, and 2nd degree criminal mischief. (ECF 198-2, ¶¶ 242–47.) In addition, all but Lewis were charged with unlawful assembly. (Id.) Officer Youngblut seized the cell phones of Patton, Johnson, Lewis, and Young, at the direction of Assistant Des Moines Police Chief Tunks and Major Waymire. (Id., ¶ 248; ECF 193, ¶ 361.) The City of Des Moines Defendants assert, vaguely, that there was a "belief" the phones may contain evidence of unlawful activity. (ECF 198-2, ¶ 248.) Plaintiffs dispute this. (Id.) In any event, on June 1 or 2, 2020, someone contacted Patton, Johnson, and Young to tell them they could retrieve their phones, which were never searched. (Id., ¶ 249; ECF 193, ¶ 384.) Lewis's phone was retained longer because, while arresting him, officers found a firearm in his possession. (ECF 198-2, ¶¶ 250–51.) He was later charged with being a felon in possession. (Id., ¶ 251.)

2.      <u>The Court Grants Summary Judgment in Favor of Patton, Timberlake, Young,
        Jacobsen, Johnson, and Lewis on Count I as to Each Defendant Shown by
        Undisputed Evidence to Have Been Directly Involved in the Arrests and in
        Favor of Defendants Nicolino, George, McTaggart and Bagby.</u>

Unlike many other Plaintiffs, the members of the Patton group were not in the Court Avenue District during events near Hy-Vee at 2:40 a.m. They also were not at the Iowa Capitol Building, near the Police Station, or anywhere else in or near downtown at any point during the night with the partial exception of Plaintiff Jacobsen, who was at bars in the Court Avenue District at some point (but says she never heard any dispersal orders). The arresting officers did not, in any event, know that Jacobsen had ever been downtown, nor did they see any other members of the Patton group anywhere else prior to arresting them. Instead, officers saw the Patton group for the first time roughly forty minutes after police had tamped down activity on Court Avenue and roughly three blocks away from Hy-Vee, as shown here:



Under well-established law, the temporal and geographic distance between the unlawful activity near Hy-Vee at 2:40 a.m. and the encounter with the Patton group at 3:20 a.m. casts serious doubt on whether officers had arguable probable cause to arrest for failure to disperse or any other crime. *See, e.g.*, *Bell v. Neukirch*, 979 F.3d 594, 608–09 (8th Cir. 2020) (denying qualified immunity where officers, *inter alia*, failed to adequately consider time and distance between scene of unlawful activity and suspect's arrest). After all, the crime of failure to disperse requires evidence that the suspect: (1) was in the "immediate vicinity" of a riot or unlawful assembly; (2) was "within hearing distance" of a command to disperse; and (3) "refuse[d] to obey" the command. Iowa Code § 723.3. The mere presence of the Patton group more than two blocks away from Hy-Vee roughly forty minutes after events there ended is not enough to establish arguable probable cause for <u>any</u> of these elements, much less all three. *See, e.g.*, *Small*, 708 F.3d at 1004 (denying qualified immunity where the arrestee was never ordered to disperse and was walking away from the allegedly unlawful group at the time of arrest). Similarly, there was not arguable probable cause to arrest for unlawful assembly without an individualized basis to believe the members of the Patton group had been involved in acts of violence or other riotous behavior. *See* Iowa Code § 723.2; *see also Williams*, 271 N.W.2d at 624, 626 ("[M]ere presence at the scene of a riot is not punishable . . . [T]he impermissible conduct under section 723.1 is violence . . . .").

No arresting officer claims to have seen the members of the Patton group participating in any acts of violence or other unlawful activity. In fact, no arresting officer claims to have seen the Patton group downtown at all at any point during the night prior to the arrests, nor does any officer claim to have given them a dispersal order or heard anyone else give them a dispersal order. Similarly, with two partial exceptions, no officer claims to have been <u>told</u> that any other officer saw the members of the Patton group earlier in the night or gave them a dispersal order. Yet officers arrested them anyway without bothering to ask where they had been, where they were going, or any other questions that might have shed light on whether a crime was committed. Viewing the facts in the light most favorable to Plaintiffs, the arrests were unlawful. *See Small*, 708 F.3d at 1004; *Baude*, 23 F.4th at 1072–73; *Welch*, 51 F.4th at 813.

This conclusion is reinforced by the fact that officers had complete and total control of the streets by the time they encountered the Patton group around 3:20 a.m. There were no other civilians in the area at the time, and there were at least fourteen officers involved in arresting the six Patton group members. Thus, unlike cases like *Bernini*, where officers had no "practical alternative" to making a mass arrest, officers here had plenty of resources to conduct a "reasonably thorough investigation." *See Ross v. City of Jackson*, 897 F.3d 916, 922 (8th Cir. 2018) (quoting *Kuehl*, 173 F.3d at 650). This could have, at minimum, included making some effort to verify whether Patton lived where he said he did. Yet, with one possible exception for which a factual dispute exists, officers conducted no such investigation. They simply made arrests. *See Johnson*, 901 F.3d at 971 ("We have said repeatedly . . . [that] an officer 'cannot avoid minimal further investigation if it would have exonerated the suspect.'" (quoting *Royster v. Nichols*, 698 F.3d 681, 688 (8th Cir. 2012))).

The fact that there were six people in the Patton group does not change the unlawful nature of the arrests. Given the large number of people who live in downtown Des Moines, reasonable officers could not have believed there was probable cause to arrest-on-sight every small group they saw, regardless of their distance from Hy-Vee, the amount of time that had passed since the streets calmed down, or the absence of anyone else in the vicinity. Instead, at minimum, officers needed individualized probable cause to believe each person heard a dispersal order, participated in acts constituting a riot, or otherwise engaged in criminal activity. *See, e.g.*, *Small*, 708 F.3d at 1004; *Welch*, 51 F.4th at 813. They had no such evidence as to the Patton group. *See Small*, 708 F.3d at 1004; *Williams*, 271 N.W.2d at 626 ("[M]ere presence at the scene of a riot is not punishable.").

The fact that one of the members of the Patton group yelled something at the box-van as it drove past also does not establish arguable probable cause for arrest. In fact, if anything, the record suggests that officers did not intend to make the arrests <u>until</u> someone yelled. The First Amendment does not allow officers to make arrests in response to being criticized, and thus a reasonable officer should have known not to use the fact that someone yelled as a factor in determining whether there was probable cause for arrest. *See Hill*, 482 U.S. at 462–63; *Hartman*, 547 U.S. at 256.

There are, to be clear, two factual disputes that, if resolved in Defendants' favor, might provide slightly stronger grounds to justify the arrests of the Patton group. <u>First</u>, Defendant Armstrong claims that when officers engaged the Patton group at approximately 3:20 a.m., an unidentified officer said something to suggest there was a "previous encounter" in which the members of the Patton group were told to disperse. Plaintiffs dispute that any such previous encounter occurred, and Defendants have not identified any officer who claims to have made the statement Armstrong allegedly heard. Nor, for that matter, have Defendants identified anyone beyond Armstrong who even claims to have <u>heard</u> such a statement except Moffatt, whose testimony on the subject is equally vague.

<u>Second</u>, Defendants assert—but Plaintiffs deny—that officers reviewed identifications of the members of the Patton group and did not find anyone whose identification showed an address near the site of the arrests. Plaintiffs assert that Defendants did not check any identifications until after arrests already were made, and, even then, only checked Patton's identification for the sole purpose of confirming his identity. According to Plaintiffs, no one checked identification for the other members of the Patton group, nor did officers listen when Patton showed them his key and offered to prove it would open the door of his nearby residence.

The Court has little difficulty concluding that, when these factual disputes are resolved in Plaintiffs' favor (as they must be for purposes of Defendants' Motion for Summary Judgment), they require denial of qualified immunity as to each Defendant for whom Plaintiffs have established sufficient personal involvement in the arrests. *See, e.g.*, *Small*, 708 F.3d at 1003–04 (denying qualified immunity where undisputed facts failed to show the suspect had been ordered to disperse); *Johnson*, 901 F.3d at 971 (holding that officer cannot avoid minimal further investigation that would have exonerated the suspect). The closer question is whether, when the same factual disputes are resolved in <u>Defendants'</u> favor, they require denial of the Patton group's Motions for Summary Judgment on Count I.

- 98 -

After carefully reviewing the video footage and other available evidence, the Court concludes summary judgment should be granted in favor of each member of the Patton group on Count I as to each Defendant shown by undisputed evidence to have been involved in the arrests. The testimony of Defendants Armstrong and Moffatt about an unidentified officer's statement regarding a "previous encounter" with the members of the Patton group is so vague and unsubstantiated that a reasonable officer, in the moment, should have known not to rely solely upon such a statement—if it was made at all—as a basis for making arrests. Instead, at minimum, other officers should have asked the speaking officer <u>where</u> he or she previously encountered the group and under what circumstances. Defendants point to nothing in the record to suggest any such follow-up discussion occurred, nor, again, was there any exigency that would have made it impractical. Instead, in context, the record shows that arresting officers did not care whether the members of the Patton group had been seen previously. They were going to be arrested, period. This is a violation as a matter of law of the Fourth Amendment rights of each member of the group. *See Webster v. Westlake*, 587 F. Supp. 3d 846, 859 (S.D. Iowa 2021) (granting summary judgment in favor of plaintiffs on illegal seizure claims), *aff'd*, 41 F.4th 1004 (8th Cir. 2022).

As to the issue of Patton's identification, the Court's careful review of the record leaves it convinced there is not a genuine factual dispute. The arresting officers appear to admit, without exception, that they arrested the six members of the Patton group within thirty seconds or so of encountering them and without waiting for the results of any sort of investigation. It follows that officers did not arrest the Patton group <u>because</u> of the mismatching identification; instead, at most, the mismatching identification was something they discovered after the arrests were already made. Any factual dispute about the extent of the "investigation" into mismatching IDs is therefore immaterial. *See, e.g.*, *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) ("Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant."); *Robbins*, 984 F.3d at 680 (rejecting defendants' argument that information learned following plaintiff's arrest could support probable cause determination). Moreover, and in any event, any discrepancy in Patton's address would not have been enough to create arguable probable cause anyway given the frequency with which young adults move residences. If officers felt additional investigation was required before releasing the group, the proper course of action—which Defendant Armstrong admits is sometimes done—would have been to accept Patton's offer to check his key and see if it opened the door to the apartment complex. (*See* ECF 170-4, p. 12.)

Thus, even if the Court constructs a counterfactual scenario in which the address on Patton's driver's license actually mattered to arresting officers, the mismatching address would not have been enough, without more, to establish arguable probable cause.

It bears repeating that there was no exigency here. Officers controlled the streets and outnumbered the Patton group, and there were no other citizens in the vicinity. Thus, there was no legitimate reason for officers to believe they needed to arrest-on-sight without further investigation. *See Small*, 708 F.3d at 1003–04; *Ross*, 897 F.3d at 922; *Quraishi,* 986 F.3d at 836, 839; *Webster*, 587 F. Supp. 3d at 859.

As to individual Plaintiffs and Defendants, the Court concludes that all six Plaintiffs in the Patton group have provided sufficient evidence of the involvement of Defendant Armstrong in their arrests to be entitled to summary judgment as to him, as it appears to be undisputed that he directed the other officers to make the arrests. Thus, summary judgment will be granted in favor of Lewis, Patton, Timberlake, Jacobsen, Johnson, and Young and against Armstrong. *See Webster*, 587 F. Supp. 3d at 859. The Court also grants summary judgment in favor of Lewis as against Defendants Hedlund and Chiodo, as their involvement is undisputed. *See id.* Similarly, the Court grants summary judgment in favor of Patton as against Defendant Forrester, given, again, the absence of any factual dispute as to Forrester's involvement in arresting Patton. *See id.*

Other officer-Defendants attempt to create factual disputes regarding the extent of their involvement in the arrests. The Court concludes, however, that most of these factual disputes are not material. Liability for unlawful arrest attaches not just to the person who puts the handcuffs on the suspect, but also to others for whom sufficient, direct involvement has been shown. *See id.* With that in mind, the Court concludes: (a) Jacobsen has proven the direct involvement of Defendant Palmer and therefore is entitled to summary judgment against him; (b) Johnson has proven the direct involvement of Defendant Moffatt and therefore is entitled to summary judgment against him; and (c) Lewis has proven the direct involvement of Defendants Hedlund, Holtan, and Chiodo and therefore is entitled to summary judgment against them. Summary judgment is denied in both directions as to Defendants Smith and Wilhusen. It is undisputed that Smith ended up taking custody of Plaintiff Timberlake, but Plaintiffs admit he was not part of the first wave of officers to make contact with the Patton group. The Court therefore cannot tell whether Smith knew how weak the evidence was against Timberlake when he took control of her. It is possible he got there late enough to be entitled to assume the other officers had made an appropriate

probable cause inquiry. *See, e.g.*, *White*, 580 U.S. at 80 ("No settled Fourth Amendment principle requires that officer to second-guess the earlier steps already taken by his or her fellow officers in instances like the one [the defendant] confronted here."). Conversely, he might have seen enough to know there was no lawful basis for arrest. Either way, the record does not contain sufficient facts for the Court to decide the issue as a matter of law.

Similarly, with respect to Wilshusen, the Court cannot tell whether he was sufficiently involved in arresting Lewis to be liable as a matter of law. At most, the record simply reflects that he was involved in searching Lewis sometime after the arrest. The Court cannot determine from the limited record whether Wilshusen was present the entire time (in which case he likely would have been sufficiently involved to be liable) or if he arrived on the scene late enough to reasonably assume the other officers had performed their work adequately. *See id.* The Court therefore will deny summary judgment in both directions on Lewis's Count I against Wilhusen.

The Court grants summary judgment in favor of all other Defendants (except Youngblut) on Count I as to the Patton group. Plaintiffs have not offered sufficient evidence of personal involvement by Defendants George and Nicolino, both of whom simply prepared charging paperwork hours after the arrests. Similarly, although Defendants Bagby and McTaggart were slightly closer to the action when they supervised the booking process shortly after the arrests, this is not enough to give rise to a clearly established constitutional obligation requiring them to make sure there was probable cause for arrest. *See Tracy*, 840 F. Supp. 2d at 1190.

One issue remains on Count I as to Plaintiffs Patton, Johnson, Lewis, and Young, all of whom had their cell phones seized by Defendant Youngblut at the Police Station around 4:00 a.m. These Plaintiffs argue that the warrantless seizure of their property violated the Fourth Amendment. The City of Des Moines Defendants, by contrast, argue the phones were "retained by police as there was a belief that it may contain[] evidence related to continuing criminal activity." (ECF 198-2, ¶ 248; ECF 180, pp. 38–39.) They also argue the "brief" seizure was justified by arguable probable cause or, at least, reasonable suspicion.

The Court has already concluded that Patton, Johnson, Lewis, and Young have established sufficient facts to prove they were arrested without arguable probable cause. Youngblut therefore cannot justify the seizure of the phones on that basis. Moreover, as discussed above in connection with Plaintiff Lard, *Robbins* defeats Youngblut's argument that the seizure and retention of cell phones was justified by reasonable suspicion or investigative needs. 984 F.3d at 681. If Youngblut

wanted to hold the phones for twenty-four hours or more, he needed probable cause or a warrant. He had neither. The Court therefore grants summary judgment against Youngblut and in favor of Patton, Johnson, Lewis, and Young on Count I as it relates to the warrantless seizure of the cell phones. *See id.*; *Babcock*, 924 F.3d at 1190.

3. The Court Grants Summary Judgment in Favor of Patton, Timberlake, Young, Jacobsen, Johnson, and Lewis on Count II as to All Defendants Shown by Undisputed Evidence to Have Been Directly Involved in the Arrests and in Favor of Defendants Nicolino and George.

The Court will grant summary judgment for the members of the Patton group and against relevant Defendants on the *Godfrey* claims for the same reasons as the section 1983 claims. Whether the facts are viewed in the light most favorable to Plaintiffs or Defendants, it is clear that the officers who were personally involved in the arrests did not act with "all due care" in making sure there was probable cause. Instead, those officers arrested six people for simply walking down a calm public street toward an apartment after not having been present for any protests or told by any officers to disperse. *See Davis*, 33 F.4th at 1000. No reasonable juror could find the relevant Defendants to have exercised all due care in these circumstances. *See id.*

Specifically, the Court grants summary judgment as follows on Count II:

- in favor of Plaintiff Jacobsen and against Defendants Armstrong and Palmer;

- in favor of Plaintiff Johnson and against Defendants Armstrong and Moffatt, as well as against Youngblut as to the seizure of the cell phone;

- in favor of Plaintiff Lewis and against Defendants Armstrong, Hedlund, Holtan, and Chiodo, as well as against Youngblut as to the seizure of the cell phone;

- in favor of Plaintiff Patton and against Defendants Armstrong and Forrester, as well as against Youngblut as to the seizure of the cell phone;

- in favor of Plaintiff Timberlake and against Defendant Armstrong; and

- in favor of Plaintiff Young and against Defendant Armstrong, as well as against Youngblut as to the seizure of the cell phone.

In three respects, summary judgment is not being granted in favor of the members of the Patton group. First, the Court will not grant summary judgment for either side on Timberlake's claim against Smith given the lack of clarity in the record regarding what Smith knew (or did not know) regarding the absence of probable cause. Second, and similarly, the Court denies summary judgment in both directions as to Lewis's claim against Wilshusen given the lack of clarity in the

record about Wilshusen's involvement. <u>Third</u>, the Court denies summary judgment to both sides on claims against Defendants McTaggart and Bagby, just as it has done with respect to almost all other Plaintiffs' claims against those two officers. Factual disputes must be resolved, and ambiguous facts must be clarified, before the Court can decide whether McTaggart and Bagby acted with "all due care" in keeping the members of the Patton group in custody for alleged crimes the group clearly had not committed. *See Saunders*, 2020 WL 10731253, at *17.

Finally, and conversely, as with the section 1983 claims, the Court grants summary judgment in favor of Defendants George and Nicolino on Count II, as their involvement does not rise to the level for which liability might attach even when the facts are viewed in the light most favorable to Plaintiffs.

As to the alleged unlawful seizure of property, the Court resolves the *Godfrey* claims in the same way that it resolved the section 1983 claims. No reasonable juror could conclude that Defendant Youngblut acted with all due care under Iowa law in retaining cell phones for one or two days without probable cause or a warrant. Indeed, Iowa Supreme Court cases "repeatedly embrace what can only be characterized as a strong warrant preference interpretation of article I, section 8." *Ingram*, 914 N.W.2d at 816. Youngblut had no warrant here, nor has he offered any facts, viewed in light most favorable to him, that would establish an exception. Summary judgment is therefore appropriate in favor of Patton, Johnson, Lewis, and Young on Count II as it relates to Youngblut's warrantless seizure of their cell phones.

4. <u>The Court Grants Summary Judgment for Relevant Defendants on the False Arrest Claims except as to Claims for Punitive Damages against Officers Directly Involved in the Arrests.</u>

The underlying facts are the same for the Patton group's common law false arrest claims as their section 1983 and *Godfrey* claims, and thus the six Plaintiffs in the group have established sufficient facts to prove they were arrested unlawfully. However, because false arrest is a common law claim, the Court must decide whether Defendants are entitled to emergency response immunity under Iowa Code § 670.4(1)(k).

Although the Patton group was arrested forty minutes after officers tamped down activity at Hy-Vee on Court Avenue and more than two blocks away, the Court nonetheless concludes Defendants are entitled to emergency response immunity. In *Adams*, the Iowa Supreme Court held that emergency response immunity is not limited to "actions taken contemporaneously with the emergency; it immunizes actions that are part of the emergency response." 629 N.W.2d at 371.

Thus, *Adams* held that the defendant-city was immune from liability for actions taken by firefighters during salvage and investigative activities after a fire had been extinguished. *Id.*; *see also Seymour*, 519 F.3d at 802 (applying emergency response immunity despite plaintiff's claim that officers had transitioned from responding to a medical emergency to investigating related criminal issues).

Given the passage of time and geographic distance between the emergency at Hy-Vee on Court Avenue at 2:40 a.m. and the arrests of the Patton group on Locust Street at 3:20 a.m., this situation may be nearing the outer limits of emergency response immunity. Nonetheless, following cases like *Adams* and *Seymour*, it remains within those limits. Summary judgment is therefore appropriate in favor of all relevant Defendants on Count VIII and against Plaintiffs Patton, Timberlake, Young, Jacobsen, Johnson, and Lewis, except as to the issue of punitive damages.

On punitive damages, the facts are sufficient, viewed in the light most favorable to Plaintiffs, to allow a reasonable juror to conclude that the officers involved in the arrests acted with actual malice or engaged in willful, wanton, and reckless misconduct when they arrested the members of the Patton group for walking on the sidewalk. The Court therefore denies those Defendants' Motions for Summary Judgment on Count VIII as to punitive damages. Specifically, the Court denies summary judgment as to the following Defendants regarding punitive damages:

- Armstrong and Palmer as to Plaintiff Jacobsen;
- Armstrong and Moffatt as to Plaintiff Johnson;
- Armstrong, Hedlund, Holtan, Chiodo, and Wilhusen as to Plaintiff Lewis;
- Armstrong and Forrester as to Plaintiff Patton;
- Armstrong and Smith as to Plaintiff Timberlake; and
- Armstrong as to Plaintiff Young.

The Court grants summary judgment in favor of all other Defendants on the Patton group's claims for punitive damages, as there is insufficient evidence to create a jury question on actual malice or willful, wanton, and reckless misconduct.

### G. Plaintiffs Cierra Dunn and Trentae Fugate.

#### 1. Facts Specific to Dunn and Fugate.

In the early morning of May 31, Plaintiffs Cierra Dunn and Trentae Fugate drove to the Court Avenue District to visit a friend who was staying at the Savery Hotel. (ECF 198-2, ¶ 163.) Dunn wore a pink cap and dark grey pullover over a white shirt, with dark pants and white shoes;

Fugate wore a dark coat and shirt, jeans, tennis shoes, and an LA Dodgers ballcap backwards. (Id., ¶¶ 165–66.) They parked "catty-corner" from Splash Restaurant on Locust Street (near 5th Street) at approximately 2:54 a.m. (Id., ¶¶ 169–70.) This is two or three blocks north of Hy-Vee.

Dunn was aware of the protests taking place in the evening of May 30 and morning of May 31, but she and Fugate deny taking part in them. (Id., ¶¶ 164, 167.) Neither admits being anywhere else downtown prior to visiting the Savery, although both can be seen earlier in the night in Des Moines Register video footage near the Grand Avenue Bridge. (Id., ¶¶ 163, 168.) The Des Moines Register footage is not time-stamped, but it appears to depict the migration of protesters from the Iowa Capitol Building to the Court Avenue District around midnight. (Id., ¶¶ 87–88.) Dunn and Fugate are seen again on security footage in the Court Avenue District at 1:08 a.m., walking east across 3rd Street near the 3rd and Court Parking Garage. (Dunn Montage[31], 3:40–3:58.) Defendants argue that Dunn and Fugate lied in their deposition testimony when they claimed not to have been downtown.

In any event, after parking on Locust Street just before 3:00 a.m., Dunn and Fugate could see police "were just trying to clear the scene" and that people were dispersing. (ECF 198-2, ¶¶ 170–72.) After they exited their car, Defendant Holtan told them they needed to clear the area. (Id., ¶¶ 174–75, 178.) Dunn said she and Fugate were "just going to our hotel" and later can be seen shouting: "we're walking to our fu**ing hotel!" (Id., ¶¶ 176–77.) Holtan later testified that what drew his attention was that someone in the group was "heckling" officers. (ECF 193, ¶ 259; ECF 190-1, ¶ 259.)

Dunn and Fugate reached the Savery Hotel and went to a hotel room belonging to one of Fugate's friends. (ECF 198-2, ¶ 183.) At 3:29 a.m., Dunn texted Fugate that she wanted to leave. (Id., ¶ 184.) Sometime thereafter, apparently shortly before 4:00 a.m., they left the Savery along with a third person, Colin Vande. (Id., ¶¶ 185–86; ECF 190-1, ¶¶ 268, 274.) The three of them walked toward Dunn's car on Locust Street and were recognized by officers as people who had been told to clear the area. (ECF 198-2, ¶¶ 187–88.) As officers approached, Dunn and Fugate started to get into the car. (ECF 190-1, ¶¶ 271–72, 286; ECF 193, ¶¶ 271–72, 286.) Vande was initially standing near the car, too, but he fled as officers approached and was eventually arrested approximately two blocks away. (ECF 198-2, ¶¶ 192–94; ECF 190-1, ¶¶ 289–90.)

---

[31] The "Dunn Montage" is one continuous video comprised of several shorter video clips showing Dunn and/or Fugate's movements on May 30–31, 2020, in chronological order. It is found in the record at ECF 161-2, p. 141.

The City of Des Moines and City of Altoona Defendants admit that Holtan and Moffatt detained Dunn and Fugate before they were able to get in their car, with Moffatt telling them they were under arrest for "failure to disperse." (ECF 198-2, ¶ 196; ECF 193, ¶ 285; ECF 190-1, ¶ 285.) The record is somewhat unclear on other details. The City of Altoona and City of Des Moines Defendants admit Moffatt detained Fugate and took his gun. (ECF 198-2, ¶ 197; ECF 190-1, ¶ 287; ECF 193, ¶ 287.) The City of Altoona Defendants deny, however, that Officer Palmer arrested Dunn or Fugate or was involved in searching Fugate's person or seizing his firearm. (ECF 186-2, ¶¶ 90, 98–99.) For their part, Plaintiffs agree that Moffatt arrested Fugate and took his gun, but they allege that Palmer also was involved. (ECF 198-2, ¶ 197.)

In contrast, Holtan's supplemental report states that Moffatt detained Dunn (not Fugate), while Palmer located Fugate's firearms. (ECF 162-2, p. 47.) Another Officer, Polk County Deputy Ken Callahan, also was on the scene, having followed Holton to ensure his safety after other officers split off to pursue Vande. (ECF 196-1, ¶ 71.) After reviewing body camera footage, Fugate identifies Callahan as the officer who arrested him. (Id., ¶¶ 72–75.) The City of Altoona Defendants agree, claiming Callahan arrested Fugate and took his handgun. (ECF 186-2, ¶¶ 97, 102.) Callahan denies this, and there is no video of the arrest to confirm either way. (ECF 196-1, ¶¶ 78–79.) Plaintiff settles with asserting that Callahan was "one of" Fugate's arresting officers. (ECF 186-2, ¶¶ 102–03.)

Regardless, an arresting officer found a gun on Fugate's person, but this was not illegal as he had a concealed carry permit. (ECF 198-2, ¶¶ 199, 201; ECF 190-1, ¶¶ 293–94.) Moffatt and other officers, perhaps Holtan, then searched Dunn's vehicle and purse, finding a second handgun owned by Fugate, for which he also had a concealed carry permit. (ECF 198-2, ¶ 198–99; ECF 190-1, ¶¶ 301, 304; ECF 186-2, ¶ 87; ECF 170-4, p. 118; ECF 162-2, p. 51.) Dunn and Fugate were taken to the Polk County Jail. (ECF 170-4, p. 419.) Dunn was charged with 2nd degree criminal mischief and participating in a riot. (ECF 198-2, ¶ 205.) Fugate was charged with the same offenses, plus unlawful assembly and failure to disperse. (Id., ¶ 204.) Fugate's charges were dismissed on July 10, 2020, and August 25, 2020. (ECF 152, ¶¶ 178–81.) In contrast to Fugate, whom the State essentially declined to prosecute, Dunn's charges were not dismissed in full until after she moved, successfully, to suppress evidence obtained by officers during their search of her person. (Id., ¶¶ 176–77, 182–86.) The dismissal of her final charges occurred on October 1, 2020. (Id., ¶ 186.)

<u>The Court Grants Summary Judgment in Favor of All Relevant Defendants on Dunn's and Fugate's Count I.</u>

In arguing that qualified immunity exists, Defendants focus heavily on the fact that Dunn and Fugate were seen on Locust Street within one hour of being directed to disperse by Defendant Holtan. This is enough, Defendants argue, to establish arguable probable cause for arrest for failure to disperse, particularly when coupled with: (a) the apparent falsity of Dunn's earlier statement that they were going to their hotel; and (b) Vande's flight upon seeing police.

The Court agrees. Had law enforcement officers attempted to arrest Dunn and Fugate the first time they saw them, shortly before 3:00 a.m., the Court likely would have denied qualified immunity for the same reasons it has denied qualified immunity as to the unlawful arrest claims by other Plaintiffs. The same is true if officers saw Dunn and Fugate for the first time at 4:00 a.m. and tried to arrest them. But seeing them twice in roughly in an hour is a different story. Moreover, a reasonable officer could have interpreted Dunn's earlier statement about "going to . . . our hotel" as misleading (if not outright false) given her return to the street within an hour. Finally, Vande's flight from police is at least somewhat suggestive that one or more members of the small group did something wrong. *See Wardlow*, 528 U.S. at 124–25. In these circumstances, arresting officers had arguable probable cause to arrest Dunn and Fugate for failure to disperse. All relevant Defendants are therefore entitled to qualified immunity (and summary judgment) on Count I. *See McCabe v. Macaulay*, No. 05-CV-73-LRR, 2008 WL 2980013, at *8 n.8 (N.D. Iowa Aug. 1, 2008) (holding officer who "reasonably believed Plaintiffs had disobeyed a law enforcement officer's order to move . . . had probable cause to arrest Plaintiffs for violating Iowa Code § 723.3"); *see also Shamir v. City of New York*, 804 F.3d 553, 557 (2d Cir. 2015) (holding officer had probable cause to arrest for failure to disperse after ordering someone to disperse but seeing him again approximately thirty minutes later).

To be sure, there are facts that cast doubt on whether Dunn and Fugate committed a crime. For example, Dunn and Fugate argue that they "dispersed" when they went to a hotel room for an hour. This is probably the correct interpretation of Iowa Code § 723.3. But arguably not. Reasonable officers therefore could have believed that Dunn and Fugate violated the dispersal order by returning to the street within thirty to sixty minutes (or, perhaps more precisely, the officers could have believed they never dispersed in the first place). This conclusion is reinforced by Dunn's misleading statement about "going to . . . our hotel" and Vande's flight from police.

The fact that Dunn and Fugate were next to their vehicle at the time of arrest does not change this conclusion. Officers cannot arrest people for violating Iowa Code § 723.3 without first giving them a reasonable opportunity to disperse. Here, however, thirty to sixty minutes passed between the order to disperse and officers seeing Dunn and Fugate on the streets. It was not unreasonable in these circumstances for officers to conclude they had violated Iowa Code § 723.3. The Court therefore grants summary judgment in favor of all relevant Defendants and against Dunn and Fugate on Count I.

3. <u>The Court Grants Summary Judgment in Favor of All Relevant Defendants on Dunn's and Fugate's Count II.</u>

For the same reasons, the Court concludes as a matter of law that officers acted with "all due care" in concluding there was probable cause to arrest Dunn and Fugate for failure to disperse in violation of Iowa Code § 723.3. Officers gave a dispersal order directly to Dunn and Fugate shortly after riotous activity at Hy-Vee, yet Dunn and Fugate were seen on the street again within an hour. This is enough to establish as a matter of law that officers acted with all due care in placing them under arrest. All relevant Defendants are therefore entitled to qualified immunity and summary judgment on Dunn's and Fugate's state law *Godfrey* claims for unlawful seizure.

4. <u>The Court Grants Summary Judgment in Favor of All Relevant Defendants on Dunn's and Fugate's Count VIII.</u>

As with their section 1983 and *Godfrey* claims, the Court concludes summary judgment is appropriate in favor of all relevant Defendants on Dunn's and Fugate's common law false arrest claims. When there is probable cause for arrest—or, more precisely, when an officer reasonably concludes there is probable cause for arrest—a plaintiff necessarily cannot satisfy one of the elements of a false arrest claim. *See Thomas*, 652 N.W.2d at 186. Moreover, and in any event, the relevant Defendants also would be entitled to summary judgment based on emergency response immunity. *See* Iowa Code § 670.4(1)(k). The Court therefore grants summary judgment in favor of all relevant Defendants and against Dunn and Fugate on Count VIII.

## VIII. Legal Background – Excessive Force and Assault and Battery Claims (Counts III, IV, and IX).

*A. Federal Law Excessive Force Claims (Count III).*

"Excessive force claims under the Fourth Amendment are governed by a reasonableness standard." *Baude*, 23 F.4th at 1073 (quoting *White*, 865 F.3d at 1074). "Analyzing 'whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a

careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *White*, 865 F.3d at 1074 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "It is 'clearly established' that the use of more than *de minimis* force [on non-resistant and non-threatening individuals] violates the Fourth Amendment." *Mitchell v. Kirchmeier*, 28 F.4th 888, 898 (8th Cir. 2022). This includes the use of pepper spray. *See Tatum v. Robinson*, 858 F.3d 544, 546, 549–50 (8th Cir. 2017) (holding an officer used unreasonable force when he pepper sprayed an individual who did not promptly obey officer's orders and argued angrily with the officer).

   *B. State Law Excessive Force Claims (Count IV).*

   An arrest violates the Iowa Constitution if performed with excessive or unreasonable force. *State v. Dewitt*, 811 N.W.2d 460, 467 (Iowa 2012), *amended on denial of reh'g* (Apr. 6, 2012). Although the Iowa Supreme Court has not articulated the applicable standard for direct constitutional claims for excessive force, most courts applying Iowa law have concluded it would follow an objective reasonableness test akin to the federal standard. *See Williams*, 516 F. Supp. 3d at 866; *see also McElree v. City of Cedar Rapids*, 983 F.3d 1009, 1015 n.4 (8th Cir. 2020) ("An excessive force claim under the Iowa Constitution is also substantially similar to a claim under the United States Constitution."); *State v. Allen*, No. 06-1770, 2007 WL 2964316, at *2 (Iowa Ct. App. Oct. 12, 2007) ("We use an objective standard to assess an officer's conduct.").

   The Court has not found an Iowa Supreme Court or Court of Appeals case addressing when law enforcement's use of pepper spray or handcuffs becomes excessive, nor have the parties cited to any such case. *See, e.g.*, *Welch v. Dempsey*, No. 420CV00235SMRHCA, 2021 WL 5206138, at *5 (S.D. Iowa Nov. 4, 2021) (noting parties' failure to "apprise[] the Court of authority to support a contrary interpretation of the state constitutional analog" in scenario involving officer use of pepper spray), *aff'd*, 51 F.4th 809 (8th Cir. 2022). The Court therefore will look to federal case law. *See Dewitt*, 811 N.W.2d at 467 (reserving the right to apply a different standard to state constitutional excessive force claims, but "declin[ing] to consider a different state standard under the circumstances and resolv[ing] DeWitt's state and federal unreasonable seizure claims under the existing federal standards"); *see also Allen*, 2007 WL 2964316, at * 2 ("Allen has not argued and we have not discovered a basis to distinguish between the federal and state constitution; therefore, our analysis applies equally to the protections afforded to citizens under both constitutions."). The Court recognizes, in any event, that the Iowa Supreme Court has consistently

held in other contexts that questions of reasonableness are for the jury except in exceptional cases. *See, e.g.*, *Hoyt v. Gutterz Bowl & Lounge L.L.C.*, 829 N.W.2d 772, 780 (Iowa 2013) ("[T]he question of what reasonable care required under these circumstances is for the jury; it is only in exceptional cases that such questions may be decided as matters of law.").

C. *State Law Assault and Battery Claims (Count IX).*

"[A]n assault only occurs if the peace officer does not reasonably believe the particular force was necessary in the circumstances." *Johnson v. Civ. Serv. Comm'n*, 352 N.W.2d 252, 257 (Iowa 1984). The governing standard is derived from Iowa Code § 804.8, which states:

> A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest.

Reasonableness for purposes of § 804.8 is measured by an objective standard. *Chelf v. Civ. Serv. Comm'n*, 515 N.W.2d 353, 355 (Iowa Ct. App. 1994) ("We find the 'reasonableness' inquiry in Iowa Code section 804.8 is an objective standard."); *see also McElree v. City of Cedar Rapids*, 372 F. Supp. 3d 770, 794 (N.D. Iowa 2019), *aff'd by McElree*, 983 F.3d 1009. Therefore, if the officer's conduct was objectively reasonable, the Court must grant summary judgment on the state law assault and battery claims. *See Dooley v. Tharp*, 856 F.3d 1177, 1184 (8th Cir. 2017).

Iowa law does not permit a person to use force to resist an arrest or assist someone else in resisting arrest. Iowa Code §§ 719.1 (prohibiting interference with official acts), 804.12 (prohibiting use of force in resisting arrest). This is true even if the person "believes that the arrest is unlawful or the arrest is in fact unlawful." Iowa Code § 804.12; *see Wilson*, 968 N.W.2d at 918.

As with common law claims for false arrest, the Court concludes that emergency response immunity is available as a defense to common law claims for excessive force under Iowa law. *See* Iowa Code § 670.4(1)(k). Thus, in evaluating the merits of each Plaintiff's claims for assault and battery, the Court will consider whether emergency response immunity applies.

## VIII.  Legal Analysis – Excessive Force and Assault and Battery Claims.

Four of the fourteen Plaintiffs bring claims for excessive force under federal and state law, as well as state law claims for assault and battery: Plaintiffs Woods, Moler, Petefish, and Lard. Woods and Petefish were unable, following discovery, to identify the officers who allegedly used excessive force and thus bring their claims solely against John Doe Defendants as a prerequisite for claims against supervisory and entity defendants. The City of Des Moines Defendants appear to concede that this is proper. (*See* ECF 213, pp. 3–4.) Other federal courts have allowed plaintiffs

to bring claims against John Doe defendants in similar circumstances. *See, e.g.*, *Jackson v. McMahon*, No. 519CV00548SBPVC, 2021 WL 4582096, at *8 (C.D. Cal. Aug. 24, 2021) ("Whether Plaintiff was or was not able to identify John Doe #1 is not directly relevant to whether Sheriff McMahon should be held liable for failure to train."), *report and recommendation adopted*, No. EDCV190548SBPVC, 2021 WL 4317973 (C.D. Cal. Sept. 22, 2021); *Smith v. City of Euclid*, No. 1:11-CV-01208, 2012 WL 2505851, at *2 (N.D. Ohio June 28, 2012) ("The law does not wholly bar Plaintiffs from suing Defendant City for alleged civil rights violations. However, Plaintiffs must link the alleged constitutional violation by Defendant Unnamed Officers to the officially sanctioned or ordered policies and procedures of Defendant City."). The Eighth Circuit has implicitly recognized that plaintiffs may pursue claims against John Doe defendants as a predicate for bringing claims against supervisors or entities. *See Mendoza v. United States Immigr. & Customs Enf't*, 849 F.3d 408, 419–20 (8th Cir. 2017) (evaluating claims against supervisors and entity on the merits even though plaintiff could not identify underlying officers by name).

A. *The Court Denies Summary Judgment as to Defendant John Doe on Woods's Excessive Force Claims but Grants Summary Judgment in John Doe's Favor on Woods's Assault and Battery Claim.*

Woods has presented a compelling case of excessive force against Defendant John Doe. Viewing the facts in the light most favorable to him, Woods has shown that he was pepper-sprayed for doing nothing more than walking down the street and saying "hey" after seeing someone else arrested with what Woods perceived to be excessive force. There is no video footage of this event, but other footage from the same timeframe and vicinity shows some officers using pepper spray on people despite no apparent provocation. For this reason, among others, the Court must assume for present purposes that Woods's rendition of events is true. It follows that the John Doe officer who used pepper spray would not be entitled to qualified immunity under federal law on Woods's section 1983 claim for excessive force. A reasonable officer in John Doe's position could not believe he was in such "immediate danger" that the use of pepper spray was objectively reasonable. *See Mitchell*, 28 F.4th at 898 (holding that it is clearly established that officers may not use more than de minimis force against a non-threatening, non-resisting suspect); *see also* Iowa Code § 719.1(3) ("The terms 'resist' and 'obstruct' . . . do not include verbal harassment unless the verbal harassment is accompanied by a present ability and apparent intent to execute a verbal threat physically."). Similarly, the arresting officer would not be entitled to qualified immunity on

Woods's *Godfrey* claim for excessive force, as an officer who pepper-sprays someone merely for saying "hey" has not acted with "all due care." *See id.*

The problem for Woods is that he cannot identify the officer who sprayed him. The Court therefore simply concludes, as a predicate for evaluating claims against supervisors and entities in later sections of this Order, that Defendant John Doe is not entitled to qualified immunity on Woods's Counts III and IV.

By contrast, the Court grants summary judgment for Defendant John Doe on Woods's Count IX, asserting state law assault and battery claims. Woods has, to be sure, made a strong case that the arresting officer used more force than reasonably necessary "to effect the arrest or to defend any person from bodily harm while making the arrest." Iowa Code § 804.8. The officer did so, however, "in connection with an emergency response." Iowa Code § 670.4(1)(k). Emergency response immunity therefore applies and protects John Doe from liability. *See Cubit*, 677 N.W.2d at 784. The Court also will grant summary judgment on Woods's claims against supervisory and entity Defendants to the extent those claims are premised on assault and battery, as emergency response immunity protects entities and individuals alike. *See* Iowa Code § 670.4(1)(k). Finally, because Woods cannot identify the officer who allegedly used excessive force, the exception to emergency response immunity for punitive damages has no application here. *See* Iowa Code § 670.12 (making punitive damages available against "officers and employees of municipalities").

B. *The Court Grants Summary Judgment in Favor of All Relevant Defendants on Moler's Excessive Force and Assault and Battery Claims.*

Moler's excessive force claim is based on her assertion that officers pulled her from her car in the 3rd and Court Parking Garage and "threw [her] against the back of [the car]" while she "told the officer, like, multiple times . . . 'I'm not resisting.'" (ECF 170-4, p. 613.) She described the experience as painful. (Id.) She also alleges that she was placed in zip ties that were too tight and caused her hands to go numb and turn purple. (Id., p. 614.) An officer eventually cut them off and replaced them as Moler waited to be taken to the Police Station. (Id., pp. 614–15.)

The Court previously concluded that Moler was arrested without arguable probable cause. This does not mean, however, that the force used by officers was automatically excessive. Instead, "the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional." *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017). "An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances. It is not a

claim that an officer used reasonable force after committing a distinct Fourth Amendment violation such as [unlawful arrest]." *Id.*

Although officers were undeniably aggressive, the Court cannot conclude that they acted objectively unreasonably or violated clearly established law when they "threw" Moler against her car and placed her in zip ties as part of arresting her. "Not every push or shove violates the Fourth Amendment." *Robinson v. Hawkins*, 937 F.3d 1128, 1136 (8th Cir. 2019) (cleaned up) (quoting *Graham*, 490 U.S. at 396). "Police officers undoubtedly have a right to use some degree of physical force, or threat thereof, to effect a lawful seizure, and reasonable applications of force may well cause pain or minor injuries with some frequency." *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) (internal citations omitted); *see also Curd v. City Ct. of Judsonia, Ark.*, 141 F.3d 839, 841–42 (8th Cir. 1998) (seizing plaintiff's arm and turning her body was not unreasonable); *Robinson*, 937 F.3d at 1136 (holding it was not clearly established that shoving suspect against trailer was unreasonable).

Moreover, "[w]hile a *de minimis* injury does not preclude a claim of excessive force, the nature of any injuries suffered may still inform our understanding of the force used." *Robinson*, 937 F.3d at 1136. Here, Moler does not allege any injury from being "thr[o]w[n]" against the back of her car beyond stating that it was "painful." This is not enough to indicate a level of force that would violate clearly established law. Similarly, the relatively minor injuries to Moler's hands are like what any suspect who is handcuffed or placed in zip ties might experience. In context, and under binding Eighth Circuit precedent, these injuries are not sufficient to show that officers used an unreasonable level of force in carrying out the arrest. *See id.* (applying qualified immunity despite "some pain and bleeding from the wrists"); *Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003) ("[F]or the application of handcuffs to amount to excessive force there must be something beyond allegations of minor injuries.").

It bears repeating that the Court must evaluate the excessive force claim independently of the claim for unlawful arrest. If, as here, an officer arrests someone without arguable probable cause but effectuates the arrest with a level of force that would be reasonable in the context of a lawful arrest, the officer is liable for illegal seizure but not excessive force. *See Mendez*, 581 U.S. at 428–29. The Court therefore grants summary judgment on qualified immunity grounds in favor of all relevant Defendants on Moler's excessive force claim under section 1983 (Count III).

The Court reaches the same conclusion on Moler's Count IV, which asserts a state law *Godfrey* claim for excessive force. In the context of excessive force, the "all due care" standard under Iowa law appears to be akin to objective reasonableness, although the defendant bears the burden of proof. *See Baldwin I*, 915 N.W.2d at 280. Here, even interpreting the facts in the light most favorable to Moler, a reasonable juror could not conclude officers failed to act with "all due care" when they pushed her against the car and placed her in zip ties. The *Baldwin* standard is less favorable to officers than the applicable standard under section 1983, but not to the degree necessary to change the outcome here.

Finally, for the same reasons, the Court grants summary judgment to all relevant Defendants on Moler's Count IX for assault and battery. *See* Iowa Code § 804.8; *Chelf*, 515 N.W.2d at 355 (applying objective reasonableness standard). The assault and battery claims also would fail based on emergency response immunity. *See* Iowa Code § 670.4(1)(k); *Cubit*, 677 N.W.2d at 784.

>    C. *The Court Denies Summary Judgment as to Defendant John Doe on Petefish's Excessive Force Claims but Grants Summary Judgment in John Doe's Favor on Petefish's Assault and Battery Claim.*

Immediately before his arrest at 2:54 a.m., Plaintiff Petefish stopped and stood on a bench to get a better view of what was happening to the west. (ECF 198-2, ¶ 389.) There were other people in his vicinity, but not next to him, and Defendants admit no one was doing anything threatening or combative. (ECF 193, ¶¶ 143, 144.) Officers approached Petefish and told him to "go home." (ECF 198-2, ¶ 390.) Petefish alleges he immediately started to leave, but saw an individual nearby being pepper sprayed, at which point he stopped and asked the officer "what the fuck did he do wrong?" (Id., ¶ 392; ECF 173-2, ¶ 148.) Petefish was then pepper sprayed, taken to the ground, and handcuffed by unidentified officers. (Id.) Defendants admit Petefish did not resist arrest (ECF 193, ¶ 149) and do not allege that he interfered with the arrest of the other person other than to ask why officers used pepper spray.

Viewing the facts in the light most favorable to him, Petefish has established that the officer violated his clearly established rights by using pepper spray even though Petefish did nothing more than ask why someone else had been sprayed. No reasonable officer could have concluded the use of pepper spray was necessary in these circumstances, whether due to "immediate danger" or for any other reason. *See Mitchell*, 28 F.4th at 898; *Tatum*, 858 F.3d at 550 (describing the use of

pepper spray as "significant force"). Petefish likewise has shown that the officer failed to use "all due care" for purposes of the state law *Godfrey* claim for excessive force.

Nonetheless, like Woods, Petefish cannot identify the officer who sprayed him, and thus his Counts III (section 1983) and IV (*Godfrey*) are solely against Defendant John Doe as a predicate for claims for supervisory and entity liability against other Defendants. The Court will assume, for purposes of evaluating those other claims in later sections of this Order, that Defendant John Doe is not entitled to qualified immunity on Petefish's Counts III and IV.

By contrast, the Court grants summary judgment for Defendant John Doe on Petefish's state law claim for assault and battery (Count IX). The officer's use of pepper spray, though arguably unnecessary and excessive, occurred "in connection with an emergency response," and thus emergency response immunity protects both Defendant John Doe and the upstream supervisors and entities. *See* Iowa Code § 670.4(1)(k); *Cubit*, 677 N.W.2d at 784. Moreover, as punitive damages are available only against individuals, *see* Iowa Code § 670.12, Petefish cannot pursue a claim for punitive damages without knowing the identity of the officer against whom such a claim would proceed.

> D. *The Court Grants Summary Judgment for Some Defendants (but not Others) on Lard's Excessive Force and Assault and Battery Claims.*

The parties sharply dispute the facts surrounding Plaintiff Lard's arrest, which was recorded in part by Officer Valentine's and Officer Gruver's body cameras. Valentine's body camera shows that several officers advanced upon Lard and DeBrossard at the gated entrance to their apartment, which is "tunnel" shaped with walls on either side. (Valentine, 4:55.) When Lard and DeBrossard saw officers approach, they turned to face them but otherwise did not appear to physically react. (Valentine, 4:57.) Lard was grabbed first, DeBrossard second. (Valentine, 4:57–5:01.) It is difficult to see the initial portions of Lard's arrest because officers intervened and blocked Valentine's view. (Valentine, 4:57–5:13.) A few seconds after Lard was grabbed, however, Captain Hardy tried to restrain him from behind with both arms as both men bent forward, in a bear-hug motion. (Valentine, 5:00–5:01; ECF 170-4, p. 782.)

Lard asserts that he had his phone in his hand when officers approached, but he dropped it during the initial confrontation. (ECF 170-4, p. 708.) He testified that he bent down to try to pick it up, which, in context, appears to be why the video shows both he and Hardy bending forward. (Valentine, 5:00–5:01.) The parties also agree Lard was sweaty, making it difficult for Captain Hardy to grab him. (ECF 173-1, p. 384.) While Hardy tried, a second officer (perhaps Valentine)

stepped in to assist by pressing on Lard's upper body. (Valentine, 5:00–5:08.) According to video footage, a scuffle ensued in which an officer said, "take him down, take him down, take down," following which multiple officers came in to assist. (Valentine, 5:08–5:19.)

Approximately twenty seconds later, Lard was still upright. (Valentine, 5:27.) Officer Betts then pepper sprayed him, prompting Lard to scream for help and fall to the ground. (Valentine, 5:27–5:30; ECF 170-2, p. 137.) The fall caused "excruciating" pain to Lard's left shoulder and left knee. (ECF 170-4, pp. 710–11.) Four officers hovered over Lard while he was on the ground, while a fifth stood nearby and a sixth (Valentine) approached. (Valentine, 5:41–5:51.) Officer Egan held Lard's legs together on the ground, while Lard continued to scream for help. (ECF 170-2, p. 143; Valentine, 5:49–6:00.) Several seconds later, an officer said "I got one," apparently in reference to Lard's left arm, which the officer pulled out from under Lard and applied a zip tie. (Valentine, 6:07.) Lard continued to lay face down on the ground, asking for help, while officers worked for approximately one minute to secure zip ties on his other hand. (Valentine, 6:07–7:18.)

Lard asserts that he was hit repeatedly during the encounter and pepper sprayed a second time while he was on the ground. (ECF 170-4, pp. 707–08.) Defendants appear to deny that Lard was pepper sprayed a second time or that officers hit him after he fell to the ground, although they admit some level of physical force was "used to subdue a resistant Lard," and Captain Hardy testified that he recalled a second round of pepper spray after Lard went down. (ECF 173-1, p. 384; ECF 213-1, ¶¶ 62, 65–66.) Defendants also admit that Officer Coughennower (in addition to Officer Betts) pepper sprayed Lard at some point, although it is unclear when. (ECF 193, ¶ 189.) Viewing the facts in the light most favorable to Lard, the Court must conclude for purposes of Defendants' Motions for Summary Judgment that he did not resist arrest and was pepper sprayed twice, once while standing and once after being taken to the ground.

When the facts are resolved in Lard's favor in this manner, the Court cannot conclude that the officers who pepper-sprayed him are entitled to qualified immunity on his section 1983 claim for excessive force (Count III). If Lard did not resist arrest, the first use of pepper spray would have been unreasonable under clearly established law. *See Tatum*, 858 F.3d at 548–49. This is particularly true given the number of officers on the scene. *See Brown v. City of Golden Valley*, 574 F.3d 491, 498 (8th Cir. 2009) (finding force less justified where four officers were present than where only one officer was present). Moreover, even if Lard resisted arrest to a sufficient degree to permit the first use of pepper spray, it would have violated clearly established law for an

officer to pepper spray him a second time while he was on the ground unless he continued to resist arrest, which, again, is the subject of a factual dispute. *See Lambert v. City of Dumas*, 187 F.3d 931, 936 (8th Cir. 1999) (holding that a factual dispute "regarding the amount and degree of force used" precludes summary judgment on qualified immunity grounds). The Court therefore denies qualified immunity as to Defendants Coughennower and Betts, both of whom appear to have sprayed Lard at some point.

By contrast, the Court concludes Defendants Hardy and Egan are entitled to qualified immunity. It is debatable whether they needed to take Lard to the ground in a situation where, viewing the facts in the light most favorable to him, he merely leaned forward at the time of arrest after dropping his phone. In the heat of the moment, however, officers were not required to interpret his ambiguous motion as benign; instead, it was not unreasonable for them to conclude he should be taken down in the interest of officer and community safety. *See Aipperspach v. McInerney*, 766 F.3d 803, 806 (8th Cir. 2014) ("We are hesitant to second-guess the split-second judgments of officers working in tense, uncertain, and rapidly evolving situations." (cleaned up) (quoting *Loch v. City of Litchfield*, 689 F.3d 961, 967 (8th Cir.2012))). Moreover, although Lard alleges that the excessive force continued after he was on the ground, the video shows officers struggling to get control of his arms for the placement of zip ties. The situation may have been somewhat rough, but not to the point where clearly established constitutional lines were crossed. *See Robinson*, 937 F.3d at 1136 ("Not every push or shove violates the Fourth Amendment.") (quoting *Graham*, 490 U.S. at 396). Finally, although Lard alleges "excruciating pain" to his shoulder, he does not appear to have suffered permanent or lasting injuries. This, too, supports the conclusion that Hardy and Egan did not use excessive force. *See id.* ("While a *de minimis* injury does not preclude a claim of excessive force, the nature of any injuries suffered may still inform our understanding of the force used."). Viewing the facts in Lard's favor, the excessive force here was the repeated use of pepper spray, not the takedown. The Court therefore grants summary judgment to Hardy and Egan on Count III.

The Court resolves Lard's *Godfrey* claims for excessive force (Count IV) in the same way as his section 1983 claims. Viewing the facts in Lard's favor, a reasonable juror could conclude that Coughennower and Betts failed to act with "all due care" when each of them pepper sprayed Lard despite the presence of so many other officers and him not resisting arrest. *See McElree*, 983 F.3d at 1015 n.4 ("An excessive force claim under the Iowa Constitution is also substantially

similar to a claim under the United States Constitution."); *Dewitt*, 811 N.W.2d at 467 (resolving state law excessive force claim under federal standard where neither side argued for different standard). The same reasonable juror could not, however, conclude that Hardy and Egan failed to act with "all due care" by taking Lard down in response to Lard's ambiguous movement, particularly where Lard suffered temporary pain but no long-term injury from the encounter. *See id*. The Court therefore grants summary judgment in favor of Hardy and Egan but not Coughennower and Betts on Count IV.

Finally, as it has done repeatedly in this Order, the Court grants summary judgment for all Defendants on Lard's state law assault and battery claims on emergency response immunity grounds. Officers arrested Lard as part of their emergency response to the unlawful activity at Hy-Vee, and thus they are entitled to immunity under Iowa Code § 670.4(1)(k). The only exception is that Coughennower and Betts are not entitled to summary judgment on Lard's claim for punitive damages. A reasonable juror who resolves factual disputes in Lard's favor could conclude that Coughennower and Betts acted with actual malice or engaged in willful, wanton, and reckless misconduct through the unwarranted use of pepper spray. *See* Iowa Code § 670.12.

## X.      Background and Analysis – Malicious Prosecution Claims (Counts VII and XII).

### A.  Federal Law Malicious Prosecution (Count VII).

All fourteen Plaintiffs bring malicious prosecution claims under federal and state law against the City of Des Moines and many individual officers. In their opening Brief, the City of Des Moines Defendants moved for summary judgment on the federal claims on the basis that malicious prosecution is not a viable theory under section 1983 in the Eighth Circuit. *See, e.g.*, *Kurtz v. City of Shrewsbury*, 245 F.3d 753, 758 (8th Cir. 2001) ("[T]his court has uniformly held that malicious prosecution by itself is not punishable under § 1983 because it does not allege a constitutional injury."), *abrogated by Thompson v. Clark*, 142 S. Ct. 1332 (2022).

By the time they filed their Reply, the City of Des Moines Defendants implicitly admitted that *Kurtz* and similar cases have been abrogated. And for good reason: "the Supreme Court recently declared that malicious prosecution is actionable under the Fourth Amendment [in a section 1983 claim]." *Klein v. Steinkamp*, 44 F.4th 1111, 1115 (8th Cir. 2022) (citing *Thompson*, 142 S. Ct. at 1337). Now, a plaintiff may pursue a malicious prosecution claim under section 1983 by satisfying three elements: "(1) the criminal proceeding was instituted without probable cause, (2) the defendant's motive in instituting the proceeding was malicious, and (3) the prosecution

terminated in acquittal or discharge of the accused." *Id.* Historically, American courts have defined "malice" in this context as "without probable cause and for a purpose other than bringing the defendant to justice." *Thompson*, 142 S. Ct. at 1338. The Supreme Court has not decided, however, whether the plaintiff "must establish malice (or some other *mens rea*) in addition to the absence of probable cause." *Id.* at 1338 n.3.

1. <u>The Court Will Assume without Deciding that Plaintiffs Have Shown a Sufficient Impairment of Their Fourth Amendment Rights to Proceed on a Section 1983 Claim Based on Malicious Prosecution.</u>

Because the Eighth Circuit did not recognize federal malicious prosecution claims prior to *Thompson*, it has not yet fleshed out the parameters of such claims. For example, the Eighth Circuit has not decided the connection that must be shown between the malicious prosecution and the plaintiff's Fourth Amendment rights. Other circuits have held, however, that plaintiffs must show their Fourth Amendment rights were impaired in some way that that would not have happened but for the alleged abuse of the legal process. *See, e.g.*, *Jordan v. Town of Waldoboro*, 943 F.3d 532, 545 (1st Cir. 2019) (requiring the plaintiff to prove "a seizure . . . pursuant to legal process unsupported by probable cause"), *abrogated on other grounds by Thompson*, 142 S. Ct. 1332; *Wilkins v. DeReyes*, 528 F.3d 790, 798 (10th Cir. 2008) ("Unlike a false arrest or false imprisonment claim, malicious prosecution concerns detention only after the institution of legal process." (cleaned up) (quoting *Mondragon v. Thompson*, 519 F.3d 1078, 1083 (10th Cir. 2008))), *abrogated on other grounds by Thompson*, 142 S. Ct. 1332. In other words, it is not enough for plaintiffs to show they were prosecuted for a crime for which arguable probable cause was lacking; rather, they also must show that the prosecution impacted their Fourth Amendment liberties. *See, e.g.*, *Sanchez v. Hartley*, 810 F.3d 750, 757 (10th Cir. 2016) (concluding malicious prosecution claim was viable under section 1983 where the plaintiff spent an additional 125 days in jail due to alleged abuses of legal process); *Becker v. Kroll*, 494 F.3d 904, 915–16 (10th Cir. 2007) (dismissing section 1983 malicious prosecution because although charges were allegedly baseless, the plaintiff was never taken into custody).

The Eighth Circuit surely would agree that some level of restriction on a person's liberty is required in a section 1983 claim alleging malicious prosecution, as holding otherwise would be inconsistent with the Supreme Court's conclusion in *Thompson* that the Fourth Amendment is the appropriate vehicle for such claims. A prosecution that does not result in any sort of restrictions on liberty has not impaired Fourth Amendment rights. Even so, other circuits disagree on what

level of restrictions is enough to constitute a Fourth Amendment "seizure," with some concluding pretrial restrictions, the posting of bond, and required court appearances are enough, *see, e.g.*, *Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997), but others requiring arrest or incarceration, *see, e.g.*, *Becker*, 494 F.3d at 915. The situation is even more complicated when, as here, the suspects were already arrested before the conduct giving rise to the malicious prosecution claim. *Compare, e.g.*, *Kingsland v. City of Miami*, 382 F.3d 1220, 1235 (11th Cir. 2004) ("[T]he plaintiff's arrest cannot serve as the predicate deprivation of liberty because it occurred prior to the time of arraignment, and was 'not one that arose from malicious prosecution as opposed to false arrest.'" (quoting *Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000))), *with Gallo v. City of Philadelphia*, 161 F.3d 217, 224 (3d Cir. 1998), (adopting "continuing seizure" theory and holding that pretrial restrictions on travel and compelled appearance at court hearings are enough to state viable malicious prosecution claim under section 1983), *as amended* (Dec. 7, 1998).

The parties' filings do not devote any attention to whether the alleged abuses of legal process here impaired Plaintiffs' Fourth Amendment rights in a way that would give rise to viable section 1983 claims. The Court cannot tell, for example, whether or to what extent the relevant Defendants' conduct caused Plaintiffs to spend additional time in custody beyond what they would have spent simply by virtue of being arrested, nor can the Court tell whether the alleged abuses of legal process otherwise subjected Plaintiffs to restrictions on their liberty. The deficiencies in the record are largely the result of the City of Des Moines Defendants' decision to focus on arguing (incorrectly, as it turns out) that malicious prosecution is not cognizable under section 1983 at all. Beyond this argument, the briefs are perfunctory, and the record is underdeveloped. As Defendants bear the burden of proving undisputed material facts supporting qualified immunity, the Court must conclude they have not satisfied their burden here. *See White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008). The Court instead will assume without deciding that Plaintiffs suffered a sufficient impairment of their Fourth Amendment rights to allow their malicious prosecution claims to proceed under section 1983.

2.  The Court Will Assume Without Deciding that the Federal Malicious Prosecution Claims Are Viable in Other Relevant Respects.

The parties devoted more—but still not much—attention to the related issue of whether a malicious prosecution claim may proceed when officers had arguable probable cause to support the original arrest. Both sides essentially assume that the absence of probable cause is a prerequisite for a malicious prosecution claim. This is consistent with Eighth Circuit precedent post-*Thompson*.

*See Klein*, 44 F.4th at 1115 (requiring, as one of three elements, that "the criminal proceeding was instituted without probable cause"). However, the parties did not address a crucial question: probable cause . . . *as to what*?

In some circuits, probable cause for <u>any</u> crime is enough to defeat a malicious prosecution claim even when other offenses are also charged for which arguable probable cause did not exist. *See Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020). Other circuits disagree and hold that "a defendant initiating criminal proceedings on multiple charges is not necessarily insulated in a malicious prosecution case merely because the prosecution of one of the charges was justified." *See, e.g.*, *Johnson v. Knorr*, 477 F.3d 75, 85 (3d Cir. 2007). The weight of authority appears to agree with *Johnson* in rejecting the so-called "any-crime rule." *See Williams v. Aguirre*, 965 F.3d 1147, 1159 (11th Cir. 2020) (rejecting "any-crime rule" after identifying three other courts that have rejected it versus one that has adopted it). The Eighth Circuit appears not to have decided the issue, and the parties did not give it any attention in their briefs.

Resolution of this issue is immaterial as to the twelve Plaintiffs for whom the Court has concluded—sometimes only when viewing the record in the light most favorable to Plaintiffs— that there was not arguable probable cause for any crime. But it matters for Plaintiffs Dunn and Fugate because the undisputed facts establish arguable probable cause for arrest for failure to disperse but not for participating in a riot or criminal mischief (for which Dunn and Fugate were both charged) or unlawful assembly (for which Fugate also was charged). The viability of the "any-crime rule" is therefore critical to their malicious prosecution claims.

Given the Fourth Amendment underpinnings to a malicious prosecution claim under section 1983, the Court believes the Eighth Circuit would follow the "any-crime rule" if the baseless prosecution did not impact a person's Fourth Amendment rights beyond what the person would have experienced from the prosecution of the crime for which probable cause existed. In other words, the governing question is whether the plaintiff suffered an <u>additional</u> Fourth Amendment injury from the pursuit of the baseless charge. *See Howse*, 953 F.3d at 409 n.3 (affirming summary judgment on malicious prosecution claims where "plaintiff [did] not present[] any evidence that the additional assault charges caused Howse to suffer longer detention"). Here, the record is too sparse to allow the Court to rule as a matter of law. The Court does not know, for example, whether Dunn and Fugate stayed in custody longer—or suffered some other infringement on their liberties—by virtue of being prosecuted for crimes other than failure to disperse. The Court

therefore must conclude that Defendants have not established sufficient predicate facts to warrant summary judgment in their favor.

As to all other Plaintiffs, as the Court already explained, there was not probable cause for <u>any</u> of the charged crimes when the facts are viewed in the light most favorable to Plaintiffs. Thus, the any-crime rule would not affect their malicious prosecution claims even if it is viable.

       3.  <u>The Relevant Defendants Have Not Shown that They Are Entitled to Summary Judgment on Plaintiffs' Federal Malicious Prosecution Claims.</u>

One issue the parties did address in their briefs is whether the absence of probable cause is enough by itself to satisfy the "malice" requirement on a federal malicious prosecution claim or if Plaintiffs must show something more (and, if so, whether they have done enough to survive summary judgment). Even here, however, the City of Des Moines Defendants did not address the issue in their opening Brief and cited solely to a case applying Iowa law in their Reply. The Court is hesitant to grant summary judgment on such a sparse record.

In any event, in *Thompson*, the Supreme Court expressly declined to decide whether malice requires something more than the absence of probable cause in a section 1983 claim. 142 S. Ct. at 1338 n.3. In a subsequent case, however, the Eighth Circuit explained in a slightly-different context that a plaintiff must "show malice—that is, an improper purpose for bringing the action or using the process . . . [and] that the defendant instituted proceedings without reasonable grounds for doing so." *Brown v. Am. Fed'n of State, Cnty. & Mun. Emps., Council No. 5, AFL-CIO*, 41 F.4th 963, 968 (8th Cir.), *cert denied sub nom. Brown v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 5, AFL-CIO*, 143 S. Ct. 491 (2022). The Court interprets *Brown* to mean the absence of probable cause is not enough in and of itself to establish malice. *But see Sykes v. Anderson*, 625 F.3d 294, 309 (6th Cir. 2010) ("In the context of malicious prosecution, the Fourth Amendment violation that generates a § 1983 cause of action obviates the need for demonstrating malice.")

The next question is whether the absence of probable cause is enough to create an <u>inference</u> of malice. Most courts have concluded that it is. *See, e.g.*, *Luke v. Gulley*, 50 F.4th 90, 96–97 (11th Cir. 2022); *Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014) ("Malice may be inferred if a defendant causes the prosecution without arguable probable cause."); *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003) ("A lack of probable cause generally creates an inference of malice."). The Eighth Circuit has not expressly decided the issue under federal law, although it has recognized that under Iowa law malice is not to be inferred from the absence of probable cause. *See Hoffert v. Westendorf*, 854 F. App'x 93, 95 (8th Cir. 2021). However, *Thompson* held that a

malicious prosecution claim under section 1983 must be based on "the most analogous tort as of 1871 when § 1983 was enacted," not subsequent developments in state law. 142 S.Ct. at 1337. By 1871, "proof of the absence of probable cause allowed a jury to infer malice for the common law tort of malicious prosecution." *Luke*, 50 F.4th at 97. The Court therefore concludes that the absence of probable cause is enough to create an inference of malice in a malicious prosecution claim under section 1983 even though the same is not true in a claim under Iowa law. *See id.*

Plaintiffs argue that the inference of malice is enough for them to survive summary judgment, particularly given the perfunctory nature of the briefing by the City of Des Moines Defendants. Plaintiffs also direct the Court's attention to the following: (i) the aggressive manner in which many Plaintiffs were arrested; (ii) Defendants' failure to identify the arresting officers for most Plaintiffs; and (iii) conflicts in the testimony of Defendants vis-à-vis Plaintiffs, which Plaintiffs argue "would allow a jury to infer malice" if the conflicts are resolved in their favor.

The Court has doubts about the relevance of some of these issues. Nonetheless, as with other aspects of the malicious prosecution claims, the record is so underdeveloped that the Court cannot conclude the relevant Defendants have established sufficient undisputed facts to warrant summary judgment on qualified immunity grounds or any other basis. After all, "[t]he party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *White*, 519 F.3d at 813. Here, the record reveals very little about what happened between the night of the arrests and the eventual dismissal of charges as it pertains to the allegations of malicious prosecution. All the record shows is that the charges were filed but later dismissed, usually voluntarily. Similarly, and as explained above, the Court also does not have any enough information about the connection between the allegations of malicious prosecution and whether Plaintiffs suffered a Fourth Amendment injury.

In these circumstances, although the Court has doubts about whether Plaintiffs will be able to prove their malicious prosecution claims once it becomes their burden to do so at trial, the Court cannot conclude at this point that Defendants have met <u>their</u> burden of establishing undisputed facts warranting summary judgment. *See id.*; *Clinton*, 49 F.4th at 1143 (affirming denial of qualified immunity where defendants failed to prove predicate facts). The Court therefore denies summary judgment to all relevant Defendants on Plaintiffs' federal malicious prosecution claims.

*B. The Court Grants Summary Judgment in Favor of All Relevant Defendants on Plaintiffs' State Law Malicious Prosecution Claims (Count XII).*

The outcome is different on Plaintiffs' state law claims for malicious prosecution because Iowa law requires greater proof of malice than federal law. Under state law, the elements of a malicious prosecution claim include: (1) Defendants instigated a prosecution without probable cause; (2) Defendants acted with malice; (3) Plaintiffs were acquitted or discharged; (4) Plaintiffs suffered damage. *Linn v. Montgomery*, 903 N.W.2d 337, 345 (Iowa 2017). "The element of actual malice essential to an action for malicious prosecution involving a defendant who is a public official cannot simply be inferred from a lack of probable cause, but must be the subject of an **affirmative showing** that defendant's instigation of criminal proceedings against plaintiff was [p]rimarily inspired by ill-will, hatred or other wrongful motives." *Vander Linden v. Crews*, 231 N.W.2d 904, 906 (Iowa 1975) (emphasis added).

Viewing the facts in the light most favorable to them, Plaintiffs have not made a sufficient showing of "ill-will, hatred or other wrongful motives" for their prosecution. Instead, at most, the evidence might show "ill-will, hatred or other wrongful motives" at the time of arrest based on the arbitrary nature in which arrests were made and, as to some Plaintiffs, the use of excessive force. But Iowa law already provides causes of action for unlawful arrest and excessive force, and the Court does not interpret malicious prosecution to be redundant to those avenues for relief. Instead, a plaintiff in a malicious prosecution action must make an "affirmative showing" of "ill-will, hatred or other wrongful motives" in connection with the "instigation of criminal proceedings." While the circumstances of arrest might be relevant to the analysis if the arresting officers also were directly involved in instigating criminal proceedings—i.e., filing or pursuing charges—the record here is utterly silent on what the relevant Defendants did or did not do after May 31 in connection with the prosecutions. As far as the Court knows, they did nothing at all, with the charging and dismissal decisions made entirely by supervisors or prosecutors who were not directly involved in the unlawful arrests.

In these circumstances, Plaintiffs have not done enough to satisfy their obligation of making an "affirmative showing" on the issue of malice as it relates to the "instigation of criminal proceedings." The Court therefore grants summary judgment in favor of all relevant Defendants on Plaintiffs' state law claims for malicious prosecution (Count XII). *See Hoffert*, 854 F. App'x at 95 (affirming dismissal of malicious prosecution claim where plaintiff, *inter alia*, "failed to make any non-conclusory allegations indicating that [defendant] acted with the requisite level of

intent"); *Reed v. Linn Cnty.*, 425 N.W.2d 684, 686 (Iowa Ct. App. 1988) (affirming summary judgment for defendants due to lack of evidence to satisfy "affirmative showing that [the defendant's] actions were primarily inspired by ill-will, hatred or other wrongful motive").

## XI.    Background and Analysis – State Law Recklessness Claims (Count X).

Plaintiffs do not resist dismissal of their negligence and gross negligence claims, but they do resist dismissal of their recklessness claims. *See Lukken v. Fleischer*, 962 N.W.2d 71, 81–82 (Iowa 2021) (describing "separate grounds for tort liability" premised on reckless conduct). Plaintiffs do not explain, however, the purpose of the recklessness claims beyond serving as a vehicle for punitive damages. *See* Iowa Code § 670.12 (allowing punitive damages claims against municipal officers or employees when there has been "actual malice" or "willful, wanton and reckless misconduct"). The Court therefore assumes this is the only function the recklessness claims serve. The Court has already evaluated, above, the instances in which the facts are sufficient to allow punitive damages claims to go to the jury. The Court will not evaluate the recklessness claims further. Instead, the Court will grant summary judgment in favor of all Defendants on the recklessness claims except those Defendants identified above for whom the facts are sufficient to give rise to liability for punitive damages under Iowa Code § 670.12.

## XII.   Legal Background – Failure to Train/Supervise (Counts V and VI) and Respondeat Superior (Count XI) Claims.

The final claims for the Court to address are federal and state claims against supervisors and entities. These claims are not based on the supervisors' and entities' direct involvement in Plaintiffs' arrests, but rather on indirect theories of liability including *respondeat superior* (Count XI) and failure to provide adequate training and/or supervision (Counts V and VI).

### A.   Federal Law Failure to Train/Supervise Claims (Count V).

"*Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Instead, plaintiffs seeking to impose liability on a local government entity must "prove that their constitutional rights were violated by an action pursuant to official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law." *Edwards v. City of Florissant*, 58 F.4th 372, 376 (8th Cir. 2023) (cleaned up) (quoting *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998)). "[A]bsent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the City." *Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018).

"Policy and custom are not the same thing." *Corwin*, 829 F.3d at 699–700. "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Id.* (quoting *Mettler*, 165 F.3d at 1204). By contrast, to establish municipal liability through an official "custom," Plaintiffs must show: "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Snider*, 752 F.3d at 1160.

In addition, "[i]n limited circumstances, a local government may be liable for its 'decision not to train certain employees about their legal duty to avoid violating citizens' rights.'" *Folkerts*, 707 F.3d at 982 (quoting *Connick*, 563 U.S. at 61). "The failure to train must rise to 'deliberate indifference' to be actionable." *Id.* "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to show deliberate indifference." *Id.* "It may be, however, that 'evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability.'" *Id.* (quoting *Brown,* 520 U.S. at 409). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

Relatedly, "a supervisor may . . . be liable under section 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." *Jackson,* 747 F.3d at 543. "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." *Id.* (quoting *Bonner*, 552 F.3d at 679). When pursuing supervisor liability on a failure to train or supervise theory, the plaintiff must prove that the supervisor's actions or omissions amounted to deliberate indifference to the likelihood that subordinate officers would violate constitutional rights. *See McGuire v. Cooper*, 952 F.3d 918, 923 (8th Cir. 2020).

*B. State Law Failure to Train/Supervise (Count VI) and Respondeat Superior (Count XI) Claims.*

"Unlike its federal counterparts, a plaintiff alleging a *Godfrey* action under the Iowa Constitution may impose municipal liability under a theory of *respondeat superior*." *Meyer v. Herndon*, 419 F. Supp. 3d 1109, 1134 (S.D. Iowa 2019); *see also Clinton*, 551 F. Supp. 3d at 958. Plaintiffs therefore need not prove an unlawful custom or policy or deliberately indifferent failure to train as against the entity Defendants. *See Meyer*, 419 F. Supp. 3d at 1134. Instead, Plaintiffs simply must prove a *Godfrey* claim against an employee "while the employee is acting within the scope of his or her employment." *Godar v. Edwards*, 588 N.W.2d 701, 705 (Iowa 1999).

Plaintiffs cannot, however, recover against individual supervisors on *Godfrey* claims under principles of *respondeat superior*. *See Clinton*, 551 F. Supp. 3d at 958. Recognizing this, Plaintiffs pursue claims against Defendants Wingert, McTaggart, and Bagby on failure to train and supervise theories. The parties have not presented any authority to indicate that the state standards applicable to these claims are different than the federal standards, and thus the Court will assume without deciding that the federal standards apply. *See Saunders v. Thies*, 38 F.4th 701, 715 (8th Cir. 2022), *cert. denied*, No. 22-6484, 2023 WL 2357359 (U.S. Mar. 6, 2023). Meaning: Plaintiffs must prove the supervisors were deliberately indifferent to the likelihood that subordinate officers would violate constitutional rights. *See McGuire*, 952 F.3d at 923.

## XIII. Legal Analysis – Failure to Train/Supervise (Counts V and VI) and Respondeat Superior (Count XI) Claims.

*A. All Supervisor and Entity Defendants Are Entitled to Summary Judgment on the Federal Law Failure to Train/Supervise Claims.*

In their summary judgment filings, Plaintiffs do not appear to argue that the City of Des Moines or its supervising officers had an unlawful custom or practice regarding illegal seizures or excessive force. The Court therefore will not decide the issue. The Court notes, however, that on the night in question, the ranking Metro STAR officer did not issue an arrest-everyone-in-sight order in the aftermath of the unlawful activity at Hy-Vee around 2:35 a.m. (ECF 193, ¶ 37.) Rather, Lieutenant Schafnitz told officers to arrest "individuals who were engaging in criminal activity or who did not clear the area from the crowd which had been declared an unlawful assembly." (Id.) This was an appropriate directive, and the record shows that many officers in downtown Des Moines appeared to understand it. For example, Plaintiff Moler encountered some officers who asked whether she (or others near her) needed medical attention, as well as others who told her she

was free to leave and that it was safe to do so. Similarly, Plaintiff Klingenberg encountered officers on his way out of the 3rd and Court Parking Garage who did not see fit to arrest him. Thus, although a different subset of officers decided to arrest Moler and Klingenberg without arguable probable cause, this was not a situation in which the City of Des Moines or its senior officers appear to have directed subordinate officials as a matter of custom or policy to make arrests without probable cause or use excessive force. Instead, the unlawful arrests and excessive force were the result of independent decision-making by individual officers.

In any event, Plaintiffs focus their attention on failure to train and supervise theories. They argue that the City's failure to train officers on the offenses of unlawful assembly and failure to disperse resulted in many arrests in the early morning hours of May 31 without probable cause. Plaintiffs further argue that officers used excessive force to such an alarming degree that morning that there must have been a failure to train on that issue as well. Plaintiffs provide many apparent examples of excessive force, including situations in which officers pepper-sprayed or used other forms of force without any apparent provocation.

Plaintiffs essentially admit, as they should, that the protests during the last week of May 2020 were unique in their duration and intensity. This makes it harder for Plaintiffs to establish municipal liability under a failure to train theory, as a "pattern of similar constitutional violations by untrained employees is ordinarily necessary to show deliberate indifference." *Folkerts*, 707 F.3d at 982. Nonetheless, Plaintiffs argue it was "patently obvious" that the failure to train officers on the crimes of failure to disperse and unlawful assembly would lead to a violation of constitutional rights. *See, e.g.*, *Thelma D. By & Through Delores A.*, 934 F.2d at 934.

The Court disagrees. Viewing the record in its entirety, and drawing all reasonable inferences in Plaintiffs' favor, it seems clear that officers largely refrained from making arrests on May 30 and 31 until the very end of the night. For example, it does not appear that officers made significant numbers of arrests in the aftermath of the dispersal orders at the Iowa Capitol Building around 11:15 p.m. or near the Police Station at 12:30 a.m. Instead, it was not until the unrest in the Court Avenue District around 2:30 a.m. that officers swept in and began taking people into custody in large numbers. In these circumstances, Plaintiffs have not shown that it was "patently obvious" the City and its supervising officers needed to provide training on the crimes of failure to disperse and unlawful assembly. Instead, at most, the evidence shows that the City and its supervisors never expected to reach the point of arresting so many people for those offenses at all. The City arguably

should have done a better job of anticipating where things might go, but the record does not allow the Court to conclude, even with inferences drawn in favor of Plaintiffs, that the City was deliberately indifferent to the potential for unconstitutional arrests. *See Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018) (affirming summary judgment on failure to train claim where sheriff lacked sufficient notice of other incidents of misconduct); *Larkin v. St. Louis Hous. Auth. Dev. Corp.*, 355 F.3d 1114, 1118 (8th Cir. 2004) (holding Housing Authority's decision to rely on security guard's licensure training was not so likely to result in a violation of constitutional rights that the need for additional training was patently obvious).

The Court reaches the same conclusion on excessive force. For most of the night, the record shows, at most, only sporadic instances of alleged excessive force. It was only at the very end of the night—shortly after officers thought they were being dismissed, only to be called back unexpectedly due to unrest in the Court Avenue District—that there was a marked increase in improper conduct. Some of the examples captured on video are disturbing, but, in context, the issue does not appear to have been improper training, but rather tired and frustrated officers who let their emotions get the better of them in a difficult situation. This is not enough to allow a reasonable juror to conclude the City of Des Moines or its supervisors were deliberately indifferent in failing to train officers as to the appropriate use of force. *See Patterson v. City of Omaha*, 779 F.3d 795, 799 (8th Cir. 2015) (affirming summary judgment on failure to train claim where, *inter alia*, city maintained "official written policies pertaining to training on excessive force and internal review of incidents involving excessive force"); *Gatlin ex rel. Est. of Gatlin v. Green*, 362 F.3d 1089, 1094–95 (8th Cir. 2004) (affirming summary judgment where, *inter alia*, "no reasonable jury could decide a lack of training in these areas resulted in [plaintiff's injuries]").

Finally, the Court also grants summary judgment to all relevant Defendants on the failure to train or supervise claims relating to malicious prosecution. Plaintiffs have not offered any evidence of a "custom or practice" in the City of Des Moines of charging people with offenses they did not commit, nor have Plaintiffs shown that City supervisors were on notice of improper charging decisions to the degree necessary that the failure to train on that issue (if there was a failure to train at all) amounts to deliberate indifference to constitutional rights.

> B. *The Entity and Supervisory Defendants Are Entitled to Qualified Immunity on the State Law Failure to Train/Supervise Claims.*

Although Plaintiffs pursue state law failure to train/supervise claims against Defendant City of Des Moines, the claims appear to serve little purpose. The City already will be liable under

principles of *respondeat superior* for any *Godfrey* claims proven by Plaintiffs against one of the City's officers if the officer was acting within the scope of his or her employment (which is not a disputed issue here). *See Williams*, 516 F. Supp. 3d at 872–73. Conversely, where Plaintiffs have not survived summary judgment on a *Godfrey* claim against an individual officer, there is no basis for recovery against the City on any theory. *See Dickens v. Associated Anesthesiologists, P.C.*, 709 N.W.2d 122, 125–26 (Iowa 2006) ("[An] employer has no liability unless the employee is liable.") The failure to train/supervise claims against the City of Des Moines therefore cannot result in any additional recovery for Plaintiffs beyond what they already would receive through other claims with less burdensome elements of proof.

The situation is different for Defendants Wingert, McTaggart, and Bagby, all of whom are supervisors in the Des Moines Police Department. These Defendants are not vicariously liable under principles of *respondeat superior* for the conduct of subordinate officers, and thus Plaintiffs must prove either direct liability or failure to train or supervise if they want to recover against them. However, Plaintiffs have not argued that the standards for a failure to train or supervise claim are any different under state law than they are under federal law. "Accordingly, we apply federal law to [Plaintiffs'] claims under the Iowa Constitution." *Saunders*, 38 F.4th at 715. As the Court has already concluded that Plaintiffs cannot survive summary judgment on their section 1983 claims for failure to train and supervise, the Court must likewise grant summary judgment in favor of all relevant Defendants on the same state law claims. *See id.*

C. *The Court Grants in Part and Denies in Part Summary Judgment on the State Law* <u>*Respondeat Superior*</u> *Claims Against the Entity Defendants, Consistent with the Court's Rulings on the Predicate Claims Against Individual Officers.*

Iowa municipalities are subject to *respondeat superior* liability for the torts of their employees, including constitutional torts. *See Meyer*, 419 F. Supp. 3d at 1134; *Williams*, 516 F. Supp. 3d at 872–73; *Baldwin*, 929 N.W.2d at 696; Iowa Code § 670.2(1). "A claim of vicarious liability under the doctrine of *respondeat superior* rests on two elements: proof of an employer/employee relationship, and proof that the injury occurred within the scope of that employment." *Biddle v. Sartori Mem'l Hosp.*, 518 N.W.2d 795, 797 (Iowa 1994). An "employer has no liability unless the employee is liable." *Dickens*, 709 N.W.2d at 125–26. Municipalities are entitled to qualified immunity on *respondeat superior* claims stemming from alleged constitutional violations if their employees exercised "all due care" while engaging in the allegedly tortious activity. *Baldwin*, 929 N.W.2d at 701–02.

1. <u>For All Defendants Except John Does, the Outcome of the *Respondeat Superior* Claims Tracks the Outcome of the Claims Against Individual Defendants.</u>

In most respects, the outcome of Plaintiffs' state law *respondeat superior* claims against the entity Defendants flows directly from the outcome of the state law claims against the individual officer-Defendants. For example, where the Court has granted summary judgment in favor of one or more Plaintiffs against an employee of the City of Des Moines, the Court also grants summary judgment on the *respondeat superior* claim against the City itself. *See Williams*, 516 F. Supp. 3d at 872–73. This is because all entity Defendants admit their respective officers were acting within the scope of employment at the time of the relevant conduct. (*See* ECF 166, p. 27; ECF 167, pp. 27–31; ECF 168, p. 34; ECF 169-1, p. 17; ECF 180, pp. 55–56). *See also Godar*, 588 N.W.2d at 705 ("[A]n act is deemed to be within the scope of one's employment 'where such act is necessary to accomplish the purpose of the employment and is intended for such purpose.'" (quoting *Sandman v. Hagan*, 154 N.W.2d 113, 117 (Iowa 1967))). The same, of course, is also true in the opposite direction: where the Court has granted summary judgment in favor of all individual Defendant-officers on a particular claim, the employing entities are by definition not liable on the *respondeat superior* claim. *See Dickens*, 709 N.W.2d at 125–26. The Court notes, however, that Plaintiffs appear not to have moved for summary judgment on *respondeat superior* claims against any entity other than the City of Des Moines, and thus summary judgment will not be granted against those entities on any claims.

2. <u>The Court Denies the City of Des Moines' Motion for Summary Judgment with Respect to John Doe Defendants.</u>

The analysis is more complicated with respect to the John Doe Defendants. Because Metro STAR is a multi-jurisdictional task force, Plaintiffs cannot say for sure that the John Does are employees of the City of Des Moines, as opposed to Polk County or one of the suburban cities. Nonetheless, Plaintiffs argue that the City of Des Moines is vicariously liable for all Metro STAR officers—including John Doe officers—pursuant to the "borrowed servant doctrine." (ECF 181, pp. 79–81.) The City of Des Moines counters that it cannot be liable for torts committed by officers employed by other entities because "[t]he policies that govern MetroStar officers are the policies of their respective employe[r]s whether they are from a suburb or Polk County." (ECF 213, p. 4.) The City further argues that it cannot be liable for torts committed by "unnamed officers" because "Iowa Code § 670.2 by its language requires an identifiable officer or employee." (Id.) For their part, Polk County and the Cities of Altoona and West Des Moines do not appear to take a position

on the borrowed servant doctrine; instead, they simply assert that employers cannot be liable under *respondeat superior* if the individual officers are not liable. (ECF 166, p. 27; ECF 167, pp. 27–31; ECF 168, p. 34; ECF 169-1, p. 17; ECF 180, pp. 55–56); *see Dickens*, 709 N.W.2d at 125. This is true as far as it goes, but the Court has concluded that Plaintiffs have raised some claims that survive summary judgment or for which summary judgment should be granted in their favor. The same conclusions are appropriate against whichever entity employs the individual officer(s).

Parsing the other arguments, the Court rejects the position that Iowa Code § 670.2 protects the City of Des Moines from liability unless Plaintiffs can identify an underlying officer by name. Section 670.2 allows claims against a municipality for torts committed by "a person who performs services for a municipality," but it does not on its face require a plaintiff to prove the person's name or identity, nor does the City of Des Moines provide authority to suggest it has been interpreted in that way. By contrast, longstanding Iowa law holds that an employee is not a necessary party to a case against the employer: "The right of a damaged or injured third party to sue and hold the employer liable is, in effect, a direct or primary right. The servant is not a necessary party to an action against the master." *Wiedenfeld v. Chicago & N.W. Transp. Co.*, 252 N.W.2d 691, 695 (Iowa 1977) (internal citations omitted); *see also Thorp v. Casey's Gen. Stores, Inc.*, 446 N.W.2d 457, 464 (Iowa 1989) (holding plaintiff "pled a viable cause of action" for *respondeat superior* against the State for alleged negligence by its non-party employee). In fact, in *Dickens*, the Iowa Supreme Court held that a plaintiff's dismissal of an employee from a lawsuit—even with prejudice—does not release an employer from liability unless it was the plaintiff's express intent. 709 N.W.2d at 126–27; *see also Brosamle v. Mapco Gas Prod., Inc.*, 427 N.W.2d 473, 476 (Iowa 1988) (same). Against this legal backdrop, the Court cannot conclude that the Iowa Legislature intended to require a plaintiff to prove the identity of the government official to succeed on a claim under Iowa Code § 670.2.

The question turns, then, to whether the City of Des Moines can be vicariously liable for the acts of John Doe officers even when those officers are potentially employees of other entities. The City of Des Moines admits that the John Doe officers were "performing services for [the City of Des Moines]" (e.g., ECF 193, ¶¶ 86, 89–90, 106–07, 150, 216, 251, 267, 269; ECF 170-4, p. 182), which is arguably enough in and of itself to conclude that vicarious liability exists under the plain language of Iowa Code § 670.2, which makes a municipality liable for torts committed by a

person "performing services for [the municipality]." If more is needed, the Court agrees with Plaintiffs that the borrowed servant doctrine gets them there.

"The employer who temporarily borrows and exercises control over another's employee assumes liability in respondeat superior for the activities of the borrowed employee." *Bride v. Heckart*, 556 N.W.2d 449, 452 (Iowa 1996) (quoting 27 Am. Jur. 2d *Employment Relationship* § 462, at 899 (1996)). To determine whether an employee is "borrowed" by another employer, "the focus is on which employer had control over the employee at the time of the incident causing injury." *Id.* at 453. Control must amount to "more than a right to point out the work to be done." *Id.* Iowa courts also look to whether the parties intended to create a borrowed employee relationship and sometimes to a five-factor test evaluating which party: (1) selects the employee; (2) is responsible for the employee's wages; (3) may discharge the employee; (4) controls the employee's work; and (5) benefits from the work. *Id.* at 453–54.

As applied here, these factors point in favor of concluding that the John Doe officers were "borrowed servants" for the City of Des Moines even if they were employees of other entities. It is undisputed, for example, that the Des Moines Police Department ("DMPD") runs Metro STAR and that DMPD officers—including Schafnitz and Wessels—are the "higher supervisors" who "effectuate" Metro STAR policies. (ECF 193, ¶¶ 388, 391, 393–94.) Furthermore, Metro STAR operates from DMPD facilities, and, because protests were taking place in and around Des Moines on May 30 and 31, Metro STAR officers took orders from DMPD that night. (ECF 193, ¶¶ 393, 399.) Schafnitz picked the Team Leaders, including, *inter alia*, Armstrong. (E.g., ECF 170-4, pp. 28, 170.) Wessels "was in charge of placing people, team leaders and assigning people . . . ." (ECF 173-1, p. 571.) Wellman was the "incident commander" for the protests and had the power to "issue reasonable orders and directives" to Metro STAR teams. (ECF 193, ¶ 397; ECF 173-1, p. 535.) To that end, Wellman was one of the people who decided not to require officers to file use of force reports. (ECF 170-4, p. 76.) Team Leaders relayed his orders to Metro STAR officers, all of whom were required to follow those orders as long as they were "deemed by the Team leader to be safe, within the capabilities of the Team, and within the scope of the mission request." (Id.)

To be sure, non-DMPD officers also were required "to rely on their own department's polices in addition to Metro STAR's procedures." (ECF 170-4, pp. 171, 331.) This meant, for example, that some officers did not wear body cameras because doing so would have conflicted with their employing department's policy relating to "tactical operations." (Id.) The obligation to

follow local policies appears to have arisen, however, only in cases of direct conflict with Metro STAR policies. Otherwise, Metro STAR officers followed DMPD policies, procedures, and orders, including, notably, in each respect giving rise to Plaintiffs' claims. For example, Metro STAR officers followed the orders of DMPD officers when they made arrests: Armstrong was the Team Leader of the Metro STAR team that arrested the Patton Group and ordered officers to arrest the members of the group (ECF 193, ¶¶ 211, 229); Hardy ordered the arrest of Lard and DeBrossard (ECF 198-2, ¶ 417); and Herman and/or Holtan ordered Klingenberg's arrest (ECF 193, ¶ 107). Under the totality of circumstances, the City of Des Moines primarily controlled the work of the Metro STAR officers, regardless of their employing entities.

On the question of party intent, there is little evidence whether Metro STAR officers were intended to be treated as City of Des Moines employees or employees of their "home" jurisdictions. Metro STAR operations were generally governed by the 28E Agreement and MOU, but those documents simply say that Metro STAR team members are considered State employees when on "State" deployment but "are employed by either the City or the County" when on "Local" deployment. (ECF 173-1, pp. 531–32.) Moreover, the Cities of Altoona and West Des Moines are not even named in the 28E Agreement and MOU. (Id., pp. 536, 541.) Thus, while the deployment on May 30 and 31 was presumably a "Local" deployment, the 28E Agreement sheds little light on the parties' intent.

Turning to the remaining factors, the summary judgment record is underdeveloped on how officers are selected for Metro STAR. The 28E Agreement merely states that team members "may be recruited from within [Polk County's or the City of Des Moines's] jurisdiction and from other areas within or outside of the state." (ECF 173-1, p. 533.) Beyond this, it is not clear how officers from Polk County and the Cities of Altoona and West Des Moines became part of Metro STAR. All the same, the evidence that does exist points in favor of the City of Des Moines having control. For example, Schafnitz picked the Metro STAR Team Leaders and Wessels assigned officers to specific Teams on the night in question. This factor therefore weighs in favor of Metro STAR officers being City of Des Moines employees under the borrowed servant doctrine.

The final factors point in the same direction. Although the Metro STAR officers' regular employing departments are responsible for officer wages, those departments "can seek cost reimbursement from the political subdivision" that requested Metro STAR deployment; meaning, here, the City of Des Moines. (ECF 193, ¶ 390; ECF 173-1, p. 534.) Moreover, the City of Des

Moines and Polk County "have sole oversight and responsibility for personnel within the Team, including development of conduct standards and disciplinary procedures." (ECF 173-1, p. 533.) Here, the City of Des Moines exercised control over Metro STAR activities on the night and morning in question and was clearly the primary beneficiary of the officers' work.

In sum, the Court cannot conclude as a matter of law that the City of Des Moines is protected from *respondeat superior* liability for the acts of the John Doe officers even if it turns out that those officers are not City of Des Moines employees. Plaintiffs are therefore allowed to proceed with their "borrowed servant" theory at trial on any claims against John Doe Defendants that have survived summary judgment.

The Court notes, however, that the borrowed servant doctrine may create as many questions for Plaintiffs as it solves. The parties have not explored, for example, why Polk County or the Cities of Altoona and West Des Moines should be liable for the acts of their respective employees under principles of *respondeat superior* if the "borrowed servant" doctrine makes the City of Des Moines liable for everyone's conduct. *See Bride*, 556 N.W.2d at 452 ("The borrowed servant doctrine is significant, in part, because it operates to relieve the general employer from liability."). The parties will need to flesh out issues like this by the time of trial to ensure the jury is properly instructed and avoid double recovery. For now, the Court simply concludes that the City of Des Moines has not established as a matter of law that it is not liable for the conduct of John Doe Defendants.

## XIV. Conclusion.

With fourteen Plaintiffs bringing up to twelve claims each against some combination of fifty-three Defendants, this is a massively complicated case. After independently analyzing the facts and law surrounding each claim by each Plaintiff against each Defendant, the Court has concluded that many survive summary judgment and many others do not. The Court therefore GRANTS IN PART and DENIES IN PART the respective Motions for Summary Judgment filed by Plaintiffs (ECF 173), the City of Des Moines Defendants (ECF 170), the City of Altoona Defendants (ECF 160; ECF 161), the City of West Des Moines Defendants (ECF 160), and the Polk County Defendants (ECF 169).

**IT IS SO ORDERED.**

Dated: April 19, 2023

_____

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE